**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-03501-RBJ

LIBERTY GLOBAL, INC.,

      Plaintiff,

v.

UNITED STATES OF AMERICA,

      Defendant.

---

MOTION FOR SUMMARY JUDGMENT

---

## I.    INTRODUCTION

The primary question in this case is whether Plaintiff ("LGI") is entitled to claim a deduction under section 245A of the Internal Revenue Code.[1] In December 2018, LGI engaged in a transaction involving the sale of a foreign affiliate (the "TGH Transaction"), which caused LGI to recognize income treated as a dividend. Under the plain language of section 245A, LGI was entitled to claim a deduction to offset that income. However, more than five months *after* the TGH Transaction, Treasury promulgated regulations—Temporary Treasury Regulation section 1.245A-5T or the "Temporary Regulations"—that override the plain language of section 245A and retroactively deny the deduction that LGI claimed.

Treasury was not authorized to issue the Temporary Regulations and certainly was not authorized to make those regulations retroactive. Treasury's authority is to enforce the law—not,

---

[1] Unless otherwise indicated, all references to "section" are to the Internal Revenue Code ("Code"), Title 26 of the U.S. Code, or to Title 26 of the Code of Federal Regulations.

as it has done here, to re-write the law according to its own view of appropriate international tax policy. Thus, LGI respectfully asks this Court to declare the Temporary Regulations invalid and to hold that Defendant may not apply those regulations to deny the section 245A deduction that LGI claimed. The Temporary Regulations are invalid for three independent reasons:

*First*, Treasury had no authority to rewrite section 245A by issuing the Temporary Regulations. Agency rulemaking "must always be grounded in a valid grant of authority from Congress" and "must always give effect to the unambiguously expressed intent of Congress." *Marlow v. New Food Guy, Inc.*, 861 F.3d 1157, 1162-63 (10th Cir. 2017) (citations omitted). Here, Congress authorized Treasury only to "carry out" or "enforce" the provisions of section 245A. That mandate does not vest Treasury with the authority to issue regulations that *override* the statute's plain language (as Treasury concedes it has done here).

*Second*, Treasury was not authorized to change the law *retroactively*. Retroactive regulations are strongly disfavored, and agencies may issue retroactive rules only where "that power is conveyed by Congress in express terms." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Congress gave no such authorization here. Indeed, the statute relied upon by Treasury to make the Temporary Regulations retroactive was enacted as part of Congress' intent to *limit* Treasury's retroactive rulemaking.

*Third*, Treasury failed to comply with the APA's notice-and-comment procedures. *See* 5 U.S.C. § 551 *et seq.* Advance notice and a meaningful opportunity to comment are fundamental tenets of administrative law. These requirements are excused only when an agency can show "good cause"—i.e., the rare "necessity or emergency." H.R. Rep. No. 79-1980, at 258 (1946). In other words, Treasury must "show the *impracticability* of affording notice and comment." *U.S.*

*Steel Corp. v. EPA*, 595 F.2d 207, 213 (5th Cir. 1979) (emphasis added). Treasury can make no

such showing here. Treasury had *18 months* from the enactment of section 245A until the

Temporary Regulations were issued to comply with the APA's requirements. Treasury does not

explain—because it cannot—why it was "impracticable" to conduct notice-and-comment within

that 18-month period. Indeed, Treasury publicly announced an intention to issue these

regulations more than 8 months before it finally did so. Yet instead of acting promptly, Treasury

waited to issue the Temporary Regulations and then claimed it had run out of time for notice-

and-comment. That does not create good cause. The law is clear that "the good cause exception

does not apply when an alleged 'emergency' arises as the result of an agency's own delay."

*Env't Def. Fund, Inc. v. Env't Prot. Agency*, 716 F.2d 915, 921 (D.C. Cir. 1983).

Should the Court agree with LGI on any one of those three points, then the Temporary

Regulations cannot be applied to the TGH Transaction and the Court should grant this Motion.

## II.      BACKGROUND

### A.  Taxation of Foreign Earnings and Section 245A

This case involves efforts by the government to tax the earnings of a foreign corporation

with a foreign business—not any income earned in the United States. Subject to targeted

exceptions, the United States does not directly tax foreign earnings of a foreign business. Instead,

the United States historically taxed foreign earnings of a foreign business when those earnings

were distributed as a dividend to the foreign corporation's U.S. shareholders.

The Tax Cuts and Jobs Act of 2017 ("TCJA"), however, scaled back the taxation of

foreign dividends to U.S. corporations. Pub. L. No. 115-97, 131 Stat. 2054 (2017). In particular,

Congress decided to effectively exempt from U.S. tax most dividends paid by foreign

corporations from their foreign earnings.[2] Section 245A was the mechanism to accomplish this exemption. It provides that, a U.S. corporation that receives a dividend from a "specified 10-percent owned foreign corporation . . . *shall be allowed* . . . a deduction [in] an amount equal to the foreign-source portion of [the] dividend." Section 245A(a) (emphasis added). Thus, section 245A permits a deduction to offset foreign dividends received from a foreign corporation so that "these foreign profits do not face additional U.S. taxation as they did under previous law." Pomerleau, *supra* note 2, at 4. For example, if a U.S. corporation receives a $100 dividend of eligible foreign earnings from a foreign corporation, section 245A generally permits the U.S. corporation to claim a $100 deduction to offset the $100 of dividend income on which it would otherwise owe U.S. tax.

When section 245A was enacted, Congress stated its intent that the deduction would be broadly available to U.S. corporations. *See* H.R. Rep. No. 115-466, at 599 (2017) (Conf. Rep.) ("The term 'dividend received' [as used in section 245A] is intended to be interpreted broadly . . . ."). And Congress also broadly defined the categories of income that are eligible for the section 245A deduction beyond formal dividends. In particular, Congress provided that income reported by U.S. taxpayers as a result of sales of foreign corporations with retained earnings must be treated as a dividend eligible for the section 245A deduction to the extent of the

---

[2] Other countries have adopted similar approaches, generally ensuring that "multinational corporations . . . do not face an additional [tax in the country where headquartered] on foreign profits when their foreign subsidiaries pay the profits to them in the form of dividends." Kyle Pomerleau, *A Hybrid Approach: The Treatment of Foreign Profits under the Tax Cuts and Jobs Act*, The Tax Foundation, 3 (May 2018), https://taxfoundation.org/treatment-foreign-profits-tax-cuts-jobs-act/.

subsidiary's earnings, provided applicable conditions are met. *See* sections 1248(j), 964(e)(4).

### B.  The TGH Transaction and the Temporary Regulations

In December 2018, LGI undertook the TGH Transaction, which caused LGI to recognize income treated as a dividend and eligible for an offsetting section 245A deduction.[3] Specifically, LGI was required to include in gross income its share of the gain from the sale of a foreign corporate affiliate (TGH). That income to LGI was attributable to TGH's retained foreign earnings and was treated as a dividend for purposes of section 245A. *See* section 964(e)(4). LGI therefore claimed a section 245A deduction in connection with the TGH Transaction, a result that Treasury admits is proper under "a literal application"—i.e., the plain language—"of section 245A." 84 Fed. Reg. 28,398, 28,400 (June 18, 2019) (the "Preamble").[4]

In June 2019, more than five months after the TGH Transaction, Treasury published the Temporary Regulations. *See* Preamble at 28,398. Without any formal notice or the opportunity for public comment, the Temporary Regulations created complex, extra-statutory rules that *retroactively* disallowed the section 245A deduction in specified circumstances found nowhere in the relevant statutes. In particular, the Temporary Regulations purported to retroactively deny

---

[3] The TGH Transaction is summarized in the Complaint ¶¶ 12-14 (ECF No. 1), and is further described in the "TGH Transaction Step Plan" (ECF No. 29-1).

[4] The Preamble makes clear that Treasury understood that, by statute, the section 245A deduction was available for transactions like the TGH Transaction. Treasury stated that it issued the Temporary Regulations to prevent taxpayers from claiming "the section 245A deduction for earnings generated in the extraordinary disposition [i.e., the TGH Transaction]." Preamble at 28,406. It stated that taxpayers could "engage in the transactions to which these rules relate *with confidence that they achieve the intended tax avoidance results absent the applicability of the regulations*." *Id.* (emphasis added). And Treasury acknowledged that, to accomplish that goal for transactions like the TGH Transaction, it was necessary to "limit[]" the "*literal effect* of section 245A" *Id.* at 28,400 (emphasis added).

a section 245A deduction for transactions like the TGH Transaction. Denying LGI's deduction imposes a retroactive tax on income attributable to foreign earnings that otherwise would have been "exempt" from U.S. tax.

Through the Temporary Regulations, Treasury sought to "address transactions that have the effect of avoiding tax . . . by inappropriately converting income that should have been subject to U.S. tax into nontaxed income." Preamble at 28,398. In particular, Treasury issued several pages of rules that invented two categories of transactions not described in section 245A or any other statute—"extraordinary reduction" and "extraordinary disposition" transactions—and declared that all or a portion of the dividends received in such transactions are "*ineligible*" for the section 245A deduction. *See* Temp. Treas. Reg. § 1.245A-5T(b) (emphasis added).

Shortly after the Temporary Regulations were issued, Treasury received numerous comment letters arguing that the Temporary Regulations were invalid and could not be enforced, raising many of the same concerns as are presented in this Motion. *See, e.g.*, Letter from Stewart Lipeles to David Kautter et al. (Sept. 16, 2019), https://www.regulations.gov/comment/IRS-2019-0027-0010; Letter from Jeffrey Moeller et al. to Charles Rettig (Sept. 16, 2019), https://www.regulations.gov/comment/IRS-2019-0027-0013.

## III.   MATERIAL UNDISPUTED FACTS

There are no disputed facts material to this Motion, which can be decided as a matter of law. The question here is whether the Temporary Regulations are valid, and whether an agency has "authority to promulgate and enforce [] regulations" is a legal question. *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1219 (10th Cir. 2017). The Court "must judge the propriety of [the agency] action solely by the grounds invoked by the agency," *SEC v. Chenery Corp.*, 332 U.S.

194, 196 (1947), and thus must not look beyond the administrative record before the agency when the rule was issued, *Franklin Savings Ass'n v. Director, Office of Thrift Supervision*, 934 F.2d 1127, 1137 (10th Cir. 1991). The basis of Treasury's rulemaking is set forth in the Preamble, and the contents of the relevant administrative record are not in dispute.

## IV.   ARGUMENT

The Temporary Regulations are invalid for three reasons, each of which independently supports a ruling in favor of LGI. *First*, the Temporary Regulations exceed Treasury's rulemaking authority because they rewrite a plain and unambiguous statute. *Second*, even if Treasury had authority to issue the Temporary Regulations, it did not have any express grant of authority required to make those regulations retroactive. *Finally*, even if Treasury had authority to issue the Temporary Regulations and give them retroactive effect, it lacked the "good cause" necessary to excuse its failure to comply with the APA's notice-and-comment requirements.

### A.   The Temporary Regulations Are Invalid Because Treasury Had No Authority to Rewrite Section 245A

Treasury admits that the Temporary Regulations impose rules contrary to the plain, mandatory language of section 245A. As Treasury put it, the "literal application of section 245A"—i.e., its plain language—permits a deduction for LGI. Preamble at 28,400. The Temporary Regulations improperly reverse that result. Congress granted Treasury rulemaking authority only "to carry out the provisions" of section 245A, not the sweeping power to *rewrite* them. *See* section 245A(g).

#### 1.   Congress Mandated the Allowance of LGI's Deduction

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen*, 488 U.S. at 208. The

Tenth Circuit has succinctly summarized this fundamental limit on agency rulemaking:

> Agencies have a limited rulemaking role. "An administrative agency's power to regulate in the public interest *must always be grounded in a valid grant of authority from Congress*." Agencies may "exercise discretion only in the interstices created by statutory silence or ambiguity; *they must always give effect to the unambiguously expressed intent of Congress*."

*Marlow*, 861 F.3d at 1162-63 (emphasis added) (citations omitted). Consistent with these limitations, "[t]he APA directs courts to set aside agency actions that are taken 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.'" *WildEarth Guards. v. U.S. Fish & Wildlife Serv.*, 784 F.3d 677, 683 (10th Cir. 2015) (quoting 5 U.S.C. § 706(2)(C)).

Treasury argues that it was authorized to issue the Temporary Regulations under sections 245A(g) and 7805(a). Preamble at 28,400. Those sections authorize Treasury to "carry out the provisions of [section 245A]" and to issue "regulations for the enforcement of [the Code]." Section 245A(g); section 7805(a). They do not authorize Treasury to promulgate regulations that conflict with section 245A's plain text. A grant of "authority to 'carry out the provisions of'" a statute does not include the power "to render nugatory" the statute's specific provisions. *Allegheny Def. Project v. FERC*, 964 F.3d 1, 16 (D.C. Cir. 2020) (en banc).

The Temporary Regulations directly contravene the provisions of section 245A. In Treasury's words, the regulations create rules "for determining eligibility for the section 245A deduction" for transactions like the TGH Transaction. Preamble at 28,403. Congress, however, answered that eligibility question in the statute—unambiguously and twice over. First, section 245A(a) provides that taxpayers "*shall be allowed* . . . a deduction [in] an amount equal to the foreign-source portion of [the] dividend." (Emphasis added). Second, Congress reaffirmed in section 964(e)(4)(A)(iii) that "the deduction under section 245A(a) *shall be allowable*" with

respect to transactions such as the TGH Transaction. (Emphasis added). Congress' mandatory language commands that the section 245A deduction be allowed and leaves Treasury no room to say otherwise. There is nothing ambiguous about the word "shall," which, as "a basic canon of statutory construction," conveys a mandatory requirement. *United States v. Myers*, 106 F.3d 936, 941 (10th Cir. 1997); *accord, e.g.*, *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016) ("[T]he word 'shall' usually connotes a requirement.").

The Temporary Regulations' admitted conflict with section 245A ends the analysis—Treasury had no authority to override the statute's plain language. Where, as here, Congress has "directly spoken to the precise question at issue" in the statute, the agency must follow that unambiguous direction. *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842 (1984).

### 2. Treasury's Rules Do Not Fill Any "Gaps" or Resolve Any Ambiguities in the Statute

Treasury does not rely on any "gap-filling" authority for the Temporary Regulations and cannot be heard to do so now. Agencies may have authority to regulate when "the statute is silent" or leaves a "gap." *Chevron*, 467 U.S. at 843-44. Such authority arises only when "a 'court, employing traditional tools of statutory construction,' is left with an unresolved ambiguity." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018) (quoting *Chevron*, 467 U.S. at 843 n.9). "[W]hen the Court has spoken of such silences or gaps, it has been considering undefined terms in a statute or a statutory directive to perform a specific task without giving detailed instructions." *Marlow*, 861 F.3d at 1163. But when ordinary canons of statutory construction "supply an answer, '*Chevron* leaves the stage.'" *Epic Sys. Corp.*, 138 S. Ct. at 1630 (citation omitted). Neither agencies nor courts may "disregard [a statute's] plain terms based on some extratextual consideration" or inject ambiguity into a statute where it does not exist.

*Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020).

There is no relevant ambiguity in section 245A. As explained, the statute itself makes clear when deductions "shall be allowed." Section 245A(a); *accord* section 964(e)(4)(A)(iii). Indeed, Treasury *conceded* that the section 245A deduction is permitted for transactions like the TGH Transaction under "a *literal application*"—i.e., the plain language—"of section 245A." Preamble at 28,400 (emphasis added).

Rather, Treasury invented entirely new rules with no statutory basis. Critically, these rules contradict, rather than clarify, the statute. To give one stark example, the Temporary Regulations provide that 50% of dividends received in connection with so-called "extraordinary disposition" transactions are ineligible for the section 245A deduction. Temp. Treas. Reg. § 1.245A-5T(b)(2). But nowhere in any statute is there a concept of a "50% 245A deduction"— either an amount is eligible for the deduction or not.

To be clear, Treasury may have gap-filling authority as to other portions of section 245A. For example, Congress authorized Treasury to issue rules that implement the "hybrid dividend" concept set forth in section 245A(e), which Treasury has done. Treas. Reg. § 1.245A(e)-1 (clarifying the operation of the statutory "hybrid dividend" provision). Similarly, Treasury is permitted to issue rules that clarify the statutory conditions for claiming the section 245A deduction. *See, e.g.*, section 245A(a) (limiting the deduction to "U.S. Shareholder[s]" and "foreign-source portion" of dividend); section 245A(b)(2) (requiring minimum levels of business activity). But that interstitial gap-filling is wholly unlike Treasury's attempt to rewrite section 245A's plain language governing transactions like the TGH Transaction.

3.   **Treasury Is Not Authorized to Implement Its Own Tax Policy in Contravention of Congress' Mandate**

In the face of section 245A's plain language, Treasury searches for rulemaking authority in its own vision of international tax policy and vague notions of statutory purpose unmoored from the legislative text:

> *Based on the structure and history of the international provisions of the Code, including changes made by the [TCJA]*, the Treasury Department and the IRS have concluded that section 245A was not intended to eliminate taxation with respect to the foreign earnings of a CFC that are attributable to income of a type that is subject to taxation under the subpart F or GILTI regimes.

Preamble at 28,400 (emphasis added). Disregarding the statute and resorting to "the structure and history of the international provisions of the [tax] Code" is an admission that Treasury is attempting to rewrite section 245A to suit its own policy ends. But "an agency may not rewrite clear statutory terms [via regulation] to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014); *see also Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002) (holding agency lacked authority to develop guidelines "inconsistent with" an "unambiguous statute" in order "to satisfy the [agency's] policy preferences"). Courts have specifically held that section 7805(a), which Treasury relies upon, does not permit the agency to adopt its own policies by adding extratextual qualifications to an unambiguous statute. *See, e.g.*, *Burks v. United States*, 633 F.3d 347, 358-60 (5th Cir. 2011) (invalidating regulations issued under section 7805(a) that overrode the plain meaning of section 6501(e)(1)(A)); *Pullins v. Comm'r*, 136 T.C. 432, 442 (2011) (invalidating regulations issued under section 7805(a) that added a deadline under section 6015 where the statute imposed no such deadline).

This principle—that grants of rulemaking authority do not permit agencies to create extra-statutory (much less contra-statutory) rules or qualifications—is consistently applied to all

sorts of agency actions. *See, e.g.*, *Brown v. Gardner*, 513 U.S. 115, 116-18 (1994) (holding that a Department of Veteran Affairs regulation, which allowed disability benefits only when the agency was at fault, was invalid because the statute included no fault requirement); *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541 (D.C. Cir. 2020) (invalidating regulations establishing a "pilot program" that capped transaction fees where no statute authorized such a program).

On this point, the Tenth Circuit's decision in *Marlow* is particularly instructive. *Marlow* invalidated Department of Labor ("DOL") regulations purportedly promulgated pursuant to the Fair Labor Standards Act ("FLSA"), which establishes the federal minimum wage. 861 F.3d at 1162, 1164. The FLSA establishes a so-called "tip credit," which allows employers to apply tips paid to the employee towards minimum-wage requirements. *Id.* The FLSA also included a general grant of rulemaking authority to the DOL to issue "necessary rules, regulations, and orders with regard" to the FLSA. *Id.* at 1162. Relying on that grant, DOL issued regulations that mandated that "tips are the property of the employee *whether or not the employer has taken the tip credit*." *Id.* (emphasis added). The Tenth Circuit held that the DOL lacked statutory authority to issue those regulations because they went beyond the scope of the FLSA: "the text [of the FLSA] limits the tip restrictions . . . *to those employers who take the tip credit*, leaving the DOL without authority to regulate to the contrary." *Id.* at 1164 (emphasis added).

The parallels between *Marlow* and this case are striking. As in *Marlow*, Treasury promulgated regulations under grants of rulemaking authority to issue "necessary" rules and regulations. As in *Marlow*, the government cannot point to any statutory language allowing Treasury to regulate "extraordinary reduction" or "extraordinary disposition" transactions. And as in *Marlow*, the Temporary Regulations are not addressed to any statutory gap or specific

interpretive task assigned to Treasury. Thus, as in *Marlow*, LGI is entitled to claim a section 245A deduction under the statute, and Treasury lacks authority to regulate to the contrary.

### B.   The Temporary Regulations Are Invalid Because Treasury Had No Authority to Make Them Retroactive

Even if Congress had authorized Treasury to re-write section 245A—which it did not— the Temporary Regulations are invalid for a separate reason: Treasury lacked the authority to make the regulations retroactive. For a regulation to be retroactive, Congress must expressly authorize it.[5] Congress gave no such authorization here.

"Retroactivity is not favored in the law." *Bowen*, 488 U.S. at 208. The Supreme Court has long held that "a statutory grant of legislative rulemaking authority will not, as a general matter be understood to encompass the power to promulgate retroactive rules *unless that power is conveyed by Congress in express terms*." *Id.* (emphasis added). The decision in *Bowen* illustrates how rigorously this rule is enforced and how "express" Congress must be before an agency can issue retroactive regulations. In *Bowen*, the Secretary of Health and Human Services ("HHS") issued retroactive regulations that set "cost limit rules"—i.e., limits on the amounts that Medicare would reimburse for medical services. *Id.* at 206. Even though Congress had authorized HHS to issue regulations that "provide for the making of suitable *retroactive* corrective adjustments" to Medicare reimbursements, the Court held that Congress had not expressly authorized HHS to make its cost-limit regulations retroactive. *Id.* at 209 (emphasis

---

[5] This presumption against retroactivity applies not just to agency rulemaking, but also to Congress. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994) ("Since the early days of this Court, we have declined to give retroactive effect to statutes burdening private rights unless Congress has made clear its intent.").

added) (citation omitted). Thus, "[e]ven where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant." *Id.* at 208-09; *see also De Niz Robles v. Lynch,* 803 F.3d 1165, 1172 (10th Cir. 2015) (Gorsuch, J.) (holding that a strong "presumption of prospectivity" applies "when [agencies] seek to exercise delegated legislative policymaking authority").

The APA similarly requires that regulations apply only prospectively, with an effective date no earlier than 30 days after the final rules are published. 5 U.S.C. § 553(d); *see also* 5 U.S.C. § 551(4) (defining a "rule" to have only "*future effect*" (emphasis added)). And consistent with *Bowen*, the APA's prohibition against retroactive legislative rulemaking may only be set aside by Congress "expressly." 5 U.S.C. § 559.

Treasury cites a single provision as authority to make the Temporary Regulations retroactive: section 7805(b)(2). But as explained below, that provision is a *limitation* on Treasury's retroactive rulemaking authority, not the "express" *authorization* that *Bowen* and the APA require.

To understand the operation of section 7805(b)(2), it is necessary to consider the history of Treasury's rulemaking authority. Prior to 1996, Congress allowed Treasury to determine when its regulations "shall be applied *without* retroactive effect" (reflecting the assumption that such regulations would normally be applied *with* retroactive effect). H.R. Rep. No. 104-506, at 44 (1996) (emphasis added).[6] In 1996, Congress expressed concern about Treasury's ability to

_____

[6] This unique authorization for retroactive rulemaking authority was consistent with a broader view prevailing at the time that Treasury was not required to comply with the APA when issuing most Treasury regulations—a view since rejected by the Supreme Court. *Mayo Found. for Med.*

change the rules after-the-fact, noting that "it is generally inappropriate for Treasury to issue retroactive regulations." *Id.* Acting on this concern, Congress passed the "Taxpayer Bill of Rights 2," which amended Treasury's rulemaking authority and included current section 7805(b). Pub. L. No. 104-168, § 1101, 110 Stat. 1452, 1468 (1996).

Current sections 7805(b)(1)-(2) do not authorize retroactive rulemaking. Instead, consistent with Congress' intent in passing the Taxpayer Bill of Rights 2, those provisions *limit* Treasury's authority to issue retroactive rules. Section 7805(b)(1) provides, in short, that regulations cannot be effective prior to the agency giving certain forms of notice to taxpayers under any circumstances other than those specifically enumerated elsewhere in section 7805(b). Section 7805(b)(1) thus provides no *grant* of rulemaking authority whatsoever—certainly not the "express" grant demanded by *Bowen* and the APA.

And section 7805(b)(2), on which Treasury relies in this case, likewise contains no grant of rulemaking authority. It provides only that 7805(b)(1) "shall not apply to regulations filed or issued within 18 months of the date of the enactment of the statutory provision to which the regulation relates." Plainly read, section 7805(b)(2) does not *authorize* any rulemaking—instead, it removes the limitation imposed by section 7805(b)(1) (which similarly does not authorize any rulemaking). Thus, even for regulations issued within 18 months of a related statute's enactment, Treasury must still point to an express authorization elsewhere in the Code to make those regulations retroactive.

To be sure, Congress has elsewhere *expressly* authorized Treasury to issue retroactive

---

*Educ. & Rsch. v. United States*, 562 U.S. 44, 55 (2011) ("[W]e are not inclined to carve out an approach to administrative review good for tax law only.").

regulations in compliance with *Bowen* and the APA. For example, the subsection immediately after section 7805(b)(2)—also passed as part of the Taxpayer Bill of Rights 2—provides that Treasury "may provide that any regulation[s] may take effect or apply retroactively to prevent abuse." Section 7805(b)(3). Congress made similar express grants of retroactive rulemaking authority in sections 7805(b)(4), (b)(5), and (b)(7).[7] But Treasury did not rely on any of these express grants of authority when it issued the Temporary Regulations and cannot be heard to do so now. *See Chenery*, 332 U.S. at 196.

This history and statutory construction demonstrate that when Congress intends to grant Treasury retroactive rulemaking authority, it does so expressly and in compliance with *Bowen* and the APA. The only provision relied upon by Treasury to make the Temporary Regulations retroactive—section 7805(b)(2)—contains no such authorization. Thus, the Temporary Regulations, even if otherwise valid, cannot be applied retroactively to the TGH Transaction.

### C.  The Temporary Regulations Are Invalid Because Treasury Failed to Comply with the APA's Notice-and-Comment Requirements

The Temporary Regulations are invalid for yet a third reason: Treasury failed to comply with the APA's requirement that agencies give notice of proposed legislative rules and provide an opportunity for public comment before they become effective ("Pre-Promulgation Notice-and-Comment"). 5 U.S.C. § 553(b), (c); *see also* Preamble at 28,405 (stating that the Temporary

---

[7] Congress has made other express grants of retroactive rulemaking authority for Treasury. *See* Community Renewal Tax Relief Act of 2000, Pub. L. 106-554, § 309(d), 114 Stat. 2763A-587, 638 (2000) (expressly authorizing Treasury to adopt certain basis-reduction regulations with retroactive application to any "assumptions of liability after October 18, 1999"); *cf.* section 9833 (overriding the APA and expressly authorizing Treasury to issue "any interim final rules as the Secretary determines are appropriate to carry out [chapter 100 of the Code]").

Regulations were issued "without prior notice and the opportunity for public comment.").[8]

Treasury had no excuse for its failure to comply with Pre-Promulgation Notice-and-Comment. Under its view that section 7805(b)(2) permitted retroactive rulemaking, Treasury had a full 18 months to issue the Temporary Regulations. That was more than enough time to first issue proposed regulations, solicit and consider public comments, and then issue final regulations. Treasury's failure to do so renders the Temporary Regulations invalid. *See, e.g.*, *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 115 (D.C. Cir. 2021) (vacating a legislative rule issued without notice-and-comment); *N. Am. Coal Corp. v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 854 F.2d 386, 388 (10th Cir. 1988) (recognizing the "fundamental law that a rule promulgated by a federal agency is not valid unless adopted in substantial compliance with the requirements of the APA").

### 1. Treasury Was Required to Allow Pre-Promulgation Notice-and-Comment

The APA was enacted "to afford parties affected by administrative [rulemaking] a means of knowing what their rights are and how they may be protected." S. Rep. No. 79-752, 1st Sess., at 193 (1945). "Notice and comment gives affected parties fair warning of potential changes in the law and an opportunity to be heard on those changes—and it affords the agency a chance to avoid errors and make a more informed decision." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1816 (2019). The notice-and-comment process is not a mere formality: it is a meaningful process

---

[8] There is no debate that the Temporary Regulations are legislative regulations—i.e., regulations "that an agency promulgates with the 'intent to exercise' its 'delegated legislative power' by speaking with the force of law." *NRDC v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020) (citations omitted). Treasury concedes that it was thus required to comply with the APA in issuing the Temporary Regulations. *See* Preamble at 28,405.

that ensures that (1) agency rulemaking is informed and rational, and (2) interested parties are given advance notice of proposed rules and afforded an opportunity to participate in the rulemaking process. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979).

Treasury must follow APA rulemaking procedures just like any other agency. *See Mayo Found.*, 562 U.S. at 55. While Treasury has previously claimed that temporary regulations are exempt from the APA's rulemaking requirements, that argument has no statutory basis and has been rejected. *Chamber of Commerce v. Internal Revenue Serv.*, 2017 WL 4682049, at *7 (W.D. Tex. Sept. 29, 2017) (holding that the "the temporary nature of the Rule does not excuse the Agencies from the notice-and-comment procedure required by the APA"); *cf. Intermountain Ins. Serv. of Vail LLC v. Comm'r*, 134 T.C. 211, 245 (2010) (Halpern & Holmes, JJ., concurring) ("nothing in the text of [section 7805(e)] suggests that the notice-and-comment requirement has been waived, nor does the legislative history state that it has"). Thus, Treasury has now conceded that it must comply with the APA when issuing temporary regulations. *Policy Statement on the Tax Regulatory Process*, Department of the Treasury, 2 (Mar. 5, 2019), https://home.treasury.gov/system/files/131/Policy-Statement-on-the-Tax-Regulatory-Process.pdf.

### 2. Treasury Cannot Meet the Stringent Requirements to Invoke the Good Cause Exception

Treasury asserts that it was not required to allow for Pre-Promulgation Notice-and-Comment because it had "good cause" within the meaning of 5 U.S.C. § 553(b)(3)(B) and (d)(3) (the "Good Cause Exception"). Preamble at 28,405.

As Congress said at the time the APA was enacted, the Good Cause Exception is not an "escape clause": an agency invoking it must publish a "true and supported or supportable finding of *necessity or emergency*." H.R. Rep. No. 79-1980, at 258 (1946) (emphasis added). Consistent

with Congress's intent, the Tenth Circuit has held that the Good Cause Exception "is essentially

an emergency procedure," to be "used *where delay would do real harm.*" *N. Am. Coal Corp.*, 854

F.2d at 389. "Good cause" is most commonly found in situations where there is a specific and

immediate threat to life, property, or public safety. *See, e.g.*, *Jifry v. FAA*, 370 F.3d 1174, 1179

(D.C. Cir. 2004) ("good cause" for immediate pilot licensing regulations in the wake of the

September 11th terrorist attacks); *Union of Concerned Scientists v. Atomic Energy Comm'n*, 499

F.2d 1069, 1085 (D.C. Cir. 1974) (good cause to issue emergency regulations to regulate nuclear

core cooling systems). For example, the Tenth Circuit has found "good cause" for immediate

regulation where there was a pressing threat of wildlife extinction, *N. Arapahoe Tribe v. Hodel*,

808 F.2d 741, 751 (10th Cir. 1987), and where coal miners would otherwise have lost access to

vital medical benefits, *N. Am. Coal Corp.*, 854 F.2d at 389.

 Treasury offered four reasons it had "good cause," none of which has merit.

 <u>Statutory Deadline Justification</u>: Treasury argued that it had good cause to forego Pre-

Promulgation Notice-and-Comment because the Temporary Regulations needed to "be effective

no later than June 22, 2019" to meet the "statutory deadline in section 7805(b)(2)." Preamble at

28,406. In Treasury's view that section 7805(b)(2) authorized retroactive rulemaking, the agency

had 18 months to comply with the APA's requirements—hardly the type of "necessity or

emergency" required to forego the APA requirements. H.R. Rep. No. 79-1980, at 258 (1946).

 Courts have consistently recognized that "the mere existence of deadlines for agency

action . . . does not in itself constitute good cause." *U.S. Steel Corp.*, 595 F.2d at 213. Instead, an

agency must "show the impracticability of affording notice and comment" to invoke the Good

Cause Exception. *Id.* "In the context of the various cases addressing the APA's notice-and-

comment provisions, eighteen months is a lengthy period of time." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 15 (D.D.C. 2009). Indeed, courts have required compliance with Pre-Promulgation Notice-and-Comment even with much shorter statutory deadlines. *See U.S. Steel Corp.*, 595 F.2d at 213 (six-month deadline not good cause); *Sharon Steel Corp. v. EPA*, 597 F.2d 377 (3d Cir. 1979) (12-month deadline not good cause).

And the facts do not show that compliance with Pre-Promulgation Notice-and-Comment was impracticable—they show Treasury's lack of diligence. Treasury was aware of the transactions that it addressed in the Temporary Regulations long before its purported deadline to issue those rules. In October 2018—more than eight months before that deadline—Treasury officials publicly stated an intent to issue regulations to "deny the section 245A deduction" in connection with certain "extraordinary transactions." Emily L. Foster, *U.S. Antiabuse Rules, Imperfect International Tax Regs Coming*, 92 Tax Notes Int'l 336, 337 (Oct. 15, 2018) (quoting Treasury official Lafayette G. Harter III).[9]

Notably, Treasury stated in October 2018 that it would permit Pre-Promulgation Notice-and-Comment: "Proposed section 245A regulations [were] expected to be issued [in 2018], with final rules available by June 2019." *Id.* Had Treasury simply followed through with that promise and acted with even a modicum of diligence, it could have issued proposed regulations in plenty of time to comply with Pre-Promulgation Notice-and-Comment. Indeed, Treasury took exactly that approach and complied with the APA rulemaking requirements for several other pieces of post-TCJA guidance. *See* 83 Fed. Reg. 51,072 (Oct. 10, 2018) (regulations under section 951A),

---

[9] For the Court's convenience, a copy of this article is attached as Exhibit 1.

83 Fed. Reg. 39,514 (Aug. 9, 2018) (regulations under section 965), and 83 Fed. Reg. 50,864

(Oct. 10, 2018) (regulations under section 960).

Treasury cannot sit on its hands for more than a year and then claim that its

procrastination justifies use of an emergency exception to fundamental rulemaking requirements.

*See Shell Oil Co. v. Fed. Energy Admin.*, 527 F.2d 1243, 1248 (Temp. Emer. Ct. App. 1975)

(Good Cause Exception did not apply to excuse Pre-Promulgation Notice-and-Comment where

the agency "wait[ed] until the [statutory deadline]" causing affected parties to bear "the time and

expense of litigation in order to comment in any meaningful way on the [regulations]"). As the

D.C. Circuit has held, "the good cause exception does not apply when an alleged 'emergency'

arises as the result of an agency's own delay." *Env't Def. Fund*, 716 F.2d at 921.

Amended Return Justification: Treasury argued that it had good cause to forego Pre-

Promulgation Notice-and-Comment to prevent taxpayers from needing to bear the compliance

costs of "amending and refiling" their 2018 tax returns. Preamble at 28,406. Much like the

statutory-deadline argument discussed above, this was a "problem" of Treasury's own making

and does not constitute good cause. As noted above, Treasury was aware of the transactions that

it wanted to address no later than October 2018. Corporate income tax returns for 2018 were not

due until six months later in April 2019 (and many corporate income tax returns are filed on

extension in October). *See* sections 6072(a) (establishing April 15 deadline for corporate income

tax returns); 6081(b) (allowing an automatic 6-month extension). Thus, Treasury had more than

enough time to comply with Pre-Promulgation Notice-and-Comment.

Moreover, avoiding compliance costs for regulated parties is not good cause, especially

where the compliance concerns are a result of the agency's own delay. *See Env't Def. Fund*, 716

F.2d at 920-21 (no "good cause" due to costs of "industry compliance" with requirement to file annual report where urgency was a result of the "agency's own delay").

      <u>Post-Promulgation Notice & Comment Justification</u>: Treasury claimed that "good cause is supported where a regulation is temporary, with public comment permitted and meaningfully considered before finalization of the temporary rule." Preamble at 28,406. But Treasury did not do that here. Treasury has never "finaliz[ed]" the Temporary Regulations—those regulations remain untouched since they were first announced by Treasury.[10]

      Moreover, this "good cause" justification recycles a Treasury argument that has already been rejected. "[T]he temporary nature of the Rule does not excuse the Agencies from the notice-and-comment procedure required by the APA." *Chamber of Commerce*, 2017 WL 4682049, at *7. More generally, courts have held that "[p]ermitting the submission of views after the effective date is no substitute for the right of interested persons to make their views known to the agency in time to influence the rule making process in a meaningful way." *U.S. Steel Corp.*, 595 F.2d at 214. Indeed, if Pre-Promulgation Notice-and-Comment could be excused where the agency seeks comment *after* promulgation, that exception would swallow the rule. *See Sharon Steel Corp.*, 597 F.2d at 381 ("If a period for comments after issuance of a rule could cure a violation of the APA's requirements, an agency could negate at will the Congressional decision that notice and an opportunity for comment must precede promulgation.").

---

[10] When Treasury issued the Temporary Regulations, it also issued identical "proposed" regulations. *See* 84 Fed. Reg. 28,426 (June 18, 2019). Treasury has since finalized those proposed regulations with some modifications. 85 Fed. Reg. 53,068 (Aug. 27, 2020). However, those final regulations are effective only prospectively from June 14, 2019, not retroactively. *Id.* at 53,077. Thus, transactions like the TGH transaction that occurred before June 14, 2019, "continue to be subject to the rules set forth in the [T]emporary [R]egulations." *Id.*

Taxpayer Behavior Justification: Treasury claimed it had good cause to forego Pre-Promulgation Notice-and-Comment because that process would have provided taxpayers with the opportunity to react to the proposed rules after their issuance and quickly "engage in the transactions to which these rules relate with confidence that they achieve the intended tax avoidance results absent the applicability of the regulations." Preamble at 28,406.[11]

Again, this purported exigency is a result of Treasury's procrastination and therefore cannot be "good cause." Using Treasury's purported timeline under section 7805(b)(2), it had 18 months to issue proposed regulations, allow Pre-Promulgation Notice-and-Comment, and then issue final regulations. According to Treasury, it would then have had the authority to make the regulations *retroactive*. Thus, with minimal diligence, Treasury could have complied with the APA and still foreclosed any tax planning of the type described in the Preamble.

Moreover, Treasury did not need to make the Temporary Regulations immediately effective to deter future tax planning. As discussed above, Treasury separately issued *proposed* regulations, and Treasury announced that those regulations, when finalized, would be effective as of the date the Temporary Regulations were published. *Supra* note 10. Those *proposed* regulations separately deterred taxpayers from entering into the transactions Treasury was targeting, and this rationale cannot justify Treasury's failure to engage in Pre-Promulgation Notice-and-Comment for the *Temporary* Regulations at issue in this case.

Finally, the delay between the announcement of agency rulemaking and its effective date is a feature, not a flaw, of the APA. If the opportunity for parties to change their behavior in

---

[11] If Treasury were truly concerned about these "tax avoidance results," it could have considered availing itself of section 7805(b)(3)'s authorization for retroactive regulations in cases of abuse.

anticipation of announced rules were "good cause," then the exception would swallow the rule. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 676 (9th Cir. 2021) (stating that if such arguments were good cause, notice-and-comment procedures "would often cede to the good-cause exception"). Instead, an agency must "demonstrate the existence of an exigency justifying good cause." *Id.* Here, Treasury identified no such exigency. It merely stated without support or analysis that "notice-and-comment and a delayed effective date[] could embolden some taxpayers to engage in aggressive tax planning . . . before the regulations' effective date." Preamble at 28,406. Such hypothetical concerns, which exist with nearly every Treasury regulation, cannot justify invoking the Good Cause Exception. *See Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 707 (D.C. Cir. 2014) (finding that no good cause existed when the agency's record was "too scant to establish a fiscal emergency").

**V.      CONCLUSION**

For the foregoing reasons, the Court should hold that the Temporary Regulations are invalid and cannot be applied to the TGH Transaction.

Respectfully submitted this 22nd day of October, 2021.

/s/ Rajiv Madan

Gregory S. Tamkin                          **Rajiv Madan**
Dorsey & Whitney LLP                       Skadden, Arps, Slate, Meagher & Flom LLP
1400 Wewatta Street, Suite 400             1440 New York Avenue, N.W.
Denver, CO 80202-5549                      Washington, DC 20005
Telephone: (303) 629-3400                  Telephone: (202) 371-7020
Fax: (303) 629-3450                        Fax: (202) 661-9020
E-mail: tamkin.greg@dorsey.com             E-mail: raj.madan@skadden.com

*Attorneys for Plaintiff Liberty Global, Inc.*

24

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of October 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

Thomas J. Sawyer
Jennifer Yu Golden
U.S. Department of Justice
P.O. Box 683, Ben Franklin Station
Washington, DC 20044
E-mail: Thomas.J.Sawyer@usdoj.gov
E-mail: jennifer.y.golden@usdoj.gov
*Attorneys for the United States of America*

/s/ Rajiv Madan
**Rajiv Madan**
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7020
Fax: (202) 661-9020
E-mail: raj.madan@skadden.com
*Attorney for Plaintiff Liberty Global, Inc.*