IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03501-RBJ

LIBERTY GLOBAL, INC.,

      Plaintiff,

v.

UNITED STATES OF AMERICA,

      Defendant.

---

## UNITED STATES' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

      Courts have long understood that the tax system "gives a multitude of clever individuals in the private sector powerful incentives to game the system. Even the smartest drafters of legislation and regulation cannot be expected to anticipate every device." *ASA Investerings P'ship v. Comm'r*, 201 F.3d 505, 513 (D.C. Cir. 2000). Treasury faces an ongoing need to adapt to new, "intricate and ingenious" schemes hatched by taxpayers. *Blum v. Comm'r*, 737 F.3d 1303, 1311 (10th Cir. 2013).

      Given the complexity of the Tax Cuts and Jobs Act's ("TCJA") international tax changes, it was especially prone to be exploited by multinational corporations like Liberty Global ("LGI"), with a cadre of tax and legal professionals at its disposal. Congress knew this too. In addition to Treasury's longstanding directive in I.R.C. § 7805 to issue regulations necessary to enforce the nation's tax laws, Congress included specific provisions in TCJA, such as I.R.C. § 245A(g), requiring that Treasury prescribe regulations to carry out the new law.

In 2019, Treasury invoked its statutorily delegated authority to close a perceived loophole that threatened to upend the structure and intent of TCJA. LGI was displeased. It had spent months on a complex structured transaction to manipulate that very loophole. Now that Treasury has caught wind of LGI's (and other taxpayers') plan to manufacture a billion-dollar deduction, LGI seeks to have Treasury's regulations declared invalid.

The Treasury regulations at issue are consistent with longstanding practice. They (i) satisfy Supreme Court deference principles; (ii) are authorized by I.R.C. §§ 7805 and 245A(g), including with retroactive effect; (iii) satisfy the Administrative Procedure Act ("APA"), or alternatively, any APA violation is harmless; and (iv) are properly retroactive under the Supreme Court's test in *Bowen*.

## BACKGROUND

***The TCJA.*** The Tax Cuts and Jobs Act[1] made "the most far-reaching changes . . . in many decades" to U.S. international tax laws. Rec. 1,378 (N.Y. State Bar Ass'n Tax Section, *Report on the GILTI Provisions of the Code*, at 1 (May 4, 2018)).[2] Before TCJA, the U.S. had a "worldwide" income tax system where the U.S. tax base consisted of all worldwide income of a taxpayer. It was not a pure worldwide system, because some offshore earnings could be deferred until those earnings were repatriated. TCJA moved the U.S. away from this deferral system toward one that taxed all income on a current basis. But TCJA allowed some current income to be repatriated without tax. These international tax laws are technical and complex.

---

[1] Pub. L. No. 115-97, 131 Stat. 2054 (Dec. 22, 2017).

[2] "Rec." references are to the Administrative Record, to be submitted after briefing is completed, the index of which is found at Doc. 25-2. "Doc." references are to the Court's docket entries.

Congress designed a "comprehensive and closely integrated set of tax rules" where the key aspects of TCJA worked together and harmonized with the current Code. T.D. 9865, 84 Fed. Reg. 28,398, 28,399 (June 18, 2019) (Rec. 142). On the one hand, anti-base erosion provisions—subpart F and GILTI—ensure that U.S. taxpayers are currently taxed (*i.e.*, tax is no longer deferred) on a significant portion of income earned by their offshore corporations. That is, the preexisting subpart F rules (§ 951, *et. seq.*) continue to tax certain income of U.S.-taxpayer controlled foreign corporations ("CFC").[3] TCJA introduced a new regime on top of that called "GILTI" (Global Intangible Low-Taxed Income) that subjects certain low-taxed global income to U.S. tax (new § 951A). On the flip side, a new provision, described in the legislative history as the U.S.'s version of a "participation exemption" system, let taxpayers potentially repatriate tax-free (at least at the corporate level) certain foreign income that did not pose base-erosion concerns—*i.e.*, the portion of foreign earnings not falling under the broad sweep of subpart F and GILTI. Congress selected a "dividends received deduction" (new § 245A) to implement the intended exemption. Such deductions are well-known in domestic tax matters and "limit multiple levels of corporate tax" without eliminating tax altogether. Rec. 2,040-41 (Staff of Joint Comm. on Tax'n, General Explanation of Public Law 115-97, at 348-49 (Comm. Print 2018)).

Finally, Congress imposed a transition tax (amended § 965) generally on unrepatriated foreign earnings for which tax had been deferred under prior law. The transition tax played an important role by "ensur[ing] that all distributions from foreign subsidiaries are treated in the same manner under the participation exemption system." Rec. 1,785 (H.R. Rep. No. 115-409, at 375 (2017)). Since, under the old system, corporations had a tax incentive to defer income by

---

[3] All "section" or "§" references are to the Internal Revenue Code unless otherwise indicated.

keeping earnings parked overseas in CFCs, the § 245A deduction, without such a transition tax, could present a "potential windfall for corporations that deferred income." *Id.* Put another way, Congress ensured that earnings under the new system, whether previously deferred or currently earned, would be subject to some tax before being repatriated.

In crafting TCJA, Congress expressed concerns that the § 245A deduction may, "without any base protection measures," create incentives for U.S. corporations to allocate income to foreign jurisdictions in a manner that may allow income to be returned "with no U.S. tax imposed." Rec. 1,872 (S. Comm. on the Budget, 115th Cong., Reconciliation Recommendations Pursuant to H. Con. Res. 71, at 365 (Comm. Print 2017)). Congress was concerned that the previous system put American workers and companies at a disadvantage because the "worldwide system of taxation with deferral provides perverse incentives to keep funds offshore." Rec. 1,780 (H.R. Rep. No. 115-409, at 370). But in moving to the new system, Congress recognized the need for "appropriate anti-base erosion safeguards" that would operate in tandem with § 245A. *Id.* It implemented this goal by retaining subpart F and adding GILTI to protect the tax base.

Given that TCJA was a major tax act, and enacted swiftly, it left several gaps. The Joint Committee on Taxation discussed one such gap in its report. Rec. 2,040-41. Section 245A is "intended to apply only to amounts that are treated as dividends for Federal income tax purposes." *Id.* But taxpayers like LGI might structure into a situation that generates "an inclusion under" GILTI and subpart F but where they have "cease[d] to have a U.S. shareholder" at the end of the taxable year in order to escape the tax. *Id.*

**Liberty Global's "Project Soy" scheme.** Liberty Global rushed to exploit this gap in late 2018 through an unusual transaction it code named "Project Soy." LGI portrays it as an ordinary

transaction and told this Court, "all that's happening is that there are certain cash flows moving among Liberty Global entities," and that "multinational companies do internal cash movements like that every day." Doc. 31 at 6-7. In truth, Project Soy was a highly engineered tax scheme designed to strip earnings away from the U.S. tax base.

The gambit was this: LGI would generate an intercompany "dividend" by (i) causing a CFC to purportedly create earnings and profits through an otherwise meaningless transaction; and (ii) causing that CFC's owner, another CFC, to sell it to LGI's UK parent and claim a § 245A deduction. *See* Doc. 29-1 at 6-7 (Project Soy step plan). The transaction was designed to eliminate any U.S. shareholder of the CFC that purported to generate the "dividend." *Id.* Ostensibly, this let LGI claim a $2.4 billion dividends received deduction and escape tax on the related income. *See* Declaration of Revenue Agent Kristina Rhee ("Rhee Decl."), ¶¶ 5-6. The transaction was structured to convert taxable gain into an exempt dividend while avoiding the anti-base erosion provisions (GILTI and subpart F). LGI thus hoped to remove the CFC (and its future earnings) from the U.S. tax system without paying any tax on the gain in the CFC shares.

The CFC in question, Telenet Group Holding ("TGH"), had insufficient earnings and profits at the time to generate the desired large "dividend." Rhee Decl., ¶ 6. In a series of engineered steps at year-end, LGI reported that it generated about €4 billion of earnings and profits in TGH on which to base its § 245A deduction. *See id.*; Doc. 29-1 at 4-6. Whether these highly engineered steps complied with the tax laws is a matter for trial. So far, LGI has failed to prove that TGH generated those earnings and profits. *See* Rhee Decl., ¶¶ 5-6.

Although Project Soy uses TGH, a Belgian company, it was unquestionably a U.S. tax maneuver, and U.S.-based LGI called the shots. Internal emails describe the transaction as being

"on the tax side" of LGI. Ex. 1 (LGI Jan. 16, 2019 email). KPMG was paid extra audit fees to cover this "non-routine transaction." *Id.* LGI even agreed to "reimburse Telenet [for any] external costs for Project Soy." *Id.* LGI's tax department and CEO were intimately involved in the decision-making process, but its CEO "still had some concerns" and lacked authority to execute the deal. Ex. 2 (LGI Dec. 12, 2018 email). Final approval ultimately came from John Malone, the billionaire chairman of the entire Liberty Global empire. *Id.*

Tellingly, LGI knew Project Soy was exploiting a statutory gap. Its internal emails reference the "rule where you have to be a shareholder on the last day of the year [which] applies for GILTI" and noted that LGI could escape the tax "[b]ecause LGI is no longer a US shareholder on 12/31" when TGH's tax year closed. Ex. 3 (email chain ending Jan. 15, 2019). LGI closely monitored to see if "Treasury [would] close the . . . mismatch," Ex. 2, in which event it would abort Project Soy. Ex. 4 (Oct. 29, 2018 email) ("If we see more regs / tech corrections, that may change."); Ex. 6 (Dec. 21, 2018 emails). LGI was not caught unaware by the regulations. It knew Treasury was planning to close the gap and that Treasury might act retroactively. Doc. 32-1 (news article predating Project Soy); Ex. 5 (Project Soy Exec. Summary noting "New Regulatory guidance can be issued until June 30, 2019 to be retroactive.").

***Treasury Regulations.*** Treasury closed the gap in TCJA with the regulations at issue (the "Regulations"). 84 Fed. Reg. 28,398 (June 18, 2019) (Rec. 141). The Regulations deny a § 245A deduction in "mismatch" situations where a taxpayer claims a § 245A deduction on a "dividend" of a CFC's earnings that would otherwise be GILTI/subpart F earnings, but there is no U.S. shareholder required to report GILTI/subpart F income as a result of internal reshuffling. *Id.* at 28,402 (describing "extraordinary reduction" transactions). Alternatively, the Regulations permit

a § 245A deduction (should any qualifying earnings remain) if the U.S. shareholder makes a "closing of the year" election. Such an election closes the CFC's tax year on the day of the transaction to ensure that the CFC has a U.S. shareholder to report the income. *Id.* at 28,403.

Treasury acted in direct response to taxpayer behavior. Five months after TCJA, a New York State Bar report described gaps in the statute involving the interaction of GILTI with § 245A that could lead to tax-avoidance transactions. Rec. 1,427-36. Treasury reviewed that report, and the problem became more alarming when the IRS learned "that certain taxpayers were engaged in or were considering engaging in [such] transactions." Doc. 25-1, ¶ 5. Treasury was thus aware "that some taxpayers are undertaking transactions with a view to eliminating current or future taxation of all foreign earnings of a CFC, including earnings attributable to base erosion-type income, by structuring into these situations." 84 Fed. Reg. at 28,400.

As explained in the Regulations' preamble, "[t]hese transactions have the potential to substantially undermine" the TCJA framework. *Id.* Treasury targeted "narrow circumstances . . . in connection with specific transactions that facilitate the avoidance of taxation" and that "in many cases, may have been entered into with a purpose of avoiding the consequences of the new international tax regime." *Id.* Treasury emphasized that its interpretation was based on TCJA's integrated statutory scheme and consistent with Congressional intent. *Id.* at 28,399-402.

In addition, Treasury issued the rules in time for LGI to comply with them when filing its original income tax return (on extension). LGI elected to close TGH's tax year on the day that it transferred its interest in TGH (therefore maintaining a U.S. shareholder), in accordance with the "closing of the year" election provided in the Regulations. Rhee Decl., ¶ 3. LGI reported a § 245A deduction of $360 million and § 951A (GILTI) income of $1.9 billion. *Id.*, ¶ 5. But LGI

quickly amended its tax return and asserted that the Regulations were invalid. *Id.*, ¶ 4. LGI revoked its "closing of the year" election, thereby increasing its § 245A dividends received deduction by $2 billion and eliminating $1.9 billion of GILTI income. *Id.*, ¶ 5 (summarizing differences between LGI's original and amended returns).

## ARGUMENT

### I.    The Regulations are entitled to deference.

The Supreme Court has "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme," particularly when "a full understanding . . . in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). *Chevron* deference is given whether the regulation is a permanent regulation or, like here, a temporary regulation that was later finalized as a permanent regulation. *Hosp. Corp. of Am. v. Comm'r*, 348 F.3d 136, 144 (6th Cir. 2003) ("that the temporary regulation was not subject to notice and comment does not, moreover, require us to eschew *Chevron* deference"). *Chevron* involved implementation of environmental laws that were "lengthy, detailed, technical, complex, and comprehensive." 467 U.S. at 848. Treasury's interpretation of TCJA is a permissible construction of this equally complex and difficult statute, and this Court should defer to it.

Before turning to the *Chevron* "steps," it is worth noting that Congress expressly delegated to Treasury the authority to issue regulations carrying the force of law. Section 7805(a) provides that Treasury "shall prescribe all needful rules and regulations for the enforcement" of the tax code. And when Congress created the dividends received deduction as part of TCJA's

integrated changes to the international tax system, it specifically provided in § 245A(g) that Treasury "shall prescribe such regulations or other guidance as may be necessary or appropriate to carry out the provisions of this section . . . ." Under *Mayo*, such express grants of rulemaking authority are "a very good indicator of delegation meriting *Chevron* treatment." *Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 57 (2011).[4]

### A. The Regulations satisfy Chevron step one.

The Supreme Court in *Chevron* famously framed the question as "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. The Tenth Circuit later described the *Chevron* step-one inquiry as "whether the statute is silent or ambiguous with respect to the specific issue *addressed by the regulation*." *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1222 (10th Cir. 2017) (emphasis in original). Congress did not speak to the specific issue addressed by the Regulations, and it was appropriate for Treasury to fill the gap.

TCJA created a new deduction under § 245A. Section 245A(a) provides that "there shall be allowed as a deduction an amount equal to the foreign-source portion of [certain dividends]." LGI myopically focuses on the phrase "shall be allowed." Doc. 32 at 8-9. But a provision cannot be read in a vacuum, without regard to the rest of the statute. *E.g.*, *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) (rejecting hyper-technical reading of clause examined in isolation); *Seminole Nursing Home, Inc. v. Comm'r*, 12 F.4th 1150, 1156-57 (10th Cir. 2021)

---

[4] LGI relies on *Marlow v. New Food Guy, Inc.*, 861 F.3d 1157 (10th Cir. 2017), to suggest that Treasury did not have such authority here. Doc. 32 at 12-13. But unlike the situation here, the court in *Marlow* determined that a labor regulation was directed to an issue that Congress intended *not* be addressed with a regulation because there was "no such gap or silence with respect to [the] specific task assigned to DOL." 861 F.3d at 1163-64.

(refusing to read tax provision in isolation). TCJA's provisions form a comprehensive framework, of which § 245A is just one part. Section 245A implements the participation exemption system, which allows a deduction for certain foreign earnings. TCJA pairs it crucially with anti-base erosion provisions (subpart F and GILTI) and the § 965 transition tax. Read together, TCJA meant to subject most U.S. taxpayers' foreign earnings to tax and leave only a limited bucket of earnings that qualify for a § 245A deduction.

Section 245A thus does not answer the "specific issue addressed by the regulation," *see New Mexico*, 854 F.3d at 1222, which is whether Congress intended to allow a dividends received deduction for foreign earnings generated by a CFC that avoided the Code's anti-base erosion provisions through a transaction engineered to escape taxes. While LGI would read § 245A in a vacuum to allow a deduction, the rest of TCJA is designed to deny it. Indeed, that Congress included specific regulatory authority in § 245A(g) underscores that Treasury was directed to preserve the integrity of the new offshore tax system and to prevent abuse. The Regulations target a gap that would contravene TCJA's overall intent and shut down engineered transactions aimed at that abusive result. Project Soy was typical of the transactions targeted.

As Treasury explained, "in certain atypical circumstances, a literal application of section 245A (read in isolation) could result in the [§] 245A deduction applying to earnings and profits of a CFC attributable to the types of income addressed by the subpart F or GILTI regimes—the specific types of earnings that Congress described as presenting base erosion concerns." 84 Fed. Reg. at 28,400 (Rec. 143). Moreover, Treasury knew that taxpayers were "structuring into these situations" to try to eliminate tax on all foreign earnings of a CFC. *Id*. Such transactions "substantially undermine the anti-base erosion framework for post-2017 foreign earnings." *Id*.

Put another way, Treasury was addressing manipulative transactions like Project Soy that sought to circumvent TCJA, not routine corporate transactions that might benefit from the new tax laws. Treasury's rules apply only in "these specific and narrow circumstances" where such abuse is present. *Id*. Treasury used its delegated gap-filling authority to deny a § 245A deduction in situations that Congress did not intend. Treasury implemented Congress's policy, not its own.

The Supreme Court's decision in *Mayo*, a case granting *Chevron* deference to a tax regulation, is instructive in defining the "precise question" to be considered. 562 U.S. at 52. There, the Court interpreted the "student" exemption from FICA taxes as applied to medical residents. In defining the precise question, the Court did not look merely to one clause of a statute to see whether medical residents met a dictionary definition of "student" (as the district court had done). *Id*. at 52-53. Instead, the Court framed the "precise question [as] whether medical residents are subject to FICA." *Id*. at 52. So too here. The precise question is not whether LGI "shall be allowed" a § 245A deduction, but whether such a deduction "shall be allowed" on the very types of base-erosion income that the Code and TCJA meant to tax. *See also Square D Co. v. Comm'r*, 109 T.C. 200, 225-27 (1997) (upholding, as consistent with intent expressed by Congress, temporary regulation addressing gap in 1984 tax act abused by taxpayers that manipulated closing of tax years).

*Mayo* is also relevant for a second reason. The Supreme Court said, "we have instructed that exemptions from taxation are to be construed narrowly." 562 U.S. at 59-60 (cleaned up). Just as *Mayo* narrowly construed the "student" exemption from FICA tax, the Court here should narrowly construe TCJA's "participation exemption" in § 245A. LGI misreads the legislative history when it suggests that Congress intended the § 245A deduction to be "broadly available"

to LGI. Doc. 32 at 4. Immediately following LGI's cursory quote is an example that in no way resembles LGI's scheme to avoid the anti-base erosion measures.

LGI ducks these broader questions about TCJA's framework and Congressional intent. It focuses instead on the text of § 245A in isolation and the preamble's references to a "literal" interpretation of § 245A, as if those were determinative of *Chevron* step one. The Supreme Court has repeatedly recognized that courts should not rely on a textual interpretation divorced from the statutory context. *See, e.g.*, *Bob Jones Univ. v. United States*, 461 U.S. 574, 586 (1983) (discussing when literal language "would defeat the plain purpose of the statute"). LGI's extreme, narrow reading of § 245A would go against TCJA's integrated framework, and especially, Congress's anti-base erosion policies. At a minimum, the disconnect between § 245A's language and the rest of TCJA leaves a gap to fill.

One of the overall goals of TCJA was to ensure that most foreign income of U.S. owned foreign corporations remains in the tax base, with an exception to which the § 245A deduction would apply. The purpose of TCJA would be defeated if income meant to be included in the U.S. tax base could escape tax through a structured transaction like Project Soy designed to eliminate tax on the gain from the transfer of an asset.[5] The statutory structure, Treasury's explanation of the Regulations, and the legislative history all justify denying a § 245A deduction under these atypical, engineered circumstances where a gap is being exploited.

---

[5] LGI mentions transactions where the Regulations deny 50% of a taxpayer's claimed § 245A deduction. Doc. 32 at 10. This limitation applies only to "extraordinary disposition" transactions. *See* 84 Fed. Reg. at 28,400-01. LGI's Project Soy is not such a transaction. Rhee Decl., ¶ 2.

The Supreme Court's decision in *Zuni*, a case challenging a Department of Education regulation, is analogous. *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81 (2007). The Court framed Zuni's primary argument as resting "upon the literal language of the statute" and rejected it because, despite the provision's literal language, the plain language of the statute did not unambiguously foreclose the Secretary's interpretation. 550 U.S. at 89, 93-94. Specifically, a statutory directive to look at per-pupil expenditures in school districts did not preclude the agency from also incorporating the number of students within each district into its formula for whether a school funding program "equalizes expenditures" across the state. *Id.* at 90, 93-94. Like in *Zuni*, TCJA's literal language that a deduction "shall be allowed" did not unambiguously foreclose Treasury's interpretation that the § 245A deduction should be considered within the context of the entire statutory scheme, not in isolation. And like in *Zuni*, *id.* at 90, the context and legislative history of TCJA overwhelmingly support Treasury's interpretation—which explains why LGI's internal emails anticipated that the gap would be closed.

### B. *Chevron step two is undisputed.*

With respect to *Chevron*, LGI rests its entire case on step one. It makes no *Chevron* step two argument challenging the reasonableness of the substantive rule.

## II. I.R.C. § 7805 allowed Treasury to issue the Regulations without notice and comment and retroactively, independent of the APA's rulemaking procedures.

### A. *The APA does not limit Treasury's § 7805(a) and (b) authority to issue retroactive regulations.*

I.R.C. § 7805(a) provides that Treasury "shall prescribe all needful rules and regulations for the enforcement of this title." The statute permits Treasury to issue not only permanent, but also temporary regulations. I.R.C. § 7805(e). And those regulations may sometimes be

retroactive. I.R.C. § 7805(b). One common situation for retroactive regulations is when Congress enacts a new tax law; Treasury's regulations may be retroactive to cover the entire existence of the law so long as Treasury issues the regulations "within 18 months of the date of . . . enactment." I.R.C. § 7805(b)(2). Even after 18 months, Treasury may issue regulations retroactively "to prevent abuse."  I.R.C. § 7805(b)(3). Here, Treasury issued the Regulations within 18 months of TCJA, and they prevented abusive transactions like Project Soy. *See also* Sec. IV. The Regulations were thus permissible under § 7805.

The broad rulemaking authority invoked by Treasury dates back more than 150 years. *See* Revenue Act of 1862, ch. 119, 12 Stat. 432 (granting Treasury the authority to prepare all regulations necessary to effectuate the collection of taxes). The statutory language currently codified in § 7805(a) has remained largely the same since 1917. *See, e.g.*, War Revenue Act of 1917, ch. 63, § 1005, 40 Stat. 300, 326. Treasury's authority has long included the ability to issue regulations retroactively. For instance, the 1939 Code provided that Treasury "may prescribe the extent, if any, to which any ruling, regulation, or Treasury Decision . . . shall be applied without retroactive effect." Internal Revenue Code of 1939, § 3791, 53 Stat. 1, 467.

The APA was enacted in 1946 against the backdrop of Treasury's longstanding authority to issue retroactive regulations. While APA § 553(d) generally requires agency rules to be prospective, the APA did not repeal Treasury's ability to issue retroactive regulations. *See Disabled Am. Vets. v. Sec'y of Vets. Affairs*, 419 F.3d 1317, 1322-23 (Fed. Cir. 2005) (Congress assumed to legislate against backdrop of established law). Lest there be any doubt, when the 1939 Code gave way to the 1954 Code, it provided in renumbered § 7805(b): "The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation . . . shall be

applied without retroactive effect." Internal Revenue Code of 1954, Pub. L. No. 83-591, § 7805, 68A Stat. 3, 917. It is well settled that Treasury regulations promulgated under § 7805 were presumptively retroactive until 1996. *E.g.*, *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 202 (5th Cir. 1996); *UnionBanCal Corp. v. Comm'r*, 113 T.C. 309, 327 (1999), *aff'd*, 305 F.3d 976 (9th Cir. 2002). The power to make regulations retroactive could be disturbed only for an abuse of discretion. *Auto. Club of Mich. v. Comm'r*, 353 U.S. 180, 184 (1957).

In 1996, Congress amended § 7805(b), which curtailed Treasury's blanket ability to make regulations retroactive. Taxpayer Bill of Rights 2, Pub. L. No. 104-168, § 1101, 110 Stat. 1452, 1468-69 (1996). Regulations are now presumed prospective, not retroactive. Congress described six circumstances under which regulations could be retroactive, including the two applicable here: the 18-month rule and prevention of abuse. *See* I.R.C. § 7805(b)(2)-(7).

### B.  Section 7805(e) authorizes temporary regulations with immediate effect.

While Treasury has long issued authoritative regulations under the tax laws, its use of temporary regulations under the authority of § 7805(a) generally postdates the APA. Early temporary regulations can be traced back to at least 1955. *See* T.D. 6124, 1955-1 C.B. 719 (Feb. 24, 1955). Treasury used them more frequently in the 1970s and 1980s. Congress then became concerned about the growing use of temporary regulations. Its concern was not that Treasury lacked the authority to issue regulations without notice and comment, but that it was not replacing those temporary regulations quickly enough with final regulations. S. Rep. No. 100-309, at 7 (1988) (noting "the length of time that some regulations remain in temporary form"). Therefore, in 1988, Congress added new subsection (e) to § 7805 to impose a three-year duration on temporary regulations and to require that "[a]ny temporary regulation . . . shall also be issued

as a proposed regulation." Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, § 6232, 102 Stat. 3342, 3734-35. Importantly, § 7805(e) did nothing to limit Treasury's ability to issue temporary regulations with immediate effect.

The text and legislative history of § 7805(e) indicate that Congress knew of, and blessed, the IRS's practice of issuing temporary regulations. *See Disabled Am. Vets.*, 419 F.3d at 1323 (legislative history and statutory text showed that Congress ratified longstanding agency practice). Congress noted that the IRS "issues some regulations as temporary regulations," which generally "are effective . . . upon publication and remain in effect until replaced by final regulations," and "generally also issues those same [temporary] regulations in proposed form by cross-reference." H.R. Rep. No. 100-1104, at 217 (1988) (Conf. Rep.). And Congress intended that the IRS "continue its present practice" of issuing temporary regulations and corresponding proposed regulations by cross-reference. *Id.* at 218. The duration limit on temporary regulations "[was] not to affect the validity." *Id.*

### C.  The APA does not take precedence over § 7805's more specific provisions.

Treasury complied with both § 7805(b)'s retroactivity provisions and § 7805(e)'s provisions addressing temporary regulations. Therefore, the Regulations are procedurally valid. While APA § 559 provides that subsequent laws should "expressly" state their intention to override the APA, Congress need not use "magical passwords." *Marcello v. Bonds*, 349 U.S. 302, 310 (1955). Rather, all that is required is a plainly expressed "congressional intent to depart from normal APA procedures." *Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998).

To the extent the APA and § 7805 conflict, § 7805 controls as the specific statute. *See Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961) (when reconciling two potentially

conflicting statutes, the specific statute controls over the general); *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228-29 (1957) (similar). The language and legislative history of § 7805 (discussed above) show that Congress meant to empower Treasury to issue temporary regulations and to issue them retroactively, notwithstanding the APA.

Section 7805(e) would be meaningless if all temporary regulations must undergo APA notice and comment to be valid. *See Clark v. Rameker*, 573 U.S. 122, 131 (2014) (canon of construction against surplusage). Treasury would have no reason to ever issue a temporary regulation when pursuing a final regulation would involve the same process and would avoid a three-year sunset period. Such a construction would also be at odds with the legislative history of § 7805(e), which recognized Treasury's ability to issue temporary regulations with immediate effect. Sec. II.B. Congress surely did not authorize temporary regulations, only to have them declared invalid for violating the APA. To the contrary, in § 7805(e), "Congress has established procedures so clearly different from those required by the APA that it must have intended to displace the norm." *Asiana Airlines*, 134 F.3d at 397.

The legal landscape on § 7805(e)'s interaction with the APA is sparse, and it has not been addressed by the Supreme Court or any court of appeals. LGI relies on an unpublished district court opinion in Texas that rejected the argument that § 7805 allows temporary regulations to be issued without notice and comment. *See Chamber of Commerce of U.S. v. IRS*, No. 1:16-cv-944-LY, 2017 WL 4682050 (W.D. Tex. Oct. 6, 2017); Doc. 32 at 18.[6] But that unpublished decision is simply wrong; it would render § 7805(e) superfluous.

---

[6] A Tax Court concurring opinion expressed a similar view and suffered from the same flaw. *See Intermountain Ins. Serv. of Vail, LLC v. Comm'r*, 134 T.C. 211, 245-46 (2010) (Halpern and Holmes, JJ., concurring).

Section 7805(b), similarly, would become meaningless if retroactive regulations that met its standards were declared invalid under the APA. The reasonable view is that § 7805(b)'s more specific language controls. *Redhouse v. Comm'r*, 728 F.2d 1249, 1253 (9th Cir. 1984) (finding it "doubtful that treasury regulations need to comply with the 30-day notice requirement," as § 7805(b) "would in any conflict take precedence over the general notice statute"); *see also Stamos v. Comm'r*, 95 T.C. 624, 637 (1990); *Wing v. Comm'r*, 81 T.C. 17, 30 n.15A (1983). The procedures in § 7805(b) displaced the APA. *See Asiana Airlines*, 134 F.3d at 397.

Indeed, Congress may not have thought to use any "magic" words in § 7805 to override the APA. Historically, most tax regulations were referred to as "interpretative" rules. *See, e.g.*, *United States v. Stapf*, 375 U.S. 118, 127 n.11 (1963) ("This Court has frequently given considerable and in some cases decisive weight to . . . interpretative regulations of the Treasury"). Interpretative rules, of course, are specifically excepted from both § 553(b) and (d) of the APA. 5 U.S.C. § 553(b)(3)(A), (d)(2). To be sure, in 2011, the Supreme Court in *Mayo* directly faced the question whether deference to Treasury regulations, be they interpretative or legislative, was governed by a standard other than *Chevron*. In holding that it was not, the Court noted that, particularly in the 30 years preceding *Mayo*, "the administrative landscape ha[d] changed significantly." 562 U.S. at 56.

Thus, when enacting the APA, and thereafter through the 1988 and 1996 amendments to § 7805, it makes sense that Congress did not directly reference the APA in § 7805(b) or (e). That Congress has included special rules in the tax laws that cover both retroactivity and temporary rules is not surprising. Treasury regulations predate the APA by 80 years, *see* Sec. II.A, and they play a crucial role in our tax system. The Supreme Court has proclaimed that "taxes are the

lifeblood of government, and their prompt and certain availability an imperious need." *Bull v. United States*, 295 U.S. 247, 259 (1935). Congress simply gave Treasury specific authority that superseded the APA.

### III. Even if the APA's rulemaking requirements apply, the Regulations are valid.

#### A. Treasury had good cause under the APA.

APA § 553(b) provides that notice and comment is not required "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." Likewise, an agency rule can have retroactive effect "for good cause found and published with the rule." 5 U.S.C. § 553(d)(3).

While Treasury has "long interpreted the Internal Revenue Code . . . to permit the issuance of immediately-effective temporary tax regulations without a statement of good cause," it has nonetheless committed to including a statement of good cause "[a]s a matter of sound regulatory policy."[7] Rec. 109 (Dep't of the Treasury, *Policy Statement on the Tax Regulatory Process* (Mar. 5, 2019)). Treasury described that good cause existed here because advance notice would have been contrary to the public interest. It would "enable or increase the sort of financial manipulation the rule sought to prevent" and allow proliferation of the types of transactions targeted by the rule. 84 Fed. Reg. at 28,405-06 (Rec. 148-49). Absent immediate action, imminent, significant, and irreversible harm to the public fisc would have occurred. Treasury likewise noted that retroactivity was supported by increased compliance costs to corporations

---

[7] Contrary to LGI's description, Doc. 32 at 18, Treasury's policy statement does not concede that the APA's rulemaking requirements apply to temporary regulations.

and mitigated by its solicitation and consideration of comments. *Id.* at 28,406 (Rec. 149). *See also* Stephanie Hunter McMahon, *Tax as Part of a Broken Budget: Good Taxes Are Good Cause Enough*, 2018 Mich St. L. Rev. 513.

The good cause exception is narrowly construed, *N. Arapahoe Tribe v. Hodel*, 808 F.2d 741, 751 (10th Cir. 1987), but it is not a rare event. About 35 to 45 percent of all regulations are issued without advance notice and comment, with the predominate reason being an agency's finding of good cause. Rec. 1,715 (Jared P. Cole, Cong. Rsch. Serv., R44356, *The Good Cause Exception to Notice and Comment Rulemaking: Judicial Review of Agency Action*, at 1 (2016)). Nonetheless, while the significant changes enacted in TCJA spurred over 150 items of written tax guidance, the Regulations are the only instance where Treasury relied on good cause to issue an immediately effective and retroactive rule. *See* "Tax Reform Guidance: Treasury Decisions (TDs)," https://www.irs.gov/newsroom/tax-reform-guidance-treasury-decisions-tds.

Harm to the public fisc is real and serious. *See Bull*, 295 U.S. at 259. Congress, too, has long been concerned with the evolution of corporate tax departments into "profit centers," where "senior corporate managers now perceive a corporation's tax liability, not as an inelastic and inevitable misfortune, but rather as a necessary cost that responds to aggressive management, just like other corporate expenses." Staff of Joint Comm. on Tax'n, Print JCS-3-99, at 221-22 (1999). Congress was expressly concerned about base erosion when it enacted TCJA, and thereafter Treasury became concerned about corporate taxpayers' efforts to structure into base-erosion schemes. Good cause provides an important safety valve against these issues. Here, large U.S. corporations were entering into transactions that would permanently eliminate taxation of their foreign earnings. The money at risk was significant—in the billions of dollars. *See Disabled*

*in Action of Metro. N.Y., Inc. v Brezenoff*, 506 F. Supp. 244 (S.D.N.Y. 1980) (finding good cause

for regulations designed to combat fraud losses of $1.2 million per month to city's food stamp

program); *see also N. Am. Coal Corp. v. U.S. Dep't of Labor*, 854 F.2d 386, 389 (10th Cir. 1988)

(noting financial harm to coal miners seeking black lung benefits); *N. Arapahoe*, 808 F.2d at 751

(noting remediation of wildlife losses would require "expenditure of funds").

LGI relies on two Tenth Circuit cases, both of which upheld agency action based on good

cause. In *Northern Arapahoe*, the Tenth Circuit upheld an interim hunting regulation that did not

provide advance notice and comment to affected tribes. 808 F.2d at 751. There, the Fish and

Wildlife Service had studied game management issues over many years. *Id.* at 744. Finally, after

about eight years, the Bureau of Indian Affairs issued an immediately effective rule to regulate

hunting on tribal property. *Id.* at 745. Good cause existed because delay "could produce real

harm." *Id.* at 751. It was the start of hunting season, and to wait would mean yet another year of

worsening wildlife conditions. That, in turn, might require transplanting of herds and expenditure

of federal funds. *Id.*

Similarly, in *North American Coal*, the Tenth Circuit upheld a Department of Labor rule

that, without notice and comment, immediately extended the time for making medical benefit

claims under the Black Lung Act. 854 F.2d at 387-89. After the claim-filing rules were issued, it

became clear that potential beneficiaries misunderstood the process. The agency learned that

many eligible miners were not filing for medical benefits out of fear that, if those claims were

rejected, they would lose other black lung benefits. *Id.* at 387. The court held "[m]any miners

would suffer financial and other hardships if there were a delay." *Id.* at 389. Thus, the good

cause exception operated as a safety valve "where delay would do real harm." *Id.*

Like in the Tenth Circuit cases, Treasury faced circumstances that called for prompt action. The Regulations nipped in the bud abusive transactions that threatened to harm the public interest by draining billions of dollars of tax revenue. LGI accuses Treasury of lack of diligence, but it was corporations like LGI that created the urgency by racing to exploit a perceived loophole. After TCJA, Treasury merely implemented Congress's tax policy in response to transactions it learned about well *after* the legislative process. Treasury first had to discover, then solve, the problem. As described in the administrative record, Treasury considered several alternatives. *See* 84 Fed. Reg. at 28,410-11; Doc. 25-2 (listing materials considered in connection with rulemaking). Treasury then had to race to shut down the transactions while taxpayers raced to complete them. Treasury ultimately acted within 18 months of TCJA, in time for LGI to apply the Regulations to its original tax return. Again, LGI knew its plan was risky and monitored the regulatory landscape, ready to pull the plug on its scheme on a moment's notice. *See* Ex. 6.

Treasury did act promptly, but even so, speed is not dispositive of good cause. In *Northern Arapahoe*, the agency took almost a decade to study and address the problem, yet the court found good cause. In *North American Coal*, the agency was apparently unable to explain the benefits clearly and promptly to coal miners, but the financial harm provided good cause. To be sure, Treasury here was conscious of Congress's 18-month deadline in § 7805(b). But to suggest that Treasury acted without diligence by using that full 18-month period to find the best solution is unsupported.

### B.  Alternatively, any APA defect was harmless error.

While LGI contends that the alleged errors are fatal to the Regulations' validity, in these circumstances, any such flaw should be deemed harmless. Taxpayers, including LGI, were not

prejudiced by Treasury's actions. 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"). Treasury solicited public comments when it issued the temporary regulations as required by § 7805(e)(1), gave notice of the substance of the proposed rule, and held a public hearing. LGI even refers to two comments that Treasury received. Doc. 32 at 6. With full public participation, and the required statement of basis and purpose, Treasury issued final regulations under § 245A on August 27, 2020. T.D. 9909, 85 Fed. Reg. 53,068. Because Treasury complied with the APA when finalizing the regulations, any violation was harmless. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2385 (2020).

The central inquiry here is whether Treasury gave affected parties sufficient opportunity to weigh in on the § 245A regulations (which it did), not whether the same rule would have issued absent any error. *See United States v. Stevenson*, 676 F.3d 557, 565 (6th Cir. 2012). Moreover, LGI, as the party challenging the agency action, bears the burden of showing that any error was harmful. *E.g.*, *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). Even though Treasury's final regulations did not replace the temporary regulations for the 2018 tax year, Treasury's final rule allowed taxpayers to choose to apply those regulations to the 2018 tax year. Thus, taxpayers like LGI were given the chance to apply the final rules that were adopted after notice and comment. LGI's true complaint is not with procedure. It is with the rule itself, which closed the "mismatch" that LGI had been closely following—something LGI had feared all along.

### IV.   *The Regulations meet the retroactivity test in Bowen.*

Section 7805(a) directs Treasury to "prescribe all needful rules and regulations," and § 7805(b)(2) provides that such regulations may be retroactive if "issued within 18 months of the date of the enactment" of the statutory provision. The Supreme Court in *Bowen* said that

Congress must give an agency power to issue retroactive regulations in express terms.[8] *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Section 7805(b) does just that. Section 7805(b)(2) allowed Treasury to issue the Regulations retroactively because they were promulgated within 18 months of the enactment of TCJA. *See also* Sec. II.A.

The legislative history of § 7805(b)(2) supports the natural reading that Congress authorized retroactivity. The House Report states: "Any regulations filed or issued within 18 months of the enactment of the statutory provision to which the regulation relates may be issued with retroactive effect." H.R. Rep. No. 104-506, at 44 (1996). The courts, too, have viewed § 7805(b) as an express authorization. The First and Ninth Circuits interpret § 7805(b) not as a limiting provision, but as "expressly authoriz[ing]" Treasury to make regulations retroactive under its specified terms, thus satisfying *Bowen*. *Maine Med. Ctr. v. United States*, 675 F.3d 110, 118 n.14 (1st Cir. 2012); *Baldwin v. United States*, 921 F.3d 836, 844 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 690 (2020). LGI argues that § 7805(b)(2) is not an express authorization because it negates a general rule, instead of providing authorization in more affirmative terms. Doc. 32 at 15. LGI's interpretation is illogical; it would essentially nullify § 7805(b)(2), and ignores the broad authority contained in § 7805 to issue retroactive regulations.

Because Treasury acted within 18 months of TCJA, it did not need to expressly rely on § 7805(b)(3)'s authority to issue retroactive regulations to prevent abuse. But Treasury amply describes the potential for abuse when multinational corporations structure transactions, like Project Soy, to thwart the intent of Congress. Thus, the Court can also uphold the Regulations

---

[8] The Complaint also alleged the Regulations were impermissibly retroactive under the Fifth Amendment's Due Process Clause and *United States v. Carlton*, 512 U.S. 26 (1994). Doc. 1, ¶ 35. LGI abandons this argument in its summary judgment motion.

under § 7805(b)(3). The Court must evaluate de novo, as a question of law, whether the

Regulations can be applied retroactively. *E.g.*, *Elim Church of God v. Harris*, 722 F.3d 1137,

1140 (9th Cir. 2013). In sum, § 7805(b) permits the Regulations to be issued retroactively.

## CONCLUSION

For the foregoing reasons, LGI's motion for partial summary judgment should be denied.


Dated: December 22, 2021

DAVID A. HUBBERT
Deputy Assistant Attorney General

/s/ Jennifer Y. Golden
JENNIFER Y. GOLDEN
THOMAS J. SAWYER
U.S. Department of Justice, Tax Division
P.O. Box 683, Ben Franklin Station
Washington, D.C.  20044
Tel:  (202) 514-8129 (Sawyer)
        (202) 307-6547 (Golden)
Fax: (202) 307-0054
Thomas.J.Sawyer@usdoj.gov
Jennifer.Y.Golden@usdoj.gov

*Attorneys for the United States of America*


## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2021, I served a copy of the foregoing document by

filing it with the Court's CM/ECF system, which will send an electronic copy to all counsel of

record.

/s/ Jennifer Y. Golden
JENNIFER Y. GOLDEN
Trial Attorney, Tax Division
U.S. Department of Justice