**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-03501-RBJ

LIBERTY GLOBAL, INC.,

     Plaintiff,

v.

UNITED STATES OF AMERICA,

     Defendant.

---

REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

Treasury's arguments rest on a position that it has nearly limitless rulemaking authority. Treasury claims authority to issue regulations: (1) that say *whatever it wants*, even if contrary to the governing statute; (2) that apply *whenever it wants*, even retroactively despite no applicable grant of retroactive rulemaking authority; and (3) that use *whatever procedure it wants*, with the ability to ignore the APA's Pre-Promulgation Notice-and-Comment requirements.[1] Moreover, Treasury claims that its refusal to follow the APA's mandates should be excused as harmless.

The Court should deny these sweeping claims of rulemaking authority. Treasury cannot be allowed to countermand the plain, unambiguous commands of Congress—here, Congress mandated that the deduction under section 245A "shall be allowed" and left no room for Treasury to fill any relevant gaps. And, even if there were a "gap," Treasury's attempt to fill it retroactively and without notice violates Supreme Court precedent, the plain language of section

---

[1] Capitalized terms not defined herein have the meaning set forth in Plaintiff's Motion for Summary Judgment, ECF No. 32 (the "Motion").

7805(b), and the APA. Thus, the Court should hold the Temporary Regulations invalid.

    **I.**    **Treasury Was Not Authorized to Issue the Temporary Regulations.**

        Section 245A(a) contains an unambiguous congressional mandate: a deduction "*shall be allowed*" for taxpayers like LGI who are treated as receiving dividends from specified foreign corporations. (Emphasis added). Treasury concedes that the Temporary Regulations reverse the tax results under section 245A. U.S. Resp. To Pl.'s Mot. For Partial Summ. J. at 12, ECF No. 33 ("Response") (explaining the "disconnect between § 245A's language and the rest of TCJA"). That ends the inquiry; Treasury has no authority to issue regulations contradicting an unambiguous statute. *Sundance Assocs., Inc. v. Reno*, 139 F.3d 804, 807 (10th Cir. 1998) ("If the statute is clear and unambiguous 'that is the end of the matter.'" (citations omitted)); *see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).

        Despite the plain language of section 245A, Treasury claims authority to deny deductions in the circumstances described in the Temporary Regulations because section 245A "does not answer the 'specific issue addressed by the regulation.'" Response at 10 (citing *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1222 (10th Cir. 2017)). That argument, however, is rejected in the very case that Treasury cites. As the Tenth Circuit held, "a 'statute's silence on a given issue does not confer gap-filling power on an agency unless the question is in fact a gap—*an ambiguity tied up with the provisions of the statute*.'" *New Mexico*, 854 F.3d at 1223 (emphasis added; citations omitted). Put another way, courts "will not presume a delegation of power based solely on the fact that there is not an express withholding of such power." *Michigan v. EPA*, 268 F.3d 1075, 1082 (D.C. Cir. 2001) (citation omitted); *see also Contreras-Bocanegra v. Holder*, 678 F.3d 811, 816-17 (10th Cir. 2012) (agency could not redefine statutory term "alien" to mean

only noncitizens within the United States). In short, with no gap, there is no gap-filling authority.

And Treasury can identify no gap here, just a disagreement with the clear language of the statute. Nowhere in its Response does Treasury point to any ambiguous term in section 245A or argue that LGI failed to comply with any statutory provision. Accordingly, section 245A mandates that a deduction "shall be allowed." Indeed, Treasury concedes that, instead of interpreting any statutory term, the Temporary Regulations create *additional requirements* beyond those provided in the statute. Preamble at 28,403 (the Temporary Regulations create rules "for determining eligibility for the section 245A deduction"). But "[i]f Congress wished to add additional criteria, it could have done so explicitly." *Cal. Cosmetology Coal. v. Riley*, 110 F.3d 1454, 1459 (9th Cir. 1997). Or, Congress could have authorized Treasury to create additional conditions, such as by stating—as it has in other tax statutes—that the section 245A deduction would be allowed "except as provided in regulations." *See, e.g.*, sections 706(b)(4)(B), 937(a), 444(b)(4), 1059(d)(6)(A)(ii). Congress did not do that here. Instead, Congress only authorized Treasury to *enforce* or *carry out* the statute. *See* sections 245A(g), 7805(a).[2]

Moreover, the cases relied upon by Treasury reinforce its *lack* of authority to issue the Temporary Regulations. In none of those cases did an agency countermand a plain statutory provision as Treasury did here. Instead, each case involves a true "gap" under *Chevron*: where there are "undefined terms in a statute or a statutory directive to perform a specific task without detailed instructions" for carrying out the directive. *Marlow v. New Food Guy, Inc.*, 861 F.3d

---

[2] Treasury argues at length about its view of the transaction at issue in this case. *E.g.*, Response at 4-6. LGI disagrees with Treasury's characterization of that transaction, but that dispute is not relevant for the disposition on LGI's motion for summary judgment.

1157, 1163 (10th Cir. 2017); *see Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S.

44, 52-53 (2011) (interpreting whether medical residents—who arguably have attributes of both

students and employees—are "students" as that term is used in section 3121 of the Code); *Zuni*

*Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 93-94 (2007) (considering whether agency

rules properly calculated "per-pupil expenditures"—a measure that could be calculated using

"several possible different methods"—as required in the statute); *Bob Jones Univ. v. United*

*States*, 461 U.S. 574, 586-88 (1983) (Treasury pronouncement that organizations with racially

discriminatory policies were not eligible for tax-exempt status was consistent with statutory

requirement that such organizations be "charitable" as set forth in sections 501(c)(3) and 170). In

contrast, the Temporary Regulations interpret no statutory terms.

Finally, Treasury can find no support for the Temporary Regulations in "TCJA's

integrated framework, and especially, Congress's base-erosion policies." Response at 12.

Essentially, Treasury argues that the section 245A deduction should not be available "for foreign

earnings generated by a CFC that avoided the Code's anti-base erosion provisions." Response at

10. Even if the base-erosion policy reflected in certain TCJA provisions were relevant—and it is

not, given the unambiguous statute—Treasury's argument would fail. **First**, Treasury's argument

makes no sense in the context of section 245A. Whereas Treasury's argument is entirely about

ensuring foreign earnings are taxed and preventing "base erosion," section 245A does not subject

foreign earnings to tax and is not directed at base erosion. In fact, section 245A *performs the*

*exact opposite role*. Section 245A creates a "territorial system" of tax in which "income earned

outside the United States is *not taxed* in the United States." S. Comm. on the Budget, 115th

Cong., Reconciliation Recommendations Pursuant to H. Con. Res. 71, at 358 (Comm. Print

2017) (emphasis added); *see also* Response at 10 ("Section 245A implements the participation

exemption system, which allows a deduction for certain foreign earnings."). Thus, Treasury's

position that section 245A should be narrowed to prevent a taxpayer from avoiding U.S. tax is

contrary to the purpose and role of section 245A.

  **Second**, Treasury's premise that a deduction under section 245A should be allowed only

if earnings are taxed under subpart F or GILTI is wrong. Section 245A plainly—and

intentionally—applies in circumstances where subpart F and GILTI do not:

- Section 245A applies to dividends of *all* foreign earnings; subpart F and GILTI apply

  only to targeted categories of foreign income. *See*, *e.g.*, sections 952(a), (c)(2). Thus,

  a taxpayer may claim a section 245A deduction for a dividend of earnings that were

  never subject to tax under subpart F or GILTI.

- Section 245A applies to dividends from foreign corporations even where subpart F

  and GILTI do not. *Compare* section 245A(b) (deduction allowed for shareholder

  holding at least 10% of a foreign corporation), *with* section 957(a)(1) (subpart F

  applies only to foreign corporations more than 50% owned by U.S. shareholders) *and*

  951A(a) (same). Thus, a taxpayer may claim a section 245A deduction for a dividend

  from a foreign corporation that is not subject to subpart F or GILTI.

- Section 245A has a different effective date than do the GILTI regime and the

  amendments to the subpart F regime. TCJA, Pub. L. No. 115-97, § 14201(d) (2017)

  (GILTI and amended subpart F applicable to *taxable years* beginning after December

  31, 2017); *id.* at § 14101(f) (section 245A applicable to *distributions* made after

  December 31, 2017). Thus, a taxpayer may claim a section 245A deduction for a

dividend paid before GILTI or amendments to subpart F went into effect.

As shown above, the TCJA reflects several considered disconnects, balancing complex (and competing) policy goals. Congress's statutory language resolving those compromises must be respected. *See Bd. of Governors of Fed. Rsrv. Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 374 (1986) ("Invocation of the 'plain purpose' of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise . . . ."); *United States v. Smith*, 756 F.3d 1179, 1191 (10th Cir. 2014) ("[C]ourts owe respect first and foremost to 'the means [Congress] has deemed appropriate, and prescribed, for the pursuit of those purposes.'" (citation omitted)).

At bottom, Treasury's argument is that the ends justify the means because the Temporary Regulations were necessary to "preserve the integrity of the new offshore tax system and to prevent abuse." Response at 10. But those policy concerns do not create the kinds of "gaps" that Treasury can act to fill, as the Supreme Court and the Tenth Circuit have held. *Bd. of Governors of Fed. Rsrv. Sys.*, 474 U.S. at 374 ("If the [statute] falls short of providing safeguards desirable or necessary to protect the public interest, that is a problem for Congress, and not the [agency] or the courts, to address."); *New Mexico*, 854 F.3d at 1224-25 (an agency may not contradict a statute "[r]egardless of how serious the problem an administrative agency seeks to address").

## II.   Section 7805(b)(2) Does Not Authorize Treasury to Make the Temporary Regulations Retroactive.

Even if Treasury had the authority to issue new, contra-statutory regulations, it cannot apply those rules retroactively. Both Supreme Court precedent and the APA prohibit an agency from issuing retroactive regulations, except where expressly authorized by Congress. Motion at 13-14. Section 7805(b)(2) provides no such authorization.

Treasury's Response never quotes the full language of section 7805(b)(2), which

provides that "[section 7805(b)(1)] shall not apply to regulations filed or issued within 18 months

of the date of the enactment of the statutory provision to which the regulation relates." That

language, of course, grants no retroactive authority to Treasury. Accordingly, section 7805(b)(2)

does not explicitly authorize Treasury to make the Temporary Regulations retroactive. *See*

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (agencies lack "the power to

promulgate retroactive rules unless that power is conveyed by Congress in express terms").

Treasury criticizes LGI's interpretation of section 7805(b)(2) as "illogical," Response at

24, but fails to grapple with infirmities in its own position. For example, Treasury fails to

acknowledge that the two subsections immediately following section 7805(b)(2) plainly state, in

the affirmative, that Treasury regulations can apply retroactively in specified circumstances.

Sections 7805(b)(3), (4). Congress chose not to use that same affirmative, authorizing language

in section 7805(b)(2), and "[w]here Congress includes particular language in one section of a

statute but omits it from another section of the same Act, it is generally presumed that Congress

acts intentionally . . . ." *Russello v. United States*, 464 U.S. 16, 23 (1983). Moreover, Treasury's

broad interpretation of section 7805(b)(2) is inconsistent with the purpose of the bill that enacted

the provision, which reflected Congress's view that "it is generally inappropriate for Treasury to

issue retroactive regulations." H.R. Rep. No. 104-506, at 44 (1996). Thus, it would be "illogical"

to read into section 7805(b)(2) an unchecked authorization to make retroactive rules.

Treasury argues that section 7805(b)(2)'s "more specific language" overrides the APA.

Response at 18. Each case Treasury cites in support of that argument was decided under the *pre-*

*1996* version of section 7805(b), which, unlike the current provision, expressly stated that

Treasury regulations could be retroactive. Even under the broad retroactive authority granted in

the pre-1996 section 7805(b), Treasury's decisions to make rules retroactive were still reviewed for an "abuse of discretion." *See* Response at 15 (citing *Auto. Club of Mich. v. Comm'r*, 353 U.S. 180 (1957)). And if section 7805(b)(2) grants some retroactive rulemaking authority, retroactivity here would be an abuse of discretion. Even if the statute granted Treasury such authority, section 7805(b)(2) would be premised upon Congress' assumption that the statute already provides taxpayers with *some* notice of potential new rules; indeed, as discussed above, agencies have the authority only to clarify ambiguities in the statute. Where, however, Treasury invents a new set of rules that contradict the plain text of the Code, applying those rules retroactively would be an abuse of discretion. *See First Chicago Corp. v. Comm'r*, 96 T.C. 421, 438 (1991) (analyzing whether retroactive rule was an abuse of discretion by considering if rules contradicted "literal language" of statute), *aff'd*, 135 F.3d 457 (7th Cir. 1998).

Finally, Treasury argues incorrectly that "the Court can also uphold the [retroactive] Regulations under § 7805(b)(3)," Response at 24-25. Treasury did not advance that justification at the time it issued the Temporary Regulations, and it cannot advance a new ground for retroactivity *two and a half years* later. Any agency action—including a decision to make rules retroactive—is judged "solely by the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).[3]

### III.     Temporary Regulations Are Subject to the APA.

The Temporary Regulations are also invalid because they were not issued in compliance

---

[3] *Elim Church of God v. Harris*, 722 F.3d 1137, 1140 (9th Cir. 2013), does not upset this fundamental principle of administrative law. That case, which was solely about whether an agency rule had actual retroactive effect, is inapposite and does not even mention *Chenery*.

with the APA. Motion at 16-18. At the time that it issued the Temporary Regulations, Treasury argued that it had "good cause" to avoid the APA's Pre-Promulgation Notice-and-Comment requirements. Now, Treasury argues it did not need "good cause" because temporary regulations are not subject to the APA. Response at 15 ("Section 7805(e) authorizes temporary regulations with immediate effect."). Treasury's position is wrong for three reasons.

**First**, section 7805(e) does not override the Pre-Promulgation Notice-and-Comment requirement. A statute may not supersede the APA, "except to the extent that it does so expressly." 5 U.S.C. § 559. While Congress need not use any "'magic' words," s*ee* Response at 18 (citation omitted), it must unambiguously override the APA to absolve an agency of engaging in Pre-Promulgation Notice-and-Comment. As held in *Asiana Airlines v. F.A.A.*, the APA is overridden only where "Congress has established procedures so clearly different" that they "*cannot be reconciled* with the notice and comment requirements of [the APA]." 134 F.3d 393, 397-98 (D.C. Cir. 1998) (emphasis added). On the other hand, where a statute can be harmonized with the APA, the APA requirements remain in effect. For example, a statute authorizing an agency to issue "interim final" regulations—i.e., temporary regulations—with immediate effect was held to *not* override the APA. *Coal. for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 10, 18 (D.D.C. 2010). Although the relevant statute contemplated regulations that were immediately effective without Pre-Promulgation Notice-and-Comment, that statute could still be reconciled with the APA. Specifically, if the agency could establish "good cause," it could issue immediately effective regulations while still complying with the APA. *Id.*

Section 7805(e), which similarly authorizes the issuance of interim regulations, can also be reconciled with the APA's Pre-Promulgation Notice-and-Comment requirement. Section

7805(e) eliminates no APA requirements and, instead, imposes two *additional* requirements for temporary regulations: (1) temporary regulations must always be accompanied by proposed regulations, and (2) temporary regulations cannot be effective for more than three years. Treasury can do each of those things while still complying with the APA. As in *Sebelius*, Treasury could establish that it had "good cause" to make temporary regulations immediately effective without Pre-Promulgation Notice-and-Comment.

Indeed, LGI's interpretation is consistent with Treasury's own conduct in issuing the Temporary Regulations. Treasury invoked the Good Cause Exception when it issued the Temporary Regulations, which Treasury would not have needed to do if section 7805(e) already exempted those regulations from the APA. Preamble at 28,405; *see also Policy Statement on the Tax Regulatory Process*, Department of the Treasury at 1 (Mar. 5, 2019), https://home.treasury.gov/system/files/131/Policy-Statement-on-the-Tax-Regulatory-Process.pdf (stating Treasury's commitment to "include a statement of good cause when issuing any future temporary regulations"). Thus, as held in the only two opinions to directly address the issue, section 7805(e) does not override the APA. *Chamber of Commerce of U.S. v. IRS*, 2017 WL 4682050, at 6 (W.D. Tex. Oct. 6, 2017); *Intermountain Ins. Serv. of Vail, LLC v. Comm'r*, 134 T.C. 211, 246 (2010) (Cohen, J., concurring).

**Second**, the only two cases that Treasury cites where Congress expressly overrode the APA's requirements are distinguishable from the instant case. As discussed above, the *Asiana Airlines* court held that Congress had overridden the APA only after determining that the specific procedures established by Congress in the relevant statute "cannot be reconciled with the notice and comment requirements of § 553." 134 F.3d at 398. In particular, Congress explicitly

established a timeline for seeking notice-and-comment that necessarily departed from APA norms. *Id.* (the F.A.A. "shall publish in the Federal Register an initial fee schedule and associated collection process *as an interim final rule*, *pursuant to which public comment will be sought and a final rule issued*" (emphasis added)). Congress did no such thing in section 7805(e). In the other case that Treasury cites, Congress explained procedures for a rulemaking process using the text of the APA as a guide (which it did not do here). *Marcello v. Bonds*, 349 U.S. 302, 308-09 (1955). Therefore, where the statute deviated the APA's language, that departure was an intentional congressional decision to deviate from the APA process. *Id.*

**Third**, Treasury's position, if accepted, would allow Treasury to avoid the APA's requirements at any time in its absolute discretion. If section 7805(e) exempts temporary regulations from the APA, Treasury could issue all regulations as temporary regulations and never engage in Pre-Promulgation Notice-and-Comment for any regulation. Section 7805(e)—which creates additional procedural requirements for temporary regulations—cannot be read to give Treasury such unchecked and unparalleled discretion to skip the fundamental tenet of administrative rulemaking applicable to every federal agency.

## IV. Treasury Lacked "Good Cause" to Forego Pre-Promulgation Notice-and-Comment, and Its Failure to Follow the APA Was Not Harmless Error.

For the reasons discussed above, Treasury was required to issue the Temporary Regulations in compliance with the APA, only after Pre-Promulgation Notice-and-Comment. Treasury's failure to do so is excused by neither "good cause" nor as harmless error.

### A. Pre-Promulgation Notice-and-Comment Was Not Impracticable.

Treasury's arguments that it had "good cause" to forego Pre-Promulgation Notice-and-Comment miss the point. The Good Cause Exception is narrow; an agency invoking that

11

exception must "show the impracticability of affording notice and comment." *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 213 (5th Cir. 1979). Here, Treasury can make no such showing.

Treasury's arguments ignore the question of whether Pre-Promulgation Notice-and-Comment was "impracticable." Instead, Treasury's good-cause arguments are simply an attempt to make the Temporary Regulations immediately effective upon publication and, therefore, meet the purported deadline under section 7805(b)(2) to make those rules retroactive. The APA, however, does not contemplate using "good cause" to make rules retroactive. *See* 5 U.S.C. 551(4) (defining a "rule" to have only "future effect").

Moreover, Treasury's good-cause arguments are inconsistent with its position that the Temporary Regulations could be retroactive. For example, Treasury argues that it needed to forego Pre-Promulgation Notice-and-Comment, because otherwise taxpayers would have the opportunity to engage in "the types of transactions targeted by the rule" resulting in "imminent, significant, and irreversible harm to the public fisc." Response at 19. That argument makes no sense, however, if Treasury had authority to make the Temporary Regulations retroactive. Allowing Pre-Promulgation Notice-and-Comment creates no opportunity for taxpayers to engage in transactions if rules would be *retroactively* effective.

The real question, therefore, is why Treasury was required in June 2019 to take "immediate action." Response at 19. As detailed in LGI's Motion, the need for immediate action was the result of Treasury's own delay. Motion at 19-21. Treasury had ample opportunity to comply with Pre-Promulgation Notice-and-Comment prior to its purported June 2019 deadline; it had 18 months following the enactment of the TCJA. Indeed, Treasury admits in its response that it knew of the purported need for the Temporary Regulations no later than May 2018, giving it a

full 13 months to issue regulations in compliance with the APA. Response at 7. Treasury does

not even attempt to explain why Pre-Promulgation Notice-and-Comment was impracticable in

that timeframe. *See* Motion at 20-21 (citing statements by a Treasury official of intent to comply

with the APA). In fact, Pre-Promulgation Notice-and-Comment was *not* impracticable and, as a

result, the Good Cause Exception does not apply.[4]

For the same reasons, Treasury's position finds no support in *Northern Arapahoe Tribe v.

Hodel*, 808 F.2d 741 (10th Cir. 1987), or *North American Coal Corp. v. U.S. Dep't of Labor*, 854

F.2d 386 (10th Cir. 1988). Those cases do not address the question of whether an agency could

have, with appropriate diligence, allowed Pre-Promulgation Notice-and-Comment in time to

prevent the "harm" the regulations were designed to prevent. Moreover, courts have required

compliance with Pre-Promulgation Notice-and-Comment on even shorter timelines than the one

in this case. Motion at 19-20. Treasury offers no response to those cases.

Finally, Treasury's statistics regarding how frequently the Good Cause Exception is

invoked is both irrelevant and misleading. *See* Response at 20. The percentage cited by Treasury

includes regulations that, on their face, are plainly different from the rules here. For example,

more than 95% of the cases in which the Good Cause Exception was invoked were "minor

rules," a far cry from the novel, substantive Temporary Regulations. U.S. Gov't Accountability

Off., GAO-13-21, *Agencies Could Take Additional Steps to Respond to Public Comments*, 8, 15

(2012). In any event, the sole question here is whether Treasury can satisfy the legal standard to

---

[4] Treasury's lack of urgency in promulgating the Temporary Regulations belies its concerns
about potential harm to the public fisc. If that harm were so concerning, why did Treasury
prioritize 150 pieces of other guidance over the Temporary Regulations? *See* Response at 20.

invoke the Good Cause Exception in this case, not what agencies may have done for other rules.

### B.  Treasury's Failure to Comply with the APA Was Not Harmless Error.

Treasury argues that its failure to conduct Pre-Promulgation Notice-and-Comment was

harmless error because "Treasury complied with the APA when finalizing the regulations."

Response at 23. Treasury's argument is wrong, both factually and legally.

**First**, Treasury has never "finalized" the Temporary Regulations—the only regulations

that would apply in this case. Instead, final section 1.246-5 regulations are applicable only

prospectively from the date the regulations were first proposed. Indeed, Treasury explicitly

provided that the Temporary Regulations—never finalized—would continue to apply to

transactions occurring prior to June 2019. 85 Fed. Reg. 53,068, 53,077 (Aug. 27, 2020).

**Second**, Treasury offers no legal support for its position that *post*-promulgation notice-

and-comment could cure its failure to allow Pre-Promulgation Notice-and-Comment. The single

case that Treasury cites for this position—*Little Sisters of the Poor Saints Peter & Paul Home v.*

*Pennsylvania*, 140 S. Ct. 2367 (2020)—is inapposite. In that case, the Court held simply that the

agencies' mislabeling of proposed regulations was harmless error. 140 S. Ct. at 2385. Critically,

the affected parties "certainly" had been given the opportunity for *Pre*-Promulgation Notice-and-

Comment required by the APA. *Id*. Not so here.

To the contrary, failure to comply with Pre-Promulgation Notice-and-Comment is *not*

excused by post-promulgation notice-and-comment. *See* Motion at 22. That is because

"[p]ermitting the submission of views after the effective date is no substitute for the right of

interested persons to make their views known to the agency in time to influence the rule making

process in a meaningful way." *U.S. Steel Corp.*, 595 F.2d at 214-15 (citation omitted). Indeed,

Pre-Promulgation Notice-and-Comment is particularly important where, as here, an agency

issues new rules that contradict the plain meaning of the statute; in such circumstances, the

agency's failure to provide notice cannot be said to be "harmless."

Respectfully submitted this 24th day of January, 2022.

| | /s/ Rajiv Madan |
|---|---|
| Gregory S. Tamkin | **Rajiv Madan** |
| Dorsey & Whitney LLP | Skadden, Arps, Slate, Meagher & Flom LLP |
| 1400 Wewatta Street, Suite 400 | 1440 New York Avenue, N.W. |
| Denver, CO 80202-5549 | Washington, DC 20005 |
| Telephone: (303) 629-3400 | Telephone: (202) 371-7020 |
| Fax: (303) 629-3450 | Fax: (202) 661-9020 |
| E-mail: tamkin.greg@dorsey.com | E-mail: raj.madan@skadden.com |
| | *Attorneys for Plaintiff Liberty Global, Inc.* |

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of January 2022, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system which will send notification of such filing to:

Thomas J. Sawyer
Jennifer Yu Golden
U.S. Department of Justice
P.O. Box 683, Ben Franklin Station
Washington, DC 20044
E-mail: Thomas.J.Sawyer@usdoj.gov
E-mail: Jennifer.Y.Golden@usdoj.gov
*Attorneys for the United States of America*

/s/ Rajiv Madan
**Rajiv Madan**
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7020
Fax: (202) 661-9020
E-mail: raj.madan@skadden.com
*Attorney for Plaintiff Liberty Global, Inc.*