IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03501-RBJ

LIBERTY GLOBAL, INC.,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.

---

**UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

---

**INTRODUCTION**

Liberty Global Inc. ("LGI"), a U.S. corporation, seeks to use a series of highly engineered related-party transactions to avoid paying tax on a $2.4 billion gain. The gain stemmed from LGI's successful investment in a Belgian communications company, Telenet Group Holding ("TGH"). TGH was a controlled foreign corporation ("CFC") of LGI and subject to U.S. shareholder-level taxation, *i.e.*, it was "in the U.S. tax net[.]" (Archer Dep. (Ex. A) at 41-42.)[1] After Congress passed the 2017 Tax Cuts and Jobs Act ("TCJA"), LGI decided to sell TGH to LGI's U.K.-based parent company (the "TGH Transaction"). The TGH Transaction severed TGH's tax nexus to the U.S., meaning that TGH's future earnings would not be subject to various U.S. taxes. Nothing in the TCJA barred LGI from selling its stake in TGH to eliminate

---

[1] Exhibits are identified in the accompanying Table of Exhibits.

1

U.S. taxes on its earnings for future years, so long as it paid U.S. tax on its $2.4 billion gain in 2018. But LGI contends it could move TGH outside the U.S. tax net, without paying tax Congress clearly intended LGI to pay, by claiming an offsetting $2.4 billion *deduction*.

LGI's solution was Project Soy, a series of paper transactions between related entities that were executed over four days at year end: December 25-28, 2018. Project Soy consisted of four interrelated steps. Step 4, the TGH Transaction, was relatively straightforward, but had to be precisely timed to avoid tax on what is known as subpart F income and global intangible low taxed income (GILTI). LGI's tax experts also made sure that, before Step 4, TGH first completed a series of preliminary maneuvers (Steps 1-3) designed for TGH to generate $4.8 billion in putative earnings and profits ("E&P"). LGI argues that this E&P converted the proceeds from the TGH Transaction to a "deemed" dividend, for which it claims it can take a § 245A deduction, thus eliminating the tax on the gain or on those paper earnings.[2]

LGI seeks a refund for taxes it says it paid but would not owe if Project Soy is respected. But even if LGI complied with the letter of the TCJA, courts have long recognized that clever taxpayers often exploit tax statutes in ways Congress never intended. Courts therefore consider the substance, not just the form, of tax-motivated transactions to determine "whether what was done, apart from the tax motive, was the thing which the statute intended." *Gregory v. Helvering*, 293 U.S. 465, 469 (1935). Here, the Court should apply the economic substance doctrine, codified at § 7701(o), and/or the step transaction doctrine, a common law substance-over-form principle, to disregard the artificial tax attributes LGI engineered in Steps 1-3 of Project Soy, and deny its claimed tax refund.

---

[2] Section references are to the Internal Revenue Code, 26 U.S.C., unless otherwise noted.

## LEGAL BACKGROUND

The TCJA transformed U.S. corporate international taxation. Previously, a U.S. corporation's CFC earnings were generally taxed only when repatriated. One exception was known as the subpart F regime (§ 951 *et seq*.). Subpart F, enacted in 1962, subjected U.S. CFC shareholders to immediate tax on some types of foreign income, including "passive income and other income that is readily movable from one taxing jurisdiction to another." S. Prt. 115-20, S. Comm. on the Budget, 115th Cong. (2017) ("S. Rep.") (Dkt. 41 at 77). Subpart F prevented U.S. companies from avoiding current U.S. taxes by keeping foreign earnings offshore. *See* S. Rep. No. 1881, 87th Cong., 2d Sess. 78 (1962). The TCJA retained subpart F but introduced two new key elements. First, it added GILTI, another category of foreign earnings subject to immediate tax, to serve as a cornerstone of the new regime. *See* S. Rep. (Dkt. 41 at 90 ("Intangible income is mobile and constitutes a large portion of the foreign-source income earned by U.S. corporations").) Second, it exempted certain non-GILTI and non-subpart F earnings from tax through the dividends-received deduction under § 245A. *See id*. (Dkt. 41 at 78, 90.)

The deduction may encourage companies to bring foreign earnings back into the U.S. by, in effect, reducing one level of taxation. (Dkt. 46 at 2.) But Congress recognized that "without any base protection measures," the deduction might also encourage companies to allocate income to foreign affiliates such that "the income could potentially be distributed back to the U.S. with no U.S. tax imposed." (Dkt. 41 at 90). By retaining subpart F and instituting GILTI, Congress ensured there were at least two "anti-base erosion" safeguards that would subject some portion of a multinational group's income to U.S. tax. Together, GILTI and subpart F tax a significant portion of U.S. corporations' foreign earnings.

3

But technical errors, gaps, or ambiguities in highly complex tax statutes are not uncommon, and the TCJA had many to exploit. (*See* Penne Dep. (Ex. B) 244 ("There was a lot of things poorly written in that legislation.").) Following the TCJA's passage, LGI's tax professionals soon learned of an apparent "mismatch" (as they called it) between (a) the rules for paying the GILTI and subpart F tax on a gain generated by a CFC, and (b) the qualification of an entity as a CFC. (*See* Penne Dep. 239-40 and LGI 3459 (Ex. 1) (discussing "mismatch").) In short, a foreign corporation not directly owned by any U.S. person might qualify as a CFC for U.S. tax purposes because ownership may be "attributed" to a U.S. person, but only CFCs with an actual U.S. shareholder on the last day of the taxable year would be subject to GILTI or Subpart F. *See, e.g.,* N.Y. State Bar Ass'n Tax Section, Report on the GILTI Provisions of the Code, at 49 (2018) (Dkt. 41 at 35 (discussing "last CFC date").) This mismatch arose because of the TCJA's attempt to shut down potentially abusive arrangements known as "de-controlling" transactions (not at issue here), by repealing the "downward attribution" rules of § 958(b)(4). *See* H.R. Rep. No. 115-466, at 633 (2017) (Conf. Rep.); Staff of the Joint Comm. on Taxation, 115th Cong., *General Explanation of Pub. L. 115-97*, at 384-85 (2018) (JCS-1-18) (Dkt. 41 at 119-20). But as a result, a corporation might claim CFC status, yet have no U.S. shareholders to pay GILTI and subpart F tax at year-end.[3] Project Soy was specifically designed to take advantage of this mismatch. It generated artificial E&P that, but for the mismatch, would have been taxed under subpart F or GILTI. The scheme was designed to generate enough artificial E&P to offset

---

[3] Treasury has filled this gap by regulation, but the final regulation was issued too late to apply here, and the Court invalidated an earlier version for procedural reasons. (Dkt. 46)

4

LGI's taxable gain on the TGH Transaction. LGI could afford to generate high E&P without paying tax on the E&P only because of the mismatch.

## STATEMENT OF FACTS[4]

***1. Key entities and tax personnel.*** LGI, the U.S. taxpayer here, is owned by Liberty Global plc, a U.K. entity. (*See* LGI 3 (Ex. 2) at internal pg. 2). Prior to Project Soy, Liberty Global plc and LGI collectively held a majority interest in TGH through a series of intermediate entities, as shown to the right. (KPMG _DOJ _LGI 128 - 141 (Ex. 3) ("Archer memo") at 128-29; LGI Refund Claim, Statement A (Ex. 4 ("Statement A")) at 1.) TGH itself had several subsidiaries, including Telenet Group BVBA ("Telenet Group"). (LGI 7321 (Ex. 7) at 7331.) A lower-tier subsidiary, Telenet Financing USD LLC ("Telenet Financing"), provided financing for Telenet Group by borrowing from outside lenders. (RFA 24 (Ex. F at 13-14).) [5]

```
Liberty Global plc
        │
       LGI
        │
   LGI Slovakia
        │
 Liberty Global
   Broadband I
        │
 Liberty Global
   Broadband II
        │
    Binan          Minority
 Investments     shareholders
        │             │
        └──────┬──────┘
               │
   TGH (publicly traded holding
      company of Telenet)
               │
       Telenet Group
          BVBA
               │
         TIF S.a.r.l.
               │
     Telenet Financing
            USD
```

LGI's Denver-based tax department included Margit Archer, its Director of Global (or Group) Tax Strategy. (Archer Dep. 86-87; LGI 4827 (Ex. 8).) Archer reported directly to Shawn Penne, Vice President for Group Tax Strategy, also based in Denver, who was responsible for worldwide tax strategy. (*See* Penne Dep. 23.) Archer and Penne initially developed the strategy that became Project Soy. (Archer Dep. 25-28, 45-46; *see also* LGI 6054-63 (Ex. 6) (initial plan)). They received assistance from LGI's primary outside tax advisors, Deloitte. (RFA 1 (Ex. F at 2.)) Other Denver-based LGI tax professionals assisted in

---

[4] The United States attaches a timeline of key events for the Court's convenience.
[5] Certain LGI documents list other intermediate entities between LGI and TGH, as well as other TGH subsidiaries, that are not significant here.

5

executing the project, including Marianne Deda, who reported to Penne, and Tina Zheng, who reported to Deda and Archer at different times. (Deda Dep. (Ex. C) 8-9, Zheng Dep. (Ex. D) 25.) LGI also called on Belgian tax professionals, including Karl Abelshausen, who led TGH's tax function. (*See* Archer Dep. 23, 57.)

*2. Project Soy Overview:* Project Soy went through at least sixteen iterations over six months. (RFA 61 (Ex. F at 22, Ex. F-1 (charts).) The final version incorporated four distinct "Steps," which LGI diagrammed in a confidential step plan, attached at Exhibit 2 (LGI 3-9).

**Step 1 (relating to profit certificates) – initiated October 15 and executed December 26:** Telenet Group (the operating subsidiary) reduced TGH's share capital, *i.e.*, the recorded value of TGH's ownership in the Telenet Group, by €4.288 billion. TGH was momentarily left with only a small capital interest (€61,500) and a "claim" against Telenet Group for the remaining €4.283 billion. (LGI 7321 (Ex. 7) at 7325, LGI 3 (Ex. 2) internal pgs. 3, 5.)

**Step 2 (relating to "springing to life" debt) - December 25**: Telenet Group, through a subsidiary, transferred Telenet Financing to TGH for a nominal price of €3, *i.e.*, Telenet Financing became a direct subsidiary of TGH, as opposed to an indirect subsidiary through Telenet Group. (LGI 3 (Ex. 2) internal pg. 4; RFA 27 (Ex. F at 14).)

**Step 3 (E&P generating step) - December 26:** In Step 3A, Telenet Group converted from a BVBA to an NV under Belgian law. (LGI 3 (Ex. 2) internal pg. 5.)[6] BVBAs are akin to limited liability companies in the U.S. and usually are not taxed as separate entities (*i.e.*, they are "disregarded"); NVs are akin to corporations in the US, a separate entity for tax purposes. (*See*

---

[6] Just two years earlier, Telenet Group, then known by the name Base Company, was an NV entity. It only became a BVBA around 2016, when Liberty "advised Telenet" that it would "prefer" a BVBA for U.S. tax reasons. (Penne 58-62; Abelshausen Dep. (Ex. E) 31).

6

Archer memo (Ex. 3) at 131); Treas. Reg. § 301.7701-2. The conversion also caused the intercompany debt (previously disregarded for tax purposes) to "spring to life." (RFA 34-35 (Ex. F at 28-29)). In Step 3B, Telenet Group NV issued profit certificates to TGH in the amount of its capital claim from Step 1, €4.288 billion. (LGI 3 (Ex. 2) internal pg. 5; RFA 18 (Ex. F at 11-12).)

**Step 4 (moving Telenet out from under U.S. ownership) - December 28**: LGI, through a subsidiary, sold its interest in TGH to Liberty Global plc, in exchange for a $3.2 billion intercompany note. (Case No. 22-cv-2622, Dkt. 31 ("LGI Answer") ¶ 10; LGI 3 (Ex. 2) at internal pg. 6.)[7] The sale yielded LGI a gain of $2.4 billion. (*See* LGI Answer ¶ 11, RFA 41 (Ex. F at 17).)

***3. The tax machinations underlying Project Soy.*** Although the TCJA included large tax cuts, its tax base-protection measures limited the scope of those cuts. (*See supra* at 3; *see also* Archer Dep. 39-40.) LGI knew that if it sold its interest in TGH in 2018, TGH would not be subject to U.S. tax in 2019 and beyond. (*See* Archer Dep. 41-42.) But moving an entity outside the U.S. tax net is itself a taxable event, and LGI's investment in TGH had appreciated by $2.4 billion. (RFA 41 (Ex. F at 17), LGI Answer ¶ 11.) As Archer noted in a technical memo, "[o]n first impression [the TGH transaction] should be treated as a taxable sale under section 1001 and, absent any other code section, LGBBI [an LGI subsidiary] should include in its income the gain on the TGH stock as a capital gain." (Archer memo (Ex. 3) at 138.)[8] Applying the standard 21% Subpart F rate (*see* RFA 55 (Ex. F at 30)) to $2.4 billion results in substantial tax.

---

[7] The United States filed a related suit in October 2022 seeking additional taxes LGI would owe if Steps 1-3 are disregarded. (Case No. 22-cv-2622.)
[8] The memo, which was provided to LGI's auditors at KPMG, largely ignores the first steps in the step plan documents, and refers to the NV conversion as Step 1.

LGI admits that it could have completed Step 4, the TGH Transaction, without Steps 1-3. (*See* RFA 12 (Ex. F at 5).) But the four Steps together were "part of a unitary plan to achieve [LGI's] expected U.S. federal income tax treatment." (*See* RFA 10 (*Id*.).) Telenet's Belgian tax professionals understood this too: they knew that Steps 1-3 were designed "to obtain the right U.S. tax characterization" for Step 4, *i.e.*, "to make sure that the consequences of [] the Trump tax reform [the TCJA] are not there." (LGI 7321 (Ex. 7) at 7323, Abelshausen Dep. 146-47.)

LGI admits that, from its perspective, Steps 1-3s' "primary purpose" was to generate E&P. (RFA 11 (Ex. F at 5).) Generating E&P was important because the proceeds from the sale of a CFC could be treated as "a dividend to the extent of the [CFC's] E&P" under §§ 964(e)(1) and 1248(a). (Archer memo (Ex. 3) at 138.) In other words, if TGH had sufficient E&P, LGI could treat its gain as a dividend and offset the entire $2.4 billion by claiming a § 245A deduction. (*See id*. at 136-38, 140.) Further, no LGI-related entity would actually pay tax on that E&P, since only a U.S. shareholder holding an interest in TGH on December 31 would be liable for such tax, and the sale would close December 28. (*See supra* at 7; *see also* §§ 951(a)(1) (subpart F inclusions) and 951A(e)(1) (GILTI inclusions)).

LGI's plan to recharacterize its $2.4 billion gain as a deemed dividend and take a § 245A deduction, however, required LGI's share of TGH's E&P to at least equal LGI's gain. (*See* Penne Dep. 217, 219.) The problem was that, absent Project Soy, TGH did not have enough E&P: one estimate showed that TGH's non-Soy E&P was only about €407 million. (Archer Dep. 202-03, 209-210, LGI 1285 (Ex. 9) (Tab "Lead_TN" tab, sum of cells C63 and 64).)

LGI solved the problem of insufficient E&P through highly structured transactions turning on § 351. Section 351 ordinarily allows a taxpayer to contribute assets to a corporation in

8

exchange for common stock, without recognizing a gain. (*See* Archer Dep. 81-82, 104-06 (discussing "non-recognition" principles).) But Archer knew that if a taxpayer received what is colloquially known as "boot" – property other than common stock – in exchange for contributed assets, the boot could trigger a gain under § 351(b), which in turn created E&P. (*Id*.)

LGI created steps to manufacture $4.8 billion of E&P for TGH in two ways. First, Telenet Group issued profit certificates to TGH in Steps 1 and 3. (RFA 21 (Ex. F at 12-13), LGI 3 internal pg. 5.) LGI anticipated that the profit certificates would be classified as non-qualified preferred stock (a type of boot) under § 351(b) and (g), instead of common stock. (*See* Archer Dep. 73, 76-78.) LGI essentially contends that when Telenet Group converted to an NV (Step 3), TGH "contributed" its Telenet Group BVBA capital in return for boot in the form of the profit certificates.[9] (Archer Dep. 96-97.)

The second way LGI generated E&P was through "springing to life debt" in Steps 2 and 3. As described above, in Step 2, Telenet Financing was moved up in the ownership chain and placed directly under TGH. Telenet Financing's purpose was to borrow funds from outside lenders and lend those funds to Telenet Group or other Telenet entities, as needed. (RFA 24 (Ex.

---

[9] LGI admitted that Steps 1-3 were primarily tax-related and had no meaningful economic impact or substantial non-tax business purpose. (RFAs 3-8, 11 and 15 (Ex. F at 3-7).) LGI has suggested a *non-substantial* Belgian law purpose for the BVBA to NV conversion, presumably so that Telenet Group could issue "profit certificates." (*See* RFAs 11 and 7 (Ex. F at 4-5).) It is true that in 2018, under Belgian law, NVs could issue profit certificates but BVBAs could not. If this case were to proceed to trial, the U.S.' Belgian law expert would explain that if TGH wanted preferred rights to Telenet Group distributions, Telenet Group could have issued preferred stock (an equivalent security) to TGH without the bother of an entity conversion. But TGH did not need any such preference, via preferred stock *or* profit certificates, because it owned all of Telenet Group and did not need preference against itself. It was not preferential distribution rights that LGI wanted Telenet Group to create, but "boot," which was necessary only for LGI's U.S. tax purposes. Regardless, given LGI's admissions, no trial is necessary on this point.

F at 13-14).) As Telenet Financing's owner, TGH became, in effect, Telenet Group's creditor. When Telenet Group converted to an NV in Step 3, it became a "regarded" entity separate from TGH, which in LGI's view, caused the intercompany debt held by TGH/Telenet Financing to "spring to life," or become "regarded" for U.S. tax purposes. (RFA 32 (Ex. F at 27).) LGI contends that this "springing to life" debt is boot under § 351. (RFA 35 (Ex. F at 28-29); Penne Dep. 196-97; Archer Dep. 112-13 (recognition of boot in Step 3 depended on completing Step 2); Archer Dep. 154-55 and LGI 4827 (Ex. 8) (early "springing to life" debt discussions).)

LGI carefully monitored the § 351 calculations to make sure there would be enough E&P to offset its gain. LGI referred to the amount of E&P above the amount needed to fully offset the gain as "cushion." For example, on December 12, 2018, Penne informed van den Berg, the global tax head, that "the cushion for generating enough E&P [] to get TLNT gain fully exempt has been eliminated with latest estimates … [We] do have enough to get full exempt but any decrease …would likely result in a portion of [Step 4's] gain potentially being Subpart F (and not exempt)." (LGI 3459 (Ex. 1).) LGI, around the same time, increased its "cushion" estimate to about €99 million. (Penne Dep. 227, LGI 1285 (Ex. 9) (line 92, "964(e) E&P 'cushion'").)

Of course, any benefit from increasing E&P would be for naught if LGI had to pay GILTI or subpart F tax on the boot gain (*i.e.*, the putative E&P). This is where the TCJA "mismatch" came in. LGI held its interest in TGH through LGI Slovakia (despite its name, a U.S. corporation). (Archer memo (Ex. 3) 138.) Step 4, the ultimate sale, was executed on December 28. (LGI 3 (Ex. 2 at 7); *see also supra* at 7), so LGI Slovakia was no longer a TGH shareholder at year-end, and would not have any GILTI or subpart F inclusion on LGI's tax return. (Statement A (Ex. 4) at 2; Archer memo (Ex. 3) at 138.) This mismatch's subtlety is

10

underscored by LGI's own tax employees' initially including the boot gain (*i.e.*, LGI Slovakia's share of TGH's income) in LGI's calculations. Deda caught the error and explained that it "was causing an uh-oh" because "we don't flow TNET up to the GILTI schedule" due to the "Subpart F rule where you have to be a shareholder *on the last day of the year*." (Dkt. 33-4 at LGI 1405 (emphasis added).) The timing was also important in other ways. The E&P that LGI could claim depended in part on the number of days that LGI held an interest in TGH. (Zheng Dep. (Ex. D) 76-77.) Had the transactions closed at mid-year, the putative E&P would be halved. (*Id.*)

While LGI was reworking Project Soy's sixteen iterations (RFA 61 (Ex. F at 22, Ex. F-1 (charts)), it was also "closely follow[ing] legislative and regulatory developments" regarding the TCJA and other tax provisions "including §§ 245A, 951, 951A, and 957 before making the final decision to go forward with the execution of the four steps." (RFA 51 (Ex. F at 20).) LGI knew that Congress or Treasury could fix the "mismatch" through technical corrections or regulations and watched for any fixes. (Archer Dep. 135-36; Penne Dep. 237-39, 248-49).) For example, on December 12, Penne noted a draft bill that would give "Treasury broad authority to write regulations to prohibit the avoidance of income" in connection with the CFC rules. (LGI 3459 (Ex. 1).) Penne believed that Treasury would "close the last day of year rule/mismatch" but did not expect the bill to be addressed until the new year. (*Id.*) Penne also reported that he believed that CEO Mike Fries "still had concerns" about Project Soy and wanted "more understanding of benefits/why now vs. waiting" before a discussion with Bryan Hall (general counsel) and John Malone (global chair). (*Id.*; *see also* LGI 2197 (Ex. 10), Penne Dep. 278-79, 349-50).

Notably, although Project Soy's Steps 1-3 involved transactions exclusively amongst Telenet entities, it was LGI, not Telenet, that created and directed the strategy—even though LGI

11

was neither the issuer nor the recipient of the profit certificates, and was neither the creditor nor the debtor of the "springing to life" debt. While most of the Steps involved transactions amongst Telenet entities, LGI paid Telenet's Project Soy costs, including Telenet's bills for outside counsel (at Freshfields and others), accounting services (Deloitte and KPMG), and operational expenses. (RFA 64 (Ex. F at 23); Abelshausen Dep. 340-42.) The TGH board had to approve some of the Project Soy Steps (*see, e.g.*, RFA 2 (Ex. F at 2)), but TGH was willing to approve the sale because it understood that the TCJA might impose new and undesirable constraints on its U.S.-based shareholders, and consequently on TGH's ability to issue dividends or make related decisions. (*see* LGI 7321 (Ex. 7) at 7322; Abelshausen Dep. 152-154 (discussing LGI 7322), 226-27 (minor change in errata), 325-327, 331-333). Step 4 alone would have moved TGH outside the U.S. tax net, but TGH understood the first three steps would ensure the "right US tax characterization" for its U.S. shareholders on the sale. (LGI 7321 (Ex. 7) at 7323.) (And any vote by the full board would include LGI-affiliated directors, who held a majority of the seats. (Penne Dep. 53; Abelshausen Dep. 204-06.)) Project Soy did not save any Belgian taxes. (*Id.* at 365-66.) It was LGI's idea to create gain by issuing profit certificates, and Telenet Group reduced TGH's capital solely to facilitate that plan. (Archer Dep. 79, Abelshausen Dep. 288-89.) TGH's board approved the Telenet Financing transfer to TGH, but the idea to sell a company internally did not come from anyone in Belgium. (*See* Abelshausen Dep. at 130-32.) Finally, although LGI had represented to the IRS that Project Soy was designed in part to address upcoming changes in Belgian law (*see* USA 2082 (Ex. 11) and Deda Dep. 43-44 (Ex. C)),

TGH's corporate representative testified that TGH did not consider such changes as a reason for approving Project Soy. (Abelshausen Dep. 244-47.)[10]

  **4. *LGI's refund claim.*** LGI filed its original 2018 tax return in October 2019. (*See* Statement A (Ex. 4), at 4 of 10.) LGI initially purported to follow the temporary Treasury regulations that closed the "mismatch" and paid the tax it calculated would be due accordingly. Two months later, LGI filed an amended return that sought a refund based on Project Soy, without applying the temporary regulations. (Amended return (Form 1120X), Statement 1 (Ex. 5 at 1).) One result, according to LGI, was that it claimed a $2.4 billion dividend under § 964(e)(4) and the associated § 245A deduction. (*Id.*; *see also* Dkt. 33-1 (Rhee dec.) at ¶ 5), Statement A at 1). Another result was that LGI decreased its "gross-up for foreign taxes deemed paid" (§ 78) by $64 million. (Statement 1 (Ex. 5) at 1.) LGI thereafter filed this suit.

### ARGUMENT

**A. Project Soy is an abusive tax avoidance transaction that generated tax benefits unintended by Congress and subject to the judicial doctrines.**

  Taxpayers frequently exploit the tax code in ways unintended by Congress, even while claiming to comply with the letter of the law. *See, e.g.*, *Sala v. United States*, 613 F.3d 1249, 1253 (10th Cir. 2010); *Coltec Industries, Inc. v. United States*, 454 F.3d 1340, 1352 (Fed. Cir. 2006) (noting that the Supreme Court "disregarded a transaction which complied with the literal terms of the tax code"). As the Tax Court has noted, "courts have rejected a mechanical or formalistic compliance with the rules of subpart F." *Tucker v. Comm'r*, T.C. Memo. 2017-183 at

---

[10] LGI's admissions make the true purpose of Project Soy clear—avoiding U.S. tax. (*See* RFAs 3-8, 10-14, and 17 (Ex. F at 3-7, 11).)

13

49, *aff'd*, 766 Fed. Appx. 132 (5th Cir. 2019); *see also Schering-Plough Corp. v. United States*, 651 F.Supp.2d 219, 271 (D. N.J. 2009) (explaining that subpart F "was specifically designed to prevent" attempts "to bring … untaxed foreign income back to the United States without paying an up-front tax"), *aff'd sub nom Merck & Co. Inc. v. United States*, 652 F.3d 475 (3d Cir. 2011). These doctrines "prevent taxpayers from subverting the legislative purpose of the tax code." *Consol. Edison Co. of New York, Inc. v. United States*, 703 F.3d 1367, 1374 (Fed. Cir. 2013).

The Tenth Circuit describes these doctrines as a "cardinal rule of the tax code." *Keeler v. Comm'r*, 243 F.3d 1212, 1215 (10th Cir. 2001) (citing *Gregory*, 293 U.S. at 469-70). The applicable judicial doctrines here are the economic substance and the step transaction doctrines. The Tenth Circuit has noted that in "a field as intricate and ingenious as the tax shelter industry," the economic substance doctrine is necessarily flexible to allow for the "ongoing adaptation to new schemes" designed to avoid taxes. *Blum v. Comm'r*, 737 F.3d 1303, 1311 (10th Cir. 2013). With respect to the step transaction doctrine, the Tenth Circuit has described it as a "fundamental tax principle that operates to prevent the true nature of a transaction from being disguised by mere formalisms, which exist solely to alter tax liabilities and [that] promotes the effective administration of the tax policies of Congress." *True v. United States*, 190 F.3d 1165, 1174 (10th Cir. 1999). Moreover, a taxpayer seeking a deduction bears the burden of proof, and when the deduction is based on a tax motivated transaction, the taxpayer faces "an unusually heavy burden[.]" *See Coltec*, 454 F.3d at 1355; *see also BB&T Corp. v. United States*, 523 F.3d 461, 471 (4th Cir. 2008) (taxpayer bears the burden on deductions).

Here, LGI must show that Project Soy can "pass for legitimate tax avoidance and sound financial planning" and does not "constitute manipulation of the intent and purpose of the tax

14

code." *See True*, 190 F.3d at 1173 (invoking step transaction doctrine). The Tenth Circuit applies the economic substance doctrine when a taxpayer cannot make that showing. *See, e.g.*, *Blum*, 737 F.3d at 1311; *Keeler*, 243 F.3d at 1217. The Tenth Circuit also applies the step transaction doctrine to tax avoidance transactions. *See Assoc. Wholesale Grocers, Inc. v. United States*, 927 F.2d 1517, 1521-26 (10th Cir. 1991) (applying the doctrine to corporate restructuring).

**B.    Steps 1-3 of Project Soy lack economic substance and should be disregarded for U.S. tax purposes.**

Congress codified the economic substance doctrine in 2010. *See* § 7701(o). The statute does not provide any safe harbors. Instead, § 7701(o)(5)(c) declares that "[t]he determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner" as previously applied by the courts. LGI suggests that the doctrine is not "relevant" to Project Soy, *i.e.*, the Court should not even consider it when evaluating Project Soy. In determining if the doctrine is applicable, the Tenth Circuit recognizes certain "red flags," such as when a transaction produces enormous tax savings without a concomitant economic loss, or when something "smack[s] of a too-good-to-be-true transaction" and lacks "an appreciable effect, other than tax reduction." *Blum*, 737 F.3d at 1310. Project Soy's highly-engineered inter-company transactions, rushed through at year-end, trigger "red flags" again and again.

A key factor when considering whether the judicial doctrines apply to a tax motivated transaction is whether the transaction's benefits are what Congress intended. *See e.g., Gregory*, 293 U.S. at 469-70 (finding transaction fell outside statute's "plain intent"). LGI essentially contends that Congress intended to allow multinationals to recognize substantial gains on the sale of CFCs without paying any tax at all. But as this Court recognized in its previous Order, when enacting the TCJA, Congress did not intend to allow a § 245A deduction for income that

had escaped the anti-base erosion regime, *i.e.*, GILTI and subpart F. (Dkt. 46 at 2.) The Court explained that § 245A "works in concert with … GILTI," and "these sections combine to form the basis of the new participation-exemption tax system." *Id.* "Based on the legislative history, it appears Congress intended that only earnings that are exempt from GILTI would be eligible for the § 245A dividend-received deduction." *Id.*

This Court's prior observations were correct. In the House Report, legislators specifically linked the § 245A deduction to "*appropriate anti-base erosion safeguards*." H.R. Rep. 115-409 (2017) (emphasis added) (Dkt. 41 at 69). So too in the Senate, where legislators noted that "[t]he Committee recognizes that, *without any base protection measures*, the … system established by the bill creates an incentive for U.S. corporations to allocate income that would otherwise be subject to the full U.S. corporate tax rate to foreign affiliates operating in low- or zero-tax jurisdictions." S. Prt. 115-20 (emphasis added) (Dkt. 41 at 90.) Project Soy was designed to un-link the two. As such, and as this Court has already correctly observed, Project Soy violated Congressional intent, and the doctrine is relevant to this transaction.

Once it is clear that the economic substance doctrine is relevant, *i.e.*, that the Court should consider it, there is little question it applies and that the attributes generated by Steps 1-3 should be disregarded. LGI concedes that, if the doctrine is relevant, Steps 1-3 of Project Soy fail *both* of § 7701(o)'s requirements. LGI admits that "it is not asserting that Steps 1, 2, or 3 … would satisfy the standards in § 7701(o)(1)(A) or § 7701(o)(1)(B) were the doctrine applicable." (RFA 65 (Ex. F at 23.) Steps 1-3, taken on December 25-26, 2018, were, as Telenet characterized them, "pre-steps to [the] extraction" of TGH out from underneath a U.S.-taxed entity. (LGI 7321 (Ex. 7) at 7323.) Section 7701(o)(1) states that a "transaction shall be treated

16

as having economic substance only if – (A) the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, and (B) the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction." As for § 7701(o)(1)(A), LGI admits that Steps 1-3 "did not change, in a meaningful way, LGI's economic position." (RFAs 3, 5, 7, 15 (Ex. F at 3-4, 7).) Regarding § 7701(o)(1)(B), LGI admits that Steps 1-3 "served no substantial non-tax purpose for LGI." (RFAs 4, 6, 8 (Ex. F. at 3-4).) The primary purpose of Steps 1-3 was not to achieve any real business goal, except to generate E&P for U.S. tax purposes. (RFA 11 (Ex. F at 5).) Nor were Steps 1-3 necessary for the transfer of Telenet to Liberty Global plc (Step 4). (RFA 12 (Ex. F at 5).)

Without Steps 1-3, TGH would not have had the U.S. tax attributes that LGI needed, *i.e.* E&P, to transform Step 4 into a U.S. tax-free event. (RFA 11 (Ex. F at 5): "LGI admits that, from its perspective, the primary purpose of Steps 1, 2, and 3 … was to generate earnings and profits for use in Step 4"). Thus, it is appropriate for the Court to scrutinize the E&P generating transactions to determine whether those transactions should be respected for U.S. tax purposes.

A transaction lacking economic substance is disregarded for tax purposes and thus cannot serve as the basis for the tax benefits that would otherwise follow. *See e.g.*, *Sala*, 613 F.3d at 1252 (loss-generating transaction is not respected merely because another transaction in the same scheme has economic effect); *James v. Comm'r*, 899 F.2d 905, 910 (10th Cir. 1990) (separating "legitimate" transaction from accompanying tax transaction); *Coltec*, 454 F.3d at 1360 (transaction that relied in part on § 351 and served "no purpose other than to artificially inflate [a subsidiary's] basis" in another related entity's stock "must be disregarded for tax purposes"). When Steps 1-3 are disregarded, the noneconomic E&P generated in the § 351 transaction do not

materialize, and cannot be used to support the § 245A deduction. Step 4, the TGH Transaction, would then result in $2.4 billion of taxable gain. The Court should apply the economic substance doctrine and disregard the abusive Steps 1-3.

**C.      Alternatively, Steps 1-3 should be disregarded under the step transaction doctrine.**

The step transaction doctrine instructs courts to disregard or recharacterize steps or transactions that serve no purpose other than tax avoidance. *Assoc. Wholesale Grocers*, 927 F.2d at 1522. Particular attention is warranted for a transaction that contains unnecessary steps: a transaction is not accorded a "different result because reached by following a devious path." *Assoc. Wholesale Grocers*, 927 F.2d at 1522 (citing *Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 613 (1938)). The doctrine is applicable to Project Soy for all the reasons described above. *Assoc. Wholesale Grocers*, 927 F.2d at 1521-26 (discussing applicability of doctrine to transactions that included insertion of a step designed to avoid tax imposed on liquidation of corporate subsidiary). *See also Barnes Group, Inc. v. Comm'r*, T.C. Memo 2013-109, *aff'd* 593 F. App'x (2d Cir. 2014) (applying doctrine in subpart F context to disregard "a particular step … if the taxpayer could have achieved its objective more directly but instead included the step for no other purpose than to avoid tax liability"). In applying the doctrine, courts "link together 'all interdependent steps with legal or business significance, rather than [take] them in isolation' [ ] so that 'federal tax liability may be based on a realistic view of the entire transaction.'" *True*, 190 F.3d at 1174 (quoting *Comm'r v. Clark*, 489 U.S. 726, 738 (1989)). Applying the step transaction doctrine here means disregarding the E&P generated under Steps 1-3.

The Tenth Circuit recognizes "three tests for determining when the step transaction doctrine should operate to collapse the individual steps of a complex transaction into a single

integrated transaction for tax purposes: (1) end result, (2) interdependence, and (3) binding commitment." *True*, 190 F.3d at 1174-75 (citing *Assoc. Wholesale Grocers*, 927 F.2d at 1522). The interdependence test is especially apt here. Under it, the Court should "disregard the tax effects of individual transactional steps if 'it is unlikely that any one step would have been undertaken except in contemplation of the other integrating acts.'" *True*, 190 F.3d at 1175 (quoting *Kuper v. Comm'r*, 533 F.2d 152, 156 (5th Cir. 1976)). The test focuses "on the relationship between the individual steps and 'whether under a reasonably objective view the steps were so interdependent that the legal relations created by one of the transactions seem fruitless without completion of the series.'" *True*, 190 F.3d at 1175 (quoting *Kornfeld v. Comm'r*, 137 F.3d 1231, 1235 (10th Cir. 1998)). LGI admits Steps 1-3 were interdependent and highly-integrated (RFAs 13-14 (Ex. F at 13-14)); LGI Answer ¶ 24), and that without Step 4, it "would not have executed the Transactions or any Steps thereof." (RFA 49 (Ex. F. at 19).)

The Court should follow *Associated Wholesale Grocers* and *True* to disregard Project Soy's Steps 1-3, the Steps that created § 351(b) gain that, in turn, became the E&P that would allow Step 4's TGH Transaction proceeds to be transformed into a deemed dividend and produce the § 245A deduction. As the Tenth Circuit noted, when applying the interdependence test, a court should "[d]isregard[]the tax effects of individual steps" of transactions, especially "'where … it is unlikely that any one step would have been undertaken except in contemplation of the other integrating acts.'" *Assoc. Wholesale Grocers*, 927 F.2d at 1523 (quoting *Kuper*, 533 F.2d at 156).[11] This application combats LGI's admitted tax manipulation via Project Soy. LGI concedes

---

[11] In *Associated Wholesale Grocers*, a taxpayer that was liquidating a holding company was also selling a single grocery store subsidiary within that company. The company had incurred a loss,
(continued...)

19

that Project Soy was designed and executed as a unitary plan; Steps 1-3 were never intended to stand alone. The Court should disregard the tax attributes they generated.

## CONCLUSION

For the foregoing reasons, the Court should conclude that there is no dispute as to any material facts, that the tax benefits created by Project Soy Steps 1-3 should be disregarded, and that summary judgment should be entered in favor of the United States.

Dated: July 28, 2023

DAVID A. HUBBERT
Deputy Assistant Attorney General

*/s/ E. Carmen Ramirez*
THOMAS J. SAWYER
E. CARMEN RAMIREZ
U.S. Department of Justice, Tax Division
P.O. Box 683, Ben Franklin Station
Washington, D.C.  20044
Tel:  (202) 514-8129 (Sawyer)
        (202) 616-2885 (Ramirez)
Fax: (202) 307-0054
Thomas.J.Sawyer@usdoj.gov
E.Carmen.Ramirez@usdoj.gov
*Attorneys for the United States of America*

## CERTIFICATE OF SERVICE

I certify that I served the foregoing document via CM-ECF on July 28, 2023.

*/s/ E. Carmen Ramirez*
E. Carmen Ramirez

---

but § 332 could bar recognizing the loss if the taxpayer owned at least 80 percent of the company stock continuously. To "fail" this requirement, an intermediate step was inserted involving merging the entire holding company into a new corporation, established by the person that wanted to acquire the single store. The new company then liquidated its assets and distributed them all back to the taxpayer, except for the single store. The Tenth Circuit, applying the interdependence test, disregarded the individual's brief ownership of the entire corporation, even if that meant the taxpayer could never take its economic loss. *See also True*, 190 F.3d at 1178 (rejecting tax benefits created by intermediate transactions).