**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-03501-RBJ

LIBERTY GLOBAL, INC.,

      Plaintiff,

v.

UNITED STATES OF AMERICA,

      Defendant.

---

**UNITED STATES' ANSWERING BRIEF IN RESPONSE TO PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT (Dkt. 75)**

---

      Liberty Global, Inc. ("LGI") takes a position familiar in tax shelter litigation. After carefully designing a complicated series of interrelated transactions to create a benefit Congress did not intend, and that LGI would not have undertaken but for tax purposes, LGI argues that courts have no choice but to accept the tax benefits generated by such transactions. But time and again, courts have chosen otherwise, and have disregarded tax benefits from transactions that lack economic substance or that violate the step transaction doctrine.

      LGI's summary judgment motion focuses on only one of the four steps that comprise Project Soy, a subsidiary's conversion from one type of corporation to another. LGI claims that neither the economic substance doctrine nor the step transaction doctrine apply to that isolated aspect of the overall transactions. It argues that: (i) Congress "expressly" provided an "exemption" from the economic substance doctrine for all transactions that include a corporate organization or that involve the choice between different entity types; (ii) LGI's plan for its

Telenet subsidiary to use "profit certificates" and "springing to life" debt to generate paper earnings and profits ("E&P") is also exempt, because those decisions merely reflect a choice as to how to capitalize an entity; and (iii) the step transaction doctrine is also inapplicable, because the single step LGI highlights was permanent, not temporary. LGI is incorrect. First, the economic substance doctrine as codified at § 7701(o) does not have any "exemptions." Second, the undisputed facts surrounding Project Soy do not support LGI's suggestion that it involved only basic choices like whether to capitalize a business with debt or with equity. (*See* Dkt. 76 at 5-13 (outlining Project Soy transactions).) Finally, LGI is wrong that the Tenth Circuit's (or any other circuit's) version of the step transaction doctrine has a "permanence" element.

**A.    Section 7701(o) does not "exempt" corporate organizations, reorganizations, or any other transactions from application of the economic substance doctrine.**

*1. The statute does not create any exemptions*. Section 7701(o)(5)(C) provides that "[t]he determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner as if this subsection had never been enacted." Courts have applied the doctrine in a wide range of circumstances, including transactions that included § 351 organizations (*Coltec Indus., Inc. v. United States*, 454 F.3d 1340 (Fed Cir. 2006)), subpart F avoidance (*Schering-Plough Corp. v. United States,* 651 F. Supp. 2d 219 (D. N.J. 2009), *aff'd sub nom. Merck & Co. v. United States*, 652 F.3d 475 (3d Cir. 2011)), and the use of the "check-the-box" regulations to manipulate a controlled foreign corporation (*Tucker v. Comm'r*, T.C. Memo 2017-183, *aff'd*, 766 F. Appx. 132 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 378 (2019)). Congress included no "angel list" of "exempt" transactions, and neither the courts nor Treasury has recognized such a list. *Bank of N. Y. Mellon Corp. v. Comm'r*, 801 F.3d 104, 114 (2d Cir. 2015) (§ 7701 "did not create categorical exceptions to the doctrine, for foreign tax credits or

otherwise"); IRS Notice 2010-62 at 5, 2010 WL 3529402, *1 (Treasury does not intend to issue guidance "regarding the types of transactions to which the economic substance doctrine either applies or does not apply"). After all, abusive tax shelters exist because the ingenuity of tax planners cannot be matched by even the most omniscient legislators. Tax planners would see an exemptions list not as a limitation, but as an invitation to design abusive tax shelters that meet its literal terms. *See Santander Holdings USA, Inc. v. United States*, 844 F.3d 15, 21 n.7 (1st Cir. 2016)(noting that because of the "endless ingenuity of taxpayers ... there will be a first time for everything, and the economic substance test guards against abuse of loopholes that Congress and the IRS have not anticipated") (quotation omitted)).

LGI also suggests (Dkt. 75 ("Br.") at 2) that when Congress codified the doctrine, it recognized "significant limitations" on the doctrine's use. That is not true. Congress not only "recognize[d] that the IRS ha[d] achieved a number of recent successes in litigation[,]" it believed that it was strengthening, not limiting, the doctrine and "improv[ing] its effectiveness at deterring unintended consequences." H.R. Rep. No. 111-443(I) ("House Report" or "House Rep.") at 295 (2010). Section 7701(o) resolved circuit splits concerning the doctrine, and, in each instance, Congress selected the option that would expand its use. House Rep. at 297-98.[1] Congress expected that codification would raise significant revenue. *See* Staff of Joint Comm. on Taxation, Estimated Revenue Effects of the Amendment in the Nature of a Substitute to H.R.

---

[1] For example, before § 7701(o)'s enactment, some courts would respect a transaction's putative tax effects if it met either part of a two-part test. Section 7701(o)(1) clarified that a transaction should be treated as having non-tax economic substance only if it meets *both* parts of the test. House Rep. at 297. Similarly, § 7701(o) clarified that courts should respect the transaction only if its non-tax business purpose was "substantial." *Id.*

4872, at 3 (JCX-17-10) (Mar. 20, 2010), *available at* www.jct.gov/publications/2010/jcx-17-10/.

LGI argues the opposite. It suggests that codification narrowed the doctrine's application by "expressly" exempting several types of transactions. Indeed, LGI's brief uses some form of the word "exempt" 17 times. But § 7701(o)'s "express" terms do not include any blanket exemptions, because none exist. Instead, the House Report heavily relied upon by LGI quotes with approval the Tax Court's opinion in *ACM P'ship v. Comm'r*, which stated that "*economic substance becomes applicable, and a judicial remedy is warranted, where a taxpayer seeks to claim tax benefits, unintended by Congress, by means of transactions that serve no economic purpose other than tax savings.*" House Rep. at 292 (emphasis added) (*quoting* T.C. Memo 1997-115 *36 (1997), *aff'd in part*, *rev'd in part*, 157 F.3d 231 (3d Cir. 1998)). Congress envisioned the codified economic substance doctrine as having broad and flexible application.

LGI's suggestion that there are "exemptions" from the economic substance doctrine is not based on the statute, but on this paragraph from the House Report:

> The provision [§ 7701(o)] is not intended to alter the tax treatment of certain basic business transactions that, under longstanding judicial and administrative practice are respected, merely because the choice between meaningful economic alternatives is largely or entirely based on comparative tax advantages. Among these basic transactions are (1) the choice between capitalizing a business enterprise with debt or equity; *see, e.g., John Kelley Co. v. Comm'r*, 326 U.S. 521 (1946) (respecting debt characterization in one case and not in the other, based on all the facts and circumstances); (2) a U.S. person's choice between utilizing a foreign corporation or a domestic corporation to make a foreign investment; *see, e.g., Sam Siegel v. Comm'r*, 45 T.C. 566 (1966), *acq.* 1966-2 C.B. 3, *but see Comm'r v. Bollinger*, 485 U.S. 340 (1988) (agency principles applied to title-holding corporation under the facts and circumstances); [and] (3) the choice to enter a transaction or series of transactions that constitute a corporate organization or reorganization under subchapter C; *see, e.g.*, Rev. Proc. 2009-3 2009-1 I.R.B. 108, Secs. 3.01(38), (39), and (41) (IRS will not rule on certain matters relating to incorporations or reorganizations unless there is a "significant issue"); *compare Gregory v. Helvering*, 293 U.S. 465 (1935) ….

House Rep. at 296 (moving footnotes to text).[2] The only appeals court to have considered whether a committee report creates broad exemptions under § 7701(o) held that the report "cannot overcome clear statutory text." *Alternative Carbon Res., LLC v. United States*, 939 F.3d 1320, 1330-31 (Fed. Cir. 2019). Moreover, as commentators have observed, "[t]he committee reports' discussion of basic business transactions makes clear, however, that such transactions are not absolute safe havens from the economic substance doctrine." *Relevance Games*, at 572.

Indeed, earlier codification proposals did have an angel list of sorts, but Congress did not include such a list in the statute as enacted. *Id.* at 569, n.93 (describing the earliest proposals in 1999 and 2000). Even those bills did not exempt broad categories of transactions, but described specific tax credits, which suggested "that the transactions most unlikely to be subject to the doctrine are those that squarely come within the scope of a clearly expressed, well entrenched tax benefit." *Id*. at 568-69 and n.93[3]; *see also* Joint Comm. Rep. at 379 n.1034 ("Thus, for example,

---

[2] We refer to the House Report as part of § 7701(o)'s codification history, because technically that report, which supported a different version of § 7701(o), is not official legislative history. *See Report on Codification of the Economic Substance Doctrine*, New York State Bar Assoc. Tax Sec., at 13 n.33 (Jan. 5, 2011). Commentators generally consider a different document, the Joint Committee on Taxation's "General Explanation of Tax Legislation Enacted in the 111th Congress," ("Joint Committee Report" or "Joint Comm. Rep.")(available at www.jct.gov/publications/2011/jcs-2-11/)) as the "most important" committee report. Charlene D. Luke, *The Relevance Games: Congress's Choice for Economic Substance Gamemakers*, 66 Tax Law. 551, 563-64 (2013) ("*Relevance Games*"). However, the House Report and the Joint Committee Report contain nearly identical language in the paragraph reproduced above.

[3] Compare *Sacks v. Comm'r*, 69 F.3d 982, 992 (9th Cir. 1995) with *Alternative Carbon*. The *Alternative Carbon* court rejected a scheme to generate alternative fuel tax credits, but the *Sacks* court allowed tax benefits where the taxpayer was at risk for a recourse loan and where tax credits were "intended to induce investments which otherwise would not have been made." LGI relies on *Sacks*. (Br. 14.) The Tenth Circuit recently rejected an argument based on that case, stating that "taxpayers might have a profit motive" if a tax credit might render an "otherwise unprofitable" activity profitable, "[b]ut it's not enough if the taxpayer's primary intent is to save in taxes." *Olsen v. Comm'r*, 52 F.4th 889, 903 (10th Cir. 2022).

it is not intended that a tax credit . . . be disallowed in a transaction pursuant to which, in form and substance, a taxpayer makes the type of investment *or undertakes the type of activity that the credit was intended to encourage.*") (emphasis added).)

**2. Project Soy is not a basic business transaction.** LGI's primary argument is that the transaction that gave rise to the tax benefits is a simple § 351 transaction—a corporate organization or reorganization—and that, based on the House Report, the economic substance doctrine does not apply to such "basic business transactions." (Br. at 9-10.) But as described above, the statute does not purport to exempt all corporate organizations or reorganizations. And even if the House Report could create an exemption that does not exist in the statute, Project Soy's multi-step, sequence-dependent strategy was no run-of-the-mill § 351 transaction. (*See* Dkt. 76 at 5-13 (describing transactions).)

To the contrary, the House Report's authors had something very different from Project Soy in mind. The report's reference to corporate organizations and reorganizations cites two authorities: first, a revenue procedure relating to whether a taxpayer should seek, in advance of a transaction, a ruling from the IRS as to its tax consequences, and second, the seminal Supreme Court ruling in *Gregory. See* House Rep. at 296 n.128. The revenue procedure explains that taxpayers should not seek rulings on certain basic transactions under §§ 332, 351, and 368 (corporate liquidations, organizations, and reorganizations) unless "there is a significant issue that must be resolved in order to decide those matters," *i.e.*, where "its resolution will not be essentially free from doubt." Rev. Proc. 2009-3 at § 3.01(38). The complicated Project Soy transactions are hardly "basic" or "essentially free from doubt." Further, the revenue procedure refers to several general situations in which a ruling ordinarily will not be issued, such as

transactions "that lack a *bona fide* business purpose or have as their principal purpose the reduction of Federal taxes," or "where the requested ruling deals with only part of an integrated transaction." *Id*. at §§ 3.02(1), 4.02(2). It does not say that these non-standard transactions are automatically "exempt" from the economic substance doctrine.

Even more telling is the House Report's citation to *Gregory*, 293 U.S. 465. The citation is preceded by a "compare" signal, meaning Congress believed the facts of *Gregory* "suggest[] a useful comparison" with the type of business organization not motivated by tax avoidance. The Bluebook: A Uniform System of Citation, at 1.2 (19th ed.). There, the Supreme Court rejected the use of a corporate reorganization as part of a plan to achieve tax benefits that Congress did not intend. Gregory owned a corporation (United Mortgage) which in turn owned shares of stock in a second corporation (Averill). Gregory wanted to sell her Averill shares. To minimize taxes, she created a third corporation (Monitor). United Mortgage then transferred the Averill shares to Monitor, which dissolved and made a liquidating distribution of the Averill shares to Gregory, to avoid one layer of tax. The scheme literally complied with the reorganization statute, but the Supreme Court still rejected the benefits generated by the reorganization. 293 U.S. at 470.

In language that has become famous, the Court noted that "[i]t is quite true that if a reorganization in reality was effected within the meaning of [the statute], the ulterior purpose mentioned will be disregarded. The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. … But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended. The reasoning of the court below in justification of a negative answer leaves little to be said." *Id*. at 469 (citations omitted).

It is plain, therefore, that the House Report does not suggest that *any* corporate organization or reorganization that accompanies a tax avoidance transaction must be respected, or that courts must throw up their hands in the face of a complex, multi-step tax avoidance plan purely because one of several steps may be a § 351 transaction. Instead, the Court should focus on "the thing which the statute intended." *Gregory*, 293 U.S. at 469. Here, "the statute" means the 2017 Tax Cuts and Jobs Act ("TCJA"), and Internal Revenue Code sections providing for taxable sales, including 26 U.S.C. § 1001. The thing which the TCJA intended was a revised international tax system that greatly expanded the Code's base-erosion protections. (Dkt. 76 at 3.) The TCJA included a new anti-deferral regime, GILTI, to operate in tandem with the historic subpart F regime. Project Soy was designed to evade these provisions, and thereby avoid paying an "exit tax," *i.e.*, the tax on its multi-billion dollar gain from the sale of a foreign business. (Dkt. 76 at 5-13.) Section 7701(o)'s codification history does not suggest that courts must respect *all* corporate reorganizations, even if they are part of a larger scheme designed to generate tax benefits Congress did not intend.

**3. The Court should consider the entirety of Project Soy when determining whether to respect the tax benefits generated by Steps 1-3.** The Court should reject LGI's attempt to divert attention away from Project Soy's Steps 1 and 2. As previously described, those steps were crucial to Project Soy's creation of E&P. (RFAs 13, 14 (Dkt. 76-8 at 6).) Because those steps took place within foreign entit*ies* that, at the time, were "disregarded" for U.S. tax purposes, LGI suggests that Steps 1 and 2 "were already disregarded for U.S. tax purposes." (Br. at 4.) But the fact that Telenet Group was a disregarded entity does not mean that its transactions have no U.S. tax impact. While transactions involving disregarded entities may not trigger an immediate tax,

such transactions can significantly affect the U.S. tax treatment of subsequent transactions. Steps 1 and 2 were crucial to the creation of E&P, and cannot be divorced from Step 3; without those steps, Project Soy could not have produced the tax benefits LGI's tax professionals worked so hard to create. (*See, e.g.*, Dkt. 76 at 8-12.) LGI admits that Steps 1-3 were part of a "unified plan," and that LGI would not have undertaken Steps 3 or 4 without Steps 1 and 2. (RFAs 10, 13, 14 ( Dkt. 76-8 at 5-6).) And just as importantly, LGI does not dispute that it could not escape paying tax on the transfer of the Telenet family to its U.K. parent but for Steps 1 and 2.

LGI (Br. 8-9) claims that "[c]ourts have repeatedly stated that the ESD is applied only to the particular transaction 'that gave rise to the alleged tax benefit,'" so that Step 3 is the only part of Project Soy that this Court should analyze. That is false. It is black letter law that courts consider the entirety of a transaction in applying the economic substance doctrine. *See Sala v. United States*, 613 F.3d 1249, 1252 (10th Cir. 2010)(courts look to transactions that gave rise to tax benefits, which are not made legitimate if paired with substantive transactions on the periphery); *Coltec*, 454 F.3d at 1340; § 7701(o)(5)(D) (defining "transaction" to include a "series of transactions"); House Rep. at 296-97 ("[Section 7701(o)] does not alter the court's ability to aggregate, disaggregate, or otherwise recharacterize a transaction when applying the doctrine."); *Tucker*, T.C. Memo 2017-183 at 63-64.

Courts have applied the economic substance doctrine in situations analogous to the one here. For instance, in *Tucker*, the Tax Court rejected a taxpayer's reliance on "clear, mechanical provisions" of the tax code where the taxpayer used a controlled foreign corporation and a check-the-box election (discussed below) to avoid subpart F. *Id.* at 38. The court noted that mere technical compliance with subpart F was not sufficient and that, on multiple occasions, courts

have considered not only the terms but the intent of the subpart F provisions to tax transactions in a manner consistent with their substance: "Congress neither contemplated nor intended to encourage this type of mechanical manipulation of the rules when enacting these international tax provisions. The courts have rejected a mechanical or formalistic compliance with the rules of subpart F." *Id.* at 48-49. Nor was that transaction salvaged by the check-the-box rules, discussed below. The court referred to Treasury's admonition in the preamble to the check-the-box rules that, with respect to elections to use a disregarded entity, the IRS will take appropriate action if a taxpayer seeks to achieve results inconsistent with the tax code's policies and rules. *Id*. at 50.

*4. LGI's remaining arguments that Project Soy's tax benefits are allowable even when the transaction does not have economic substance or lacks a business purpose are without merit.* LGI suggests that, if a taxpayer does not need a non-tax reason when it chooses among types of entities through which to operate a business, then it must necessarily follow that the economic substance doctrine does not apply to any transaction that includes a choice of entity. (Br. 13-14.) It is true that taxpayers can, for example, decide whether to operate a business as a partnership, a corporation, or in some other form. In 1996, Treasury introduced what are commonly called the "check the box" rules, which facilitate implementing those choices. As described in the preamble, the new system replaced "rules [that] have become increasingly formalistic . . . with a much simpler approach that generally is elective." T.D. 8697 (Dec. 18, 1996). But there is no suggestion in the regulations or preamble that transactions involving entity conversions are therefore outside of the judicial doctrines. To the contrary, the preamble to both the proposed and final regulations noted that, "in light of the increased flexibility under an elective regime for the creation of organizations classified as partnerships, Treasury and the IRS

will continue to monitor carefully the uses of partnerships in the international context and will take appropriate action when partnerships are used to achieve results that are inconsistent with the policies and rules of particular Code provisions . . ." *Id*.[4] LGI conflates the ease with which taxpayers may select entity types with the use of those entities in abusive transactions.

Indeed, in 1999, the ABA's Tax Section opposed an update to the check-the-box regulations that would have specifically identified certain arrangements as abusive, in part because judicial doctrines like economic substance already applied. Treasury had announced a proposed regulation addressing certain types of transactions it considered problematic. *See* 64 Fed. Reg. 66591-02 (proposing to amend the check-the-box regulations to address certain transactions involving the use of disregarded entities in a manner inconsistent with the tax code). Nowhere did Treasury suggest that the economic substance doctrine was inapplicable to transactions that included entity-selection decisions; to the contrary, it was careful to point out that the proposed new rule "[would] not prevent the Commissioner from applying all applicable common law doctrines to any extraordinary transaction to which this rule applies[.]" *Id*. After considering comments submitted by the public to the effect that the proposed update was "overly broad," Treasury withdrew the proposal. IRS Notice 2003-46, 2003 WL 21470116 (June 26, 2003). The ABA Tax Section had submitted comments (whose authors included attorneys at major law firms like Cravath, Skadden, and Vinson & Elkins) arguing that Treasury should not introduce a new rule identifying abusive transactions because, "the IRS/Treasury … are already

---

[4] At the time, shelters were exploiting the complex international tax rules and the use of passthrough entities, like partnerships. *See, e.g.*, *TIFD-III E, Inc. v. United States*, 459 F.3d 220 (2d Cir. 2006) (disregarding a partnership created to allocate income to a non-U.S. taxpayer while, at the same time, claiming deductions on a U.S. tax return).

sufficiently well-equipped under existing law to deal with such transactions. … *For example, vital common law doctrines such as the step-transaction and economic substance doctrines exist.*" *See Tax Notes*, *Members of ABA Tax Section Criticize Proposed Check-the-Box Regs*, 2000 TNT 158-46 (Aug. 15, 2000) (publishing ABA's comment letter of Aug. 3, 2000) (emphasis added) (footnote omitted) (*also available* at https://perma.cc/JX9K-A6YZ). Simplifying the process for choosing an entity type does not give carte blanche to use that entity in tax avoidance transactions, as the ABA Tax Section's comments acknowledged.

LGI's reliance on Rev. Rul. 2003-125 is similarly misplaced.[5] That ruling permitted a taxpayer to claim a § 165(g) worthless stock loss deduction in one situation (where a subsidiary was completely worthless), but not in a second situation (where the entity had some value), in the context of a check-the-box election. The ruling did not relate to a § 245A dividends received deduction (which did not exist at the time), and the IRS emphasized that "a change in the classification of an entity . . . is determined under all relevant provisions of the Internal Revenue Code and general principles of tax law, including the step transaction doctrine." The taxpayer in that case had suffered an actual, economic loss in the value of its stock prior to the election, and the election was required under § 165(g) to show the stock no longer could increase in value. The IRS allowed the § 165 deduction, but noted that "only a bona fide loss is allowable" and that "substance and not mere form governs in determining a deductible loss." *Id*. LGI does not attempt to argue that Project Soy is substantially similar. Instead, LGI refers to a statement by an individual IRS attorney sitting on a panel at a tax conference suggesting that the codification of

---

[5] Taxpayers may rely on revenue rulings' conclusions only when their facts and circumstances are substantially the same. *See generally* Treas. Reg. § 601.601(d)(2)(v)(e).

the economic substance doctrine would probably not change the result in "that particular fact pattern." (Br. 17.) But nothing in Tax Notes' report of that conference suggests that a transaction like Project Soy should be respected. In fact, the IRS attorney emphasized at the conference that transactions will be scrutinized consistent with *Coltec*, and that an "angel list of safe transactions may not be appropriate because 'a lot of this is just so fact driven.'" Amy S. Elliott, *Codification of Economic Substance Doctrine Should Have Minimal Effect on Practice, IRS Official Says*, 2010 TNT 90-2 (May 11, 2010). And in response to the suggestion that the economic substance doctrine could upset ordinary tax planning, a government panelist responded that, if so, "then that's a good thing because your transactional practice was really on the borderline." *Id.*

Nor do the cases cited by LGI aid its position. LGI relies on *Summa Holdings, Inc. v. Comm'r*, 848 F.3d 779 (6th Cir. 2017) and *Horn v. Comm'r*, 968 F.2d 1229 (D.C. Cir.1992).[6] In *Summa Holdings*, the Sixth Circuit examined the related substance-over-form doctrine. 848 F.3d at 784-86.[7] The court held that the doctrine does not apply to transactions that Congress specifically encouraged. *Id.* For example, Congress created Individual Retirement Accounts ("IRAs") and domestic international sales corporations ("DISCs"), the instruments at issue in *Summa Holdings*, and allowed for taxpayers to hold DISCs in IRAs. The Sixth Circuit reasoned that IRAs holding DISCs, are "all form and no substance." *Id.* Yet even if such vehicles have no non-tax business purpose or economic substance, they are arrangements that Congress itself created, and thus sanctioned as tax minimizing vehicles. *Id.*

---

[6] The taxpayer in *Tucker* also relied heavily on these cases to no avail in his unsuccessful appeal and petition for certiorari. *See, e.g.,* Petition for Writ of Certiorari, *Tucker*, 2019 U.S. S. Ct. Briefs LEXIS 2411, *8-9, *cert. denied*, 2019 U.S. LEXIS 6445.
[7] *See Rogers v. United States*, 281 F.3d 1108, 1113-18 (10th Cir. 2002) (explaining the differences between the substance over form and economic substance doctrines).

The D.C. Circuit's decision in *Horn* likewise does not support LGI's theory that the economic substance doctrine is inapplicable to transactions for which the component parts may technically comply with Code requirements. *Horn* concerned a statute that, in one subsection, permitted a deduction for a loss from a "straddle" transaction "if and only if the transaction is entered into for profit or in a trade or business." 968 F.2d at 1238. A second subsection "irrebuttably presume[d] that straddle trades made by commodities dealers are made in a trade or business." *Id*. The court inferred from that second provision that Congress intended to permit professional commodities dealers to take deductions for straddle trades, regardless of any trade's profit potential. *Id*. at 1238-1239. The court concluded that disregarding such trades under the economic substance doctrine would subvert that intended treatment of a narrow class of transactions and would "read [the second subsection] completely out of existence." *Id*. at 1234-36, 1238-40. But the *Horn* court plainly recognized that the doctrine can bar tax benefits even where the taxpayer acts within "the letter of the tax code." 968 F.2d at 1236 (citing *Gregory*, 293 U.S. at 465). The court held only that, where Congress had clearly mandated that certain trades would receive a particular tax treatment regardless of their economic effect, the economic substance doctrine should not be applied in a way that would subvert that specific legislative intent. *Id*. LGI has not shown that the TCJA was intended to allow companies to eliminate gains on the shares of foreign subsidiaries through commercially purposeless internal transactions.

Nor does *United Parcel Serv. of Am., Inc. v. Comm'r*, 254 F.3d 1014 (11th Cir. 2001) aid LGI's argument. UPS had a profitable stream of income related to insurance, which was tangential to its parcel delivery business, and wished to restructure that insurance aspect of its business. To that end, it continued to collect insurance payments from customers but entered into

an agreement with National Union, an unrelated third-party insurer, to insure packages, and formed a Bermuda entity to reinsure National Union. UPS severed its ownership and control of the Bermuda entity by transferring it to UPS's shareholders in a taxable distribution. Under the reinsurance agreement, the Bermuda entity assumed National Union's risk, in exchange for premiums based on the insurance payments UPS collected and paid to National Union. The Eleventh Circuit examined the case under the economic substance doctrine and held that the restructuring should be respected. The court emphasized the presence of a real third party that assumed real insurance risks created by genuine economic obligations. *Id*. at 1018-19. Likewise, UPS could no longer use the insurance revenue for its own business purposes. *Id*. Even though the transactions were motivated in part by tax reasons, there also was a business purpose to the arrangement, which provided real insurance to customers and allowed UPS to decrease its risk of liability. *Id*. at 1020. *UPS* does not stand for the proposition that the economic substance doctrine is not relevant to any internal restructuring, but that UPS's particular restructuring transactions had economic substance. LGI concedes here, by contrast, that if the economic substance doctrine is relevant, Steps 1-3 lack substance and fail the § 7701(o) test. (RFA 65 (Dkt. 76-8 at 23).)

Finally, LGI's reliance on *Dover Corp. & Subsidiaries v. Comm'r*, 122 T.C. 324 (2004), a case not even implicating the judicial doctrines, is misplaced. Dover sold a U.K. business to a third party, which included a retroactive election to change the business from a regarded to a disregarded entity. The IRS did not argue that the tax benefits should be disallowed under the economic substance or step transaction doctrines. Instead, the IRS argued that the taxpayer was not entitled to tax benefits under the relevant statute, *i.e.*, the taxpayer had not complied with the statute's literal terms – though the Tax Court disagreed. The IRS's litigating strategy was subject

to criticism precisely because it did not raise judicial doctrines. Jeffrey Rubinger, *Tax Court*

*Upholds 'Check and Sell' Strategy to Avoid Subpart F Income*, 101 J. Tax'n 20, 24 (2004)

("[T]he IRS might have had an easier time if it had used one of those common law doctrines[.]").

**B.      Project Soy involved more than the choice to use debt rather than equity or to use one type of entity over another.**

LGI suggests that two other references in the House Report to "basic business

transactions" have some application to Project Soy: subparagraphs (1), referring to a taxpayer's

choice to use debt versus equity, and (2), referring to the choice of using a domestic versus a

foreign entity to carry out business in a foreign country. House Rep. at 296. Both suggestions are

wrong. First, the House Report cites *John Kelley Co.*, and describes it as "respecting debt

characterization in one case and not in the other, based on all the facts and circumstances." 326

U.S. at 296 n.126. In most tax cases (but not here), the debt-equity distinction is important in that

interest on debt is deductible, but distributions to equity holders are not. *UPS*, 254 F.3d at 1019.

Here Steps 1-3 created E&P for use in Step 4 by triggering § 351(b) gain through "springing to

life" debt and through "profit certificates." Nevertheless, LGI does not dispute that Steps 1-3,

between related parties,[8] fails § 7701(o)'s requirements. (Br. 7-8; RFA 65 (Dkt. 76-8 at 23).)

Steps 1-3 introduced no new funds into Telenet Group, involved instruments that it otherwise

had no desire to use or create, and had no non-tax commercial or economic effect because

---

[8] LGI cites *Kraft*, which recognizes that transactions between related parties must be carefully scrutinized. *Kraft Foods Co. v. Comm'r*, 232 F.2d 118, 123, 126 (2d Cir. 1956) (transactions "cannot be disregarded for tax purposes merely because of the presence of a parent-subsidiary relation.") The question in *Kraft* was whether a taxpayer was entitled to a deduction for interest paid on debt. The majority concluded that the deduction was consistent with congressional intent. As we have explained, Congress's intent was far different here; Congress did not intend the § 245A deduction generated by Project Soy through commercially meaningless transactions.

Telenet Group remained 100 percent owned by TGH at all times. (*See, e.g.,* Dkt. 76 at 11-12.) The House Report's reference to the choice to use debt or equity does not mean the making of such a decision exempts what is otherwise an abusive transaction.

Likewise, Project Soy involved more than the choice to use a U.S. or foreign-formed entity to operate a foreign business. The House Report refers to *Siegel*, 45 T.C. 566, which concerned the 1958 tax year, before Congress created the subpart F regime. A U.S. taxpayer had created a Panamanian entity to conduct business abroad. The Tax Court found the taxpayer had "valid and substantial business reasons" for doing so that were consistent with what Congress had intended to permit at that time (before subpart F). *Id.* at 575. LGI, by contrast, concedes it had no substantial non-tax business purpose for Steps 1-3. (RFAs 4, 6, 8 (Dkt. 76-8 at 3-4).) LGI had no interest in minimizing *future* U.S. taxes on foreign operations, because it was transferring those operations outside the U.S. It sought to avoid tax on the accumulation of prior gains.

Tellingly, LGI's motion does not discuss the congressional intent behind the TCJA at all, let alone show that Congress intended the tax benefits manufactured by Project Soy. LGI was aware Congress did not intend the benefits Project Soy would create, if respected. The transactions were designed to exploit what LGI recognized was a "mismatch" that Congress or Treasury might try to fix by statute, through technical corrections, or by regulatory action. (*See* Dkt. 76 at 11.) LGI admits that before it made the final decision to execute Project Soy, it had been watching for legislative or regulatory changes to the applicable rules. (*See, e.g.*, RFA 51 (Dkt. 76-8 at 20).) A late December 2018 telephone call between CEO (Mike Fries) and Chairman (John Malone) focused on the fear that Congress or Treasury would act before year-end. (Penne Dep. at 349-50 (Dkt. 76-4).) LGI knew that Congress did not intend to allow

taxpayers to escape subpart F and GILTI via transactions like Project Soy, and waited to enact Project Soy to be sure that Congress did not fix the "mismatch."[9] After all, Congress intended a new regime for taxing international income—not a tax-free regime for international income.

### C. The Step Transaction Doctrine

The step transaction doctrine, as the Tenth Circuit recognizes, applies when a transaction contains unnecessary steps and creates tax benefits not present when following a straight path, but "reached by following a devious path." *Assoc. Wholesale Grocers*, 927 F.2d 1517, 1522 (10th Cir.) (citing *Minnesota Tea Co. v. Helvering*, 302 U.S. 609, 613 (1938)). Project Soy started with a U.S. taxpayer (LGI) holding a controlling interest in a Belgian company (TGH) that was within the U.S. "tax net." It ended (after Step 4) with a U.K. entity, Liberty Global plc, holding TGH, and LGI no longer having any ownership interest in TGH, putting it outside the U.S. tax net. The "straight path" for this result is Step 4, the transfer itself (what LGI has called the "TGH Transaction"). Had LGI followed that straight path, it would have paid tax on a $2.4 billion gain. But LGI inserted Steps 1, 2, and 3, which were wholly unnecessary to the actual

---

[9] LGI tax strategist Margit Archer explained that "technical corrections" have a particular meaning in tax law. (Archer Dep. at 135-36 (Dkt. 76-3) ("[W]hen Congress passes tax laws … if it becomes clear that there's a miss . . . something that was not what was intended in the law … they will issue new legislation to correct the previous legislation."); *see also*, Eleanor D. Wood, Note, Technically Important: The Essential Role of Technical Corrections and How Congress Can Revive Them, 106 Minn. L. Rev. 2543, 2562 (2022) (technical corrections are a legislative mechanism to allow a bill's language to be brought into alignment with congressional intent). To the extent that LGI contends that Project Soy is consistent with legislative intent, that argument falls flat. LGI suggests (Br. 18) that Congress intended the conjuring of E&P from the ether by repeatedly not repealing section 351(g), as Treasury had proposed. Whether or not § 351(g) should be repealed, its existence does not mean Congress intended it to be used in an abusive transaction. Nor is congressional inaction evidence of congressional intent. *Bob Jones University v. United States*, 461 U.S. 574, 600 (1983) ("Ordinarily, and quite appropriately, courts are slow to attribute significance to the failure of Congress to act on particular legislation").

transfer and in which LGI was not even a party. That is the "devious path" referenced in *Associated Wholesale Grocers*. The step transaction doctrine is well suited to deal with a transaction like Project Soy.

LGI suggests that the Tenth Circuit's test for the step transaction doctrine includes a requirement that the "devious steps" be only temporary, and must be "undone with subsequent steps." (Br. at 19.) Since Telenet Group did not liquidate, and continues in existence (albeit under the U.K. parent), LGI claims the doctrine is inapplicable. As an initial matter, Telenet Group's existence as an NV was transient, from LGI's perspective. LGI is the taxpayer and it is LGI's tax bill that is at issue. Except for achieving LGI's tax goals, there was no reason for Telenet Group to have converted to an NV for a fleeting forty-eight hours during the last few days LGI held it. (*See, e.g.*, Dkt. 76 at 6-7, 11; Dkt. 76-11 at 6-8 (discussing conversion's timing.)) But either way, the "end result" and "interdependence" tests outlined by the Tenth Circuit in *Kornfeld*, *Associated Wholesale Grocers*, and *True*[10] contain no such temporal element. That an intermediate entity was liquidated in *Associated Wholesale Grocers* does not mean every step transaction case must involve a liquidation. Indeed, our opening brief cited *Barnes Group, Inc. v. Comm'r*, T.C. Memo 2013-109, *aff'd* 593 F. Appx. 7 (2d Cir. 2014), a step transaction case involving an abuse of the subpart F regime in which the arrangement at issue was in existence after the tax years at issue. The step transaction doctrine, as applied in the Tenth Circuit (and all other circuits), is a flexible doctrine meant to disregard the tax benefits created by unnecessary steps inserted into a transaction solely to create tax benefits not intended by

---

[10] *See Kornfeld v. Comm'r*, 137 F.3d 1231, 1234 (10th Cir. 1998); *Assoc. Wholesale Grocers*, 927 F.2d at 1523; *True v. United States*, 190 F.3d 1165, 1174 (10th Cir. 1999).

Congress. Although the Court need not reach the step transaction doctrine if it finds the economic substance doctrine to be relevant to Project Soy, it bears noting that the House Report relied on so heavily by LGI includes citations, with approval, to several cases where the courts held that tax benefits created by transactions should be disregarded under both the economic substance and step transaction doctrines.[11]

Dated: August 31, 2023

DAVID A. HUBBERT
Deputy Assistant Attorney General

/s/ E. Carmen Ramirez
E. CARMEN RAMIREZ
THOMAS J. SAWYER
U.S. Department of Justice, Tax Division
P.O. Box 683, Ben Franklin Station
Washington, D.C.  20044
Tel:  (202) 514-8129 (Sawyer)
       (202) 616-2885 (Ramirez)
Fax: (202) 307-0054
Thomas.J.Sawyer@usdoj.gov
E.Carmen.Ramirez@usdoj.gov

*Attorneys for the United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2023, I served the foregoing document by filing it with the Court's CM/ECF system, which will send an electronic copy to all counsel of record.

/s/ E. Carmen Ramirez
Trial Attorney, U.S. Department of Justice

---

[11] *See, e.g.*, H.R. Rep., at 296 n.131 (citing *H.J. Heinz Co. and Subs. v. United States*, 76 Fed. Cl. 570 (2007); *Long Term Cap. Holdings LP v. United States*, 330 F.Supp.2d 122 (D. Conn. 2004), *aff'd*, 150 Fed. Appx. 40 (2d Cir. 2005).