IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge R. Brooke Jackson

Civil Action No. 1:20-cv-03501-RBJ

LIBERTY GLOBAL, INC.,

     Plaintiff,

v.

UNITED STATES OF AMERICA,

     Defendant.

---

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

---

     This matter is before the Court on the parties' cross-motions for summary judgement. Defendant's motion for summary judgment at ECF No. 75 is DENIED. Plaintiff's motion for summary judgment at ECF No. 76 is GRANTED.

## BACKGROUND

     Liberty Global, Inc. (LGI) is a multinational telecommunications company. LGI was advised on tax matters by Deloitte, LLC. In June 2018, Deloitte approached LGI about an opportunity to exploit a perceived opportunity in the international tax provisions of the 2017 Tax Cuts and Jobs Act, Pub. L. No. 115-97, 131 Stat. 2054 (TCJA). This loophole was an apparent "mismatch" (as LGI's tax professionals called it) between (1) the rules for paying tax on global intangible low taxed income (GILTI) and subpart F tax on a gain generated by a controlled foreign corporation (CFC), and (2) the qualification of an entity as a CFC. *See, e.g.*, ECF No. 76-4 at 96-97 (deposition of LGI's "vice president of group tax strategy," Shawn Penne). In

1

short, a foreign corporation not directly owned by any U.S. person might qualify as a CFC for U.S. tax purposes because ownership may be "attributed" to a U.S. person, but only CFCs with an actual U.S. shareholder on the last day of the taxable year are subject to GILTI or Subpart F.

With Deloitte's assistance, LGI planned a four-step series of transactions, code-named "Project Soy," which was specifically designed to take advantage of the TCJA's "mismatch." Project Soy would allow LGI to avoid GILTI and capital gain taxes on billions of dollars of unrealized gain from LGI's interest in one of its sub-entities. The scheme was designed to generate enough artificial earnings and profits (E&P) --which, but for the mismatch, would have been taxed under subpart F or GILTI -- to offset LGI's taxable gain on Step 4 of the plan, "the TGH Transaction."[1]  In the TGH transaction, which occurred in December 2018, an LGI affiliate sold its interest in Telenet Group Holding (TGH), a Belgian company, to LGI's parent company, Liberty Global (based in the UK).  The income from the TGH transaction is the income now at issue.

Under the relevant tax laws at the time, LGI was required to recognize income equal to its share of gain from the TGH transaction.  It sought to deduct that income using § 245A of the TCJA..  In June 2019, Treasury issued temporary regulations addressing the international tax changes made by the TCJA.  LGI filed a consolidated federal income tax return for its 2018 tax year on October 11, 2019, then filed an amended return on December 23, 2019.  The initial

---

[1] In Steps 1-3, LGI manufactured $4.8 billion of E&P for TGH.  Steps 1 and 3 generated E&P for TGH by issuance of profit certificates from Telenet Group (the operating subsidiary) to TGH.  Steps 2 and 3 generated E&P for TGH by creating "springing to life debt"—by converting Telenet Financing into a direct subsidiary of TGH rather than an indirect subsidiary through Telenet Group, and then making Telenet Group a separate entity for tax purposes.  Generating E&P was important because the proceeds from the sale of a CFC (the transfer of LGI's interest in TGH to Liberty Global in Step 4 of Project Soy) could be treated as a dividend "to the extent of the [CFC's] E&P" under §§ 964(e)(1) and 1248(a).  ECF No. 76-13 at 3 (quoting an internal LGI memo).  In other words, if TGH had sufficient E&P, LGI could treat its gain as a dividend and offset the entire $2.4 billion by claiming a § 245A deduction.

return reported the fourth step of Project Soy in a manner that was consistent with the temporary Treasury regulations.  The amended return adopted the position that the regulations were invalid and claimed a refund of $95,783,237 as a result.

LGI claims that it met the requirements to receive the § 245A deduction for the TGH transaction.  However, because the temporary regulations, adopted in June 2019, were made retroactive, LGI did not receive the full deduction.  After LGI filed its amended return claiming a federal income tax refund, the IRS began to review LGI's Project Soy transactions.  LGI produced some, but not all, of the information requested.  On November 19, 2020 the IRS issued a delinquency notice to LGI regarding the missing information and included a deadline of November 27, 2020 to respond to the notice before the IRS might seek to issue and enforce a formal summons for the information in a federal court proceeding.

On November 27, 2020 LGI filed a complaint in federal district court seeking a refund of approximately $110 million that it alleges to have overpaid for its 2018 year.[2]  Because it still had not provided the information sought by the IRS, the United States answered that discovery was necessary to determine the extent of LGI's earnings and profits and the nature of the transactions.

On April 4, 2022 this Court granted in part LGI's motion for summary judgment, concluding that the 2019 temporary Treasury regulations did not comply with the requirements of the Administrative Procedure Act and therefore did not have valid retroactive effect over the

---

[2] Tax litigators apparently are starting to recommend strategies for bypassing the administrative process (filing a tax return claiming a benefit and then undergoing an audit if selected) by instead paying the tax and then bringing a section 7422 refund suit in federal court.  *See* ECF No. 26 at 2 (citing ECF No. 26-1 at 4, "*Skadden Insights: Challenging Tax Cuts and Jobs Act Regulations and IRS Guidance*" (1/21/2020)).

transactions occurring in LGI's 2018 tax year, but denying the motion "to the extent that factual questions remain on LGI's compliance with the underlying tax laws in the TGH transactions." *Liberty Global, Inc. v. United States,* No. 1:20-cv-03501-RBJ, 2022 WL 1001568, at *7 (D. Colo. April 4, 2022).

LGI moved to dismiss the amended complaint in a related case, arguing that the government "failed to comply with the statutory prerequisites necessary to bring its lawsuit." Case No. 1:22-cv-02622-RBJ, ECF No. 24 at 1. This Court found that the requirements to which LGI referred in that motion did not apply and therefore denied the motion to dismiss. *United States v. Liberty Global, Inc.,* No. 1:22-cv-02622-RBJ, 2023 WL 4603954, at *2-5 (D. Colo. June 1, 2023).

The United States now contends that LGI is not entitled to the tax refund that it seeks in this proceeding because the economic substance doctrine (or alternatively, the step transaction doctrine) dictates that Steps 1-3 of Project Soy should be disregarded when calculating LGI's tax obligations. LGI argues that neither doctrine should apply, and therefore, that the E&P generating steps, which permitted the § 245A deduction for the TGH transaction, should be given effect. Both parties assert that the facts relevant to the analysis of whether and how the economic substance doctrine applies are not contested, and that this lawsuit can be resolved as a legal matter. *See* ECF No. 70 at 2 (joint letter of intent to file for summary judgment).

I find that the economic substance doctrine does apply, and that its application provides that LGI cannot properly claim the § 245A deduction. Therefore, I do not reach analysis as to the step transaction doctrine.

## LEGAL STANDARD

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party. *Id.* However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

Rather, the nonmoving party must offer "specific facts that would be admissible in evidence in the event of trial, from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Stated differently, the party must provide "significantly probative evidence" supported by materials such as "affidavits, deposition transcripts, or specific exhibits incorporated therein" that would support a verdict in her favor. *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). Where different ultimate inferences may be drawn from the evidence presented by the parties, substituting "the sterile bareness of summary judgment" for the advantages of trial before a live jury with live witnesses is not appropriate. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 176 (1970) (Black, J., concurring); *see also Brown v. Parker-Hannifin Corp.*, 746 F.2d 1407, 1411 (10th Cir. 1984).

## ANALYSIS

The United States contends that LGI is not entitled to the tax refund that it seeks in this proceeding under the economic substance doctrine or alternatively, the step transaction doctrine. ECF No. 76. The economic substance doctrine analysis resolves this dispute.

The economic substance doctrine is one variation of the common law doctrine of "substance over form," which instructs courts to effectuate the "plain intent of the relevant statutory regime"—in this case, the tax code—by viewing transactions in terms of their "objective economic realities" rather than their technical compliance with statutory requirements. *See Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978) (concluding that the economic substance doctrine applied to a sale-and-leaseback transaction by looking "to the objective economic realities of a transaction rather than to the particular form the parties employed"). In the tax context, the doctrine permits courts to ignore transactions that are "mere device[s]" for tax avoidance. *See Gregory v. Helvering*, 293 U.S. 465, 468-70 (1935) (refusing to give effect to a corporate reorganization that "technically complied" with statutory requirements but that the Court found had "no business or corporate purpose" other than to transfer corporate shares to the petitioner).

The doctrine is codified in 26 U.S.C. § 7701(o), which provides in relevant part that "[i]n the case of any transaction to which the economic substance doctrine is relevant, such transaction shall be treated as having economic substance only if (A) the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, and (B) the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction."

The legislative history of § 7701(o) clarifies that the doctrine "involves a conjunctive analysis." H.R. Rep. 111-443 at 297. In other words, for the economic substance doctrine to apply, the transaction must satisfy both prongs of the statutory test—the transaction "must change in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, and the

taxpayer must have a substantial non-Federal-income-tax purpose for entering into such transaction." *Id*.  This clarification in the House Report was intended to "eliminate[] the disparity" in application of the doctrine between federal circuit courts that applied the test conjunctively and courts that applied the test disjunctively.  *See id*.

"The ultimate determination of whether a transaction lacks economic substance is a question of law."  *Sala v. United States*, 613 F.3d 1249, 1252 (10th Cir. 2010), as amended on reh'g in part, (10th Cir. Nov. 19, 2010) (citing *James v. Comm'r*, 899 F.2d 905, 909 (10th Cir. 1990) ("[W]e review de novo the ultimate characterization of the transactions as shams.")); *see also Frank Lyon*, 435 U.S. at 581 n. 16 ("The general characterization of a transaction for tax purposes is a question of law….").

Application of the provision here requires resolution of several issues: (1) whether the doctrine is "relevant" to this set of facts within the meaning of the statute's prefatory clause; (2) the appropriate level of granularity to be used in selecting the transaction or set of transactions to be analyzed; (3) whether any exemptions exist, and if so, whether they apply here; and (4) whether the conjunctive test—the transaction had no meaningful non-tax effect and the taxpayer had no subjective non-tax purpose—is satisfied here.

1. Relevance of the doctrine.

LGI argues in effect that the prefatory clause in § 7701(o)—"[i]n the case of any transaction to which the economic substance doctrine is relevant"—should be distinguished from the operative clause—"a transaction is disregarded for tax purposes unless … [it meaningfully changes the taxpayer's non-tax economic position and was conducted with a substantial non-tax purpose]"— and given independent effect.  *See* ECF No. 75 at 7.  LGI would have the Court view the prefatory clause as an instruction to conduct a threshold analysis into whether the doctrine is "relevant" to the transaction at issue, and then only if the threshold is met, to continue into the two-pronged inquiry set

7

out in the operative clause of the statute.  *See id*. ("For purposes of this motion, LGI is not arguing that the Entity Conversion satisfies that two-pronged test.  Instead, LGI asks the Court to decide the threshold legal question of whether the ESD is 'relevant' to the Entity Conversion [step 3 of Project Soy]").

LGI relies on a House Report for the proposition that the legislative intent was to explicitly limit the types of transactions to which the ESD would be "relevant".  *See, e.g.*, ECF No. 75 at 4 (citing H.R. Rep. No. 111-443, 296 (2010).  However, contrary to LGI's interpretation, the House Report emphasizes that "the economic substance doctrine *becomes applicable*, and a judicial remedy is warranted, where a taxpayer seeks to claim tax benefits, unintended by Congress, by means of transactions that serve no economic purpose other than tax savings."  H.R. Rep. No 111-443, 292 (citing *ACM P'ship v. Comm'r*, 157 F.3d 231 (3d Cir. 1998), aff'd 73 T.C.M. (CCH) 2189 (1997), cert. denied 526 U.S. 1017 (1999)) (emphasis added).  The ordinary meaning of the report's statement that the doctrine "becomes applicable" under certain circumstances strongly suggests that the doctrine is "relevant" within the meaning of the statute under the same circumstances.  This statement in turn suggests that the doctrine's relevance is coextensive with the statute's test for economic substance, provided by the operative clause.

Moreover, the conclusion that there is no threshold "relevance" inquiry that precedes the inquiry described in the operative clause—is consistent with the interpretations of the Supreme Court and courts in the Tenth Circuit.  *See, e.g., Blum v. Comm'r*, 737 F.3d 1303, 1309 (10th Cir. 2013) (citing *Jackson v. Comm'r*, 966 F.2d 598, 601 (10th Cir. 1992)) (describing the "doctrinal framework" of the economic substance doctrine as "fairly straightforward" and instructing courts to "ask two questions: (1) what was the taxpayer's "subjective business motivation," and (2) did the transaction have objective economic substance?").  The Tenth Circuit there conspicuously omits any mention of a threshold inquiry or a separate or additional question that courts must resolve in

applying the economic substance doctrine.  To manufacture an additional question here—which as LGI argues would then short-circuit the entire statutory analysis—would contravene the Tenth Circuit's instructions and frustrate the purpose of the doctrine itself.

Instead, courts characterize the ultimate inquiry into economic substance as asking whether a transaction's benefits violate the legislative intent.  *See*, *e.g.*, *Gregory*, 293 U.S. at 467 (disregarding a corporation's "so-called reorganization" because it "was nothing more than a contrivance" to evade taxes, and therefore lay "outside the plain intent of the statute").  Certain circumstances raise "red flags" that a transaction lacks economic substance and correspondingly violates Congress's intent, "such as when a transaction produces enormous tax savings without a concomitant economic loss, or when something 'smack[s] of a too-good-to-be-true transaction' and lacks 'an appreciable effect, other than tax reduction.'"  *Blum*, 737 F.3d at 1310 (quoting *James*, 899 F.2d at 908).

The two prongs enumerated in § 7701(o) reflect in the most inclusive terms the situations that violate congressional intent for lack of economic substance: when a taxpayer intentionally enters a transaction that serves no purpose other than tax evasion with the sole purpose of evading taxes.  The statutory prongs are not inconsistent with the more specific "red flags" such as those described above, and in fact those red flags either rephrase the statutory factors or inform analysis of the two statutory prongs as useful sub-inquiries.  For example, the fact that a transaction "lacks an appreciable effect, other than tax reduction" is equivalent to the statutory prong describing the inquiry into the transaction's objective purpose (or lack thereof), and the fact that a transaction "produces enormous tax savings without a concomitant economic loss" is a fact suggestive of both the taxpayer's subjective intent and the objective purpose of the transaction.

At the risk of tautology, I proceed with the conclusion that the economic substance doctrine applies when a transaction lacks economic substance.  The question of whether the doctrine lacks economic substance is equivalent to the question of whether the tax benefits achieved in the

transaction violate congressional intent and is analyzed using the enumerated statutory prongs—which are in turn elaborated and informed by the "red flags" that courts have long described.  *See Blum*, 737 F.3d at 1310 (quoting *James*, 899 F.2d at 908-09) (emphasizing that the "two [statutory] factors, rather than being independent prerequisites to finding an absence of economic substance, are simply 'more precise factors to consider' in that analysis").  There is no "threshold" inquiry separate from the statutory factors.

       2.   <u>Unit of analysis</u>.

The next question is whether, as LGI argues, the Court's analysis should isolate Step 3 of Project Soy—the "entity conversion" in which Telenet Group converted from a BVBA to an NV under Belgian law[3]—or whether, as the government argues, the analysis should consider the steps of Project Soy collectively.  *Compare* ECF No. 75 at 9 *with* ECF No. 75 at 15; *see also Sala*, 613 F.3d at 1252 ("Before analyzing the question of economic substance, [the] court must first determine which transactions control the inquiry.").

The transaction to be examined in an economic substance doctrine analysis is "the transaction that gave rise to the alleged tax benefit."  *Sala*, 613 F.3d at 1252 (citing *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1356 (Fed. Cir. 2006)).  LGI argues here that, because the tax benefit at issue—"the generation of E&P"—was "created by the Entity Conversion" at Step 3 of Project Soy, that step in isolation "is the transaction to be examined."  ECF No. 75 at 9.  This argument is without merit.

First, Step 3 was not the only step in the transaction that generated E&P—Step 2 also generated "springing to life debt" that created E&P.  Second, generating E&P is not itself a tax

---

[3] BVBAs are akin to limited liability companies in the U.S. and usually are not taxed as separate entities (i.e., they are "disregarded"); NVs are akin to corporations in the U.S. and are considered separate entities for tax purposes.  ECF No. 76 at 5-6.

benefit.  It is a component required to take advantage of the "mismatch" that caused the benefit—in which "a corporation might claim CFC status, [and] yet have no U.S. shareholders to pay GILTI and subpart F tax at year-end."  ECF No. 76 at 5.  The generation of "artificial E&P" that could be used to offset the taxable gain on the TGH transaction was economically feasible for LGI only because of the mismatch.  Creation of the mismatch would not have produced a tax benefit without the generation of E&P, and generation of E&P would not have produced a tax benefit without also establishing the mismatch.  To treat a *necessary* step of the transaction as *sufficient* to produce the transaction's full effect, as LGI proposes, would be logically unsound.

Moreover, to artificially isolate Step 3 from the remainder of the scheme here would contravene the legislative intent of § 7701(o), which was for courts to conduct "necessarily flexible" analyses to effectuate the tax rules.  *Blum*, 737 F.3d at 1311; *see also* H.R. Rep 111-443 at 295 (noting that "a strictly rule-based tax system" cannot prevent all unintended consequences and that courts may therefore "supplement tax rules with anti-tax-avoidance standards, such as the economic substance doctrine, *in order to assure the Congressional purpose is achieved*") (emphasis added).  Congress emphasized that courts may "aggregate, disaggregate, or otherwise recharacterize a transaction when applying the doctrine" to effectuate that purpose.  H.R. Rep. 11-443 at 297.

In *Sala*, the Tenth Circuit held that the district court had erred in including in the economic substance analysis a later segment of Sala's participation in the "Deerhurst Program," when the "only transaction that relate[d] to the $60 million tax loss Sala [sought] to claim" was an earlier segment of participation in the program that had "no connection" to the later segment, there was "a clear break between each phase," and the later phase "had no tax benefits."  613 F.3d at 1252.  Here, by contrast, it is appropriate to aggregate the entity conversion step of Project Soy with the other steps of the transaction.  *Cf. id*.  Unlike the taxpayer's participation in two phases of the Deerhurst Program in *Sala*, only one of which produced the asserted tax benefit, Steps 1 through 3 here each "related" to

11

the tax loss that LGI seeks to claim, since each was a component of the carefully choreographed creation of the TCJA mismatch.  *Cf. id.*  Far from having "no connection" to one another or being divided by "clear break[s]" in time between phases, as in *Sala*, the steps of Project Soy were executed in a four-day period in December 2018 and were "so integrated" that LGI admits that it is "unlikely that Steps 1, 2, and 3 would have been taken except in contemplation of the TGH transaction in Step 4."  ECF No. 76-8 at 6 (admissions 13(b) and 14(b) by LGI); *cf. Sala*, 613 F.3d at 1252-53.

Just as the Second Circuit in *Bank of New York Mellon Corp. v. Commissioner* affirmed the district court's authority there to *segregate* "a routine transaction [from] a transaction lacking economic substance" to avoid stymying the doctrine's purposive application by an arid formalism, 801 F.3d 104, 121 (2d Cir. 2015), the Court here may use its authority to *aggregate* interrelated transactions to likewise avoid frustrating the doctrine's purpose.  Therefore, the Court rejects LGI's invitation to conduct the economic substance analysis with an artificially narrow focus on Step 3 of Project Soy, and instead considers whether Steps 1, 2, and 3 together should be recognized for tax purposes (affording LGI the claimed deduction) or disregarded for lack of economic substance.

3.   Exemptions.

The next question is whether the transaction at issue here is exempted from the economic substance doctrine either explicitly or by analogy to statutorily enumerated exceptions.  LGI argues first by analogy to certain permissible tax-motivated decisions that this business transaction must necessarily fall outside the scope of § 7701(o).  *See* ECF No. 75 at 2 (arguing that "in some cases, the tax consequences of a transaction are intended to be respected even where the transaction only has tax effects" and citing as an example that "married couples can elect to file a joint tax return or separate tax returns each year—a purely tax-motivated decision that affects the couple's tax but is nonetheless respected").

12

This argument makes little sense.  The economic substance doctrine applies to "*transactions that have no business purpose or economic substance beyond tax evasion.*"  *Schussel v. Werfel*, 758 F.3d 82, 97 (1st Cir. 2014) (emphasis added); see also *Blum*, 737 F.3d at 1309 (introducing its discussion of the economic substance test by asking "how, exactly, should a court determine whether a *transaction* possessed objective economic substance?") (emphasis added).  Filing taxes—jointly or individually—is not a "transaction."  *Cf.* 26 U.S.C. § 7701(5)(B) (noting that the economic substance doctrine does not apply to the personal activities of individuals but rather "only to transactions entered *into in connection with a trade or business or an activity engaged in for the production of income*") (emphasis added).

Moreover, because filing taxes jointly with one's spouse for a tax advantage does not "upon its face lie[] outside the plain intent" of the tax code, it does not implicate the core purpose of the economic substance doctrine: to prevent business organizations from entering schemes to evade taxes under circumstances in which Congress would have intended that the laws apply.[4]  *See Gregory*, 293 U.S. at 470.  In contrast to the situation in *Gregory*—in which the Court disregarded a corporate reorganization that was a "mere device," because the new corporation, although validly created, was "nothing more than a contrivance" for tax evasion—there is typically no suggestion that a person's marital status is a mere device or contrivance intended solely or primarily for tax benefits.  *Cf. id.*

Here, like in *Gregory* and unlike in LGI's example of spouses filing taxes jointly, the transaction at issue violated congressional intent.  *See* ECF No. 46 at 2 (this Court's explanation that § 245A "works in concert with … GILTI" and that "these sections combine to form the basis of the

---

[4] Similarly, LGI's citation to *Summa Holdings, Inc. v. Commissioner,* 848 F.3d 779, 788 (6th Cir. 2017), for the proposition that "a taxpayer has a right (and even a duty) to choose how an entity is taxed 'based solely on tax-reduction considerations,'" ECF No. 75 at 12 (and described by counsel during oral argument as LGI's best case) is unpersuasive.  The notion that to limit taxpayers' abilities to evade taxes would infringe upon their rights is simply contrary to the meaning and purpose of the economic substance doctrine.

new participation-exemption tax system"); *see also* ECF No. 76 at 15-16 (explaining how Project Soy was designed to, and does, unlink the § 245A deduction from the "appropriate anti-base erosion safeguards" that the legislature intended).

The related argument that Project Soy is one of the "basic business transactions" that the legislature intended to exempt from application of the economic substance doctrine likewise fails under minimal scrutiny. *See* ECF No. 75 at 2-3 (quoting H.R. Rep. No. 111-443 at 296) (noting that "the ESD does not apply to '*basic business transactions* that, under longstanding judicial and administrative practice are respected, merely because the choice between meaningful economic alternatives is largely or entirely based on comparative tax advantages'") (emphasis added). As discussed in the previous section, the transaction at issue here is not merely the entity conversion that Telenet Group underwent at Step 3, but rather the full choreography of sub-transactions that occurred in Steps 1 through 3. It is absurd to imagine that Deloitte would be consulted to devise and carry out a "basic business transaction" within any ordinary or comprehensible use of the phrase, and no reasonable factfinder could characterize Project Soy as such.

LGI argues alternatively that because the entity conversion fits within the exception for "organizations of a corporate entity" enumerated in the committee report, the series of transactions falls outside the scope of the economic substance doctrine. *See* ECF No. 75 at 10-11 (citing H.R. Rep. 111-443 at 296). This argument is flawed in several respects. First, the statute contains no express exceptions, and the list of "exemptions" to which LGI refers appear only in the committee report as illustrations of the broader concept of "basic business transactions."[5] As I conclude above, Project Soy is not a "basic business transaction," and therefore, that exception does not apply here.

---

[5] The exemptions noted in the report are as follows: (i) choice of capitalization of a business, (ii) choices between foreign and domestic entities; (ii) organizations of a corporate entity; and (iv) choice to use related parties. H.R. Rep. 111-443 at 296.

Second, the committee report states that "a transaction or series of transactions that *constitute* a corporate organization or reorganization" might represent the type of basic transaction exempt from application of the doctrine.  H.R. Rep. 111-443 at 296.  The report does not state or imply that any transaction that merely *includes* a reorganization is likewise exempt.  There is no basis to conclude from the fact that one step of Project Soy might fall within an exception that the transaction in aggregate—the appropriate unit of analysis here—should be excepted.[6]

Third, precedent suggests that exceptions are construed narrowly and given limited effect when they would contravene effectuation of the doctrine's purpose.  *See*, *e.g.*, *Gregory*, 293 U.S. at 470 (disregarding under the economic substance doctrine a corporate reorganization, notwithstanding that the transaction itself constituted the type of "corporate organization" identified by the legislature in the committee report as an example of an exception).  Here, at most two sub-transactions of Project Soy relate to a corporate reorganization (the transfer of subsidiaries and the entity conversion), as opposed to the entire transaction in *Gregory*.  Furthermore, here, the explicitly admitted tax motivations of the scheme implicate the economic substance doctrine at least as strongly as did those in *Gregory*.  I therefore conclude that, as in *Gregory*, the legislature's "basic business transaction" exception does not preclude application of the economic substance doctrine here.  *See* 293 U.S. at 470.  None of the examples of transactions suggested in the committee report as meriting respect notwithstanding their tax motivations or consequences applies here, since Project Soy was

---

[6] The government stated at oral argument that its strongest case for the proposition that the economic substance doctrine can apply to a corporate reorganization is *Coltec Industries, Inc. v. United States*, 454 F.3d 1340 (Fed Cir. 2006).  While *Coltec* could support the notion that a reorganization step somewhere in the broader transaction does not preclude application of the economic substance doctrine, the court there excluded the corporate reorganization step of the scheme from the economic substance analysis. The court there effectively rejected the argument that the doctrine could not apply to a corporate reorganization as irrelevant.  Here, by contrast, the economic substance inquiry includes the reorganization step.  This Court—by reference to the legislative history and caselaw emphasizing courts' latitude in effectuating Congress's purpose—reaches the same conclusion as the government on this issue but finds *Coltec* relatively unpersuasive in doing so.

not merely a simple business operation but rather a coordinated series of simpler steps (as most complex transactions are). To apply the exemption for "basic business transactions" here would allow the exception to swallow the rule. I decline to do so.

       4. <u>Application of the two-prong test</u>.

The final question at this stage is whether there is a genuine dispute of fact as to whether either "the transaction at issue changed in a meaningful way (apart from Federal income tax effects) LGI's economic position" or whether LGI "had a substantial non-Federal-income-tax purpose for entering into such transaction." *See* H.R. Rep. 111-443 at 297. Since the statutory test is conjunctive, *see id.*, a fact issue as to either prong is sufficient to render summary judgment inappropriate.

On the first prong, LGI admits that each of Steps 1 through 3 "did not change, in a meaningful way, LGI's economic position." ECF No. 76-8 at 3-4. LGI does qualify those responses by noting that Steps 1 through 3 each "had non-tax consequences, including consequences under Belgian corporate law." *See id.*[7] However, the fact that a given operation had some "consequences" under Belgian law does not mandate or imply that it "meaningful[ly]" changed LGI's economic position, and while the Court must at summary judgment draw logical inferences in favor of the non-movant, it need not gap-fill assertions with unfounded inferences.

Therefore, the specific admission as to the first prong controls over the gesture to unenumerated and unexplained "consequences." If none of the steps in isolation meaningfully changed LGI's position, and since LGI provides no basis to infer that the steps cohered toward a broader, non-tax-related effect, it follows that those steps in aggregate (the focus of analysis here) did

---

[7] During the oral argument, however, LGI retreated from that qualification and admitted that both prongs of the statutory test do apply to Project Soy.

not change LGI's position in a meaningful, non-tax-related way.  Thus, there is no genuine dispute of fact as to the first statutory prong.

On the second prong, LGI admits that each of Steps 1 through 3 "served no substantial non-tax purpose for LGI."  ECF No. 76-8 at 3-4.  The fact that LGI "did not direct Telenet Group Holding to enter into" the transaction makes no difference in this analysis.  Project Soy was coordinated among LGI, Telenet, and TGH.  *See*, *e.g.*, ECF No. 76-3 at 40:16-20 (Magit Archer admitting in a deposition that "the idea for profit certificates [came] from Liberty Global," but that the profit certificates were actually "issued by Telenet BVBA"); *see also* ECF No. 76-7 at 71-72 (Karl Abelhausen explaining in a deposition that there was no reason for Telenet Group to reduce TGH's capital in October 2018 other than to facilitate issuance of profit certificates under Project Soy). Therefore, it is appropriate to consider LGI's intent as to the effect of the transaction, even if it did not formally execute every step but rather merely orchestrated and facilitated the process.

LGI in its brief asserts that compliance with "Belgian corporate law requirements" was a substantial non-tax purpose for Steps 1 through 3 of Project Soy, within the meaning of the second prong.  *See* ECF No. 76-8 at 14-16 (for example, denying the government's request for admission that "conversion of Telenet Group BVBA to Telenet Group NV in Step 3 was not in furtherance of any non-tax purpose" and responding that Step 3 "was in furtherance of non-tax purposes, including Belgian corporate law requirements").[8]  This argument is inadequate to raise a genuine issue of material fact as to whether LGI had a substantial non-tax purpose for the transaction in aggregate.

First, LGI's response provides no indication what the Belgian law was or how the entity conversion, the issuance of profit certificates, or the restructuring of subsidiary entities was necessary to promote compliance with that law.  Second, the statement that an action was "in furtherance" of

---

[8] Again, this position was essentially abandoned during the oral argument.  *See supra*, n. 7.

17

some end does not suggest that the end was a "substantial purpose" for the action, or that the actor even knew of the end when initiating the action.  It seems here that LGI carefully worded its response to the government's Request for Admission to say the former while suggesting the latter.  In fact, the evidence suggests that when LGI's board decided to enter Project Soy, it did not discuss (or apparently, even know of) the changes in Belgian law that it now claims the transaction "further[ed]."  *Compare id*. (LGI's response to the government's Request for Admission) *with* ECF No. 76-7 at 66-68 (LGI's representative, Karl Abelshausen, testifying at his deposition that the board meeting about whether to approve Project Soy did not include any mention of the upcoming changes in Belgian law, and that LGI's legal team brought those changes to the attention of the board at a "much later" meeting).

Similarly, LGI's gestures to the attendant benefits of the sub-transactions in each of Steps 1 through 3—such as the ability to issue profit certificates by converting Telenet Group from a BVBA to an NV, or the acquisition of preferential distribution rights through the issuance of profit certificates—are inadequate to suggest that those consequences were a "substantial purpose" for entering the transaction, and moreover, are inconsistent with the "economic realities" of the situation that the Court is instructed by precedent to consider.  *See Gregory*, 293 U.S. at 468.  For example, because TGH owned Telenet Group, it did not need preference against itself, etiolating any need for issuance of profit certificates or preferred stock.  This reality suggests that achieving distribution preference was not a substantial purpose for entering the transaction.

Instead, it appears that the only substantial purpose of the transaction was tax evasion.  *See* ECF No. 76-8 at 5 (LGI admitting that "from its perspective, the primary purpose of Steps 1, 2, and 3 of the Transactions was to 'generate earnings and profits' for use in Step 4" and adding only that Step 1 was also undertaken to comply with Belgian law).  LGI's *ex post* arguments about the possible benefits that the profit certificates and entity conversion provided are inadequate to raise a genuine

18

fact issue about whether those consequences were a "substantial purpose" for those operations, when the evidence demonstrates that LGI either did not know of the benefit when making the decision, did not discuss it as a reason to engage in the overall transaction, or did not achieve the cited benefit from the transaction in reality.

Circumstantial evidence corroborates the admission that LGI's intent in undertaking Project Soy was to obtain tax benefits. *See Sala*, 613 F.3d at 1253 (holding that it was "clear" that the transaction at issue lacked economic substance and emphasizing that the "most compelling" factor suggesting the intent to evade taxes was that the "transaction was designed primarily to create a reportable tax loss that would almost entirely offset Sala's 2000 income with little actual economic risk"). Here, like in *Sala*, the transaction was designed to offset the $2.4 billion gain from the TGH Transaction by generating a nearly equivalent amount of E&P that could be used to convert the gain to a dividend. *See* ECF 76-3 at 89 (Archer testifying that "there was more E&P than there was gain by about $99 million"). The temporal coincidence between the generation of E&P and the sale and the close equivalence in their value permit the court to conclude that the project was "structured from the outset" not to yield any meaningful economic benefits to the company but rather as an artifice for tax benefits. *See Sala*, 613 F.3d at 1253.

Finally, even if an isolated step *did* provide objective benefits for LGI, it does not follow that the achievement of that outcome was a "substantial" non-tax purpose for the entire scheme. *See* ECF No. 76-8 at 5 (LGI characterizing Project Soy as a "*unitary plan*" intended "to achieve [LGI's] expected U.S. federal income tax treatment") (emphasis added). The economic substance inquiry is not a mathematical aggregation of isolated attendant benefits of sub-transactions; it is an inquiry into the interactions between the sub-transactions and what those interactions reveal about the transaction's overall purpose. *See Blum*, 737 F.3d 1312 (rejecting the taxpayers' argument that "because Dr. Hodder testified that each step of OPIS [the transaction] had economic substance, and

that there was an 'enormous possible upside' to OPIS," the overall transaction presented a reasonable chance of turning a profit and therefore had economic substance, because to accept that argument would require the court "to look not at the forest but at the trees"); *see also WFC Holdings Corp. v. United States*, 728 F.3d 736, 746 (8th Cir. 2013) (rejecting an effort to justify a basis-inflating scheme by "isolat[ing] a kernel of prospective profitability to justify a large, multi-step, multi-property transaction")

Here, as in *Blum* and *WFC Holdings*, even if there was a possible kernel of purpose or a prospective "upside" to any of the steps—for example, accepting LGI's assertion that compliance with Belgian law was considered a motivation, or that the profit certificates would allow LGI some preference in Telenet's distribution rights and that this would matter even though LGI owned Telenet—the isolated benefits of one step cannot be extrapolated to a conclusion that those benefits were even related to the overall purpose of the transaction, let alone that they were a substantial purpose for the transaction. *See id*.

Such an extrapolation would be particularly unfounded in the context of the "unitary plan" of Project Soy. ECF No. 76-8 at 5. There would be little reason for LGI to conceive of the first three steps as part of a larger "project" culminating in the sale of TGH to Liberty Global, if those first three steps were unrelated to the sale and were in fact in pursuit of entirely separate ends—ranging from distribution rights to Belgian corporate compliance. To accept the potential for preferential distribution rights, for example, as a rationale for the machinations of reorganization and conversion that took place in the same transaction would be similarly to "isolate a kernel" of benefit to the taxpayer and extrapolate without any logical or factual basis to an inference about the broader transaction. *WFC Holdings*, 728 F.3d at 746.

LGI has not created a genuine issue as to whether the entire multi-step transaction took place for any substantial reason other than tax evasion. The direct and circumstantial evidence establish

20

only the tax-avoidant purpose for the scheme.  LGI's suggested alternative non-tax purposes for the individual steps are contradicted by the testimony of its own representatives, and in any event, simply do not make sense as justifications for the full transaction.  Therefore, because there is no genuine issue of fact as to either the first or second prong, and both prongs resolve in favor of the application of the economic substance doctrine, it is appropriate as a matter of law to apply the doctrine here and to disregard Steps 1 through 3.

When Steps 1 through 3 are disregarded, the noneconomic E&P generated in the § 351 transaction are not recognized and cannot be used to support the § 245A deduction.  Step 4, the TGH Transaction, would then result in $2.4 billion of taxable gain.  As a matter of law, LGI is not entitled to the deduction at issue here.

## ORDER

For the reasons above, the government's motion for summary judgment at ECF No. 76 is GRANTED.  LGI's motion for summary judgment at ECF No. 75 is DENIED.  Final judgment will enter accordingly.

DATED this 31st day of October, 2023.

BY THE COURT:

_____
R. Brooke Jackson
Senior United States District Judge